**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-60834-Singhal

WERNER JACK BECKER, DANA
GUIDA, individually and on behalf of
others similarly situated,

       Plaintiffs,

v.

CITIGROUP INC.  d/b/a CITIBANK and
CITIBANK, N.A.,

       Defendants.

---

**MEMORANDUM IN SUPPORT OF CITIGROUP INC. AND CITIBANK, N.A.'S**
**INCORPORATED MOTION TO DISMISS**
<u>**PURSUANT TO RULE 12(B)(1) AND 12(B)(6)**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ....................................................................................................... 3

FACTUAL BACKGROUND ............................................................................................... 5

ARGUMENT ...................................................................................................................... 8

I.      The Court Lacks Jurisdiction Because Plaintiffs Have Not Alleged (or Shown)
        That the Financial Institutions Where They Bank Are "Able and Ready" to
        Participate in the ATM Community Network, as Required for Article III
        Standing. .............................................................................................................. 8

        A.      Financial Institutions Where Plaintiffs Bank Must be "Ready and Able" to
                Join Citibank's Network. ........................................................................... 8

        B.      Financial Institutions Where Plaintiffs Bank Also Need to Encounter a
                Racial Obstacle. ....................................................................................... 13

II.     Plaintiffs Fail to State a Claim under Section 1981. .......................................... 15

        A.      Plaintiffs Have Not Pleaded Discrimination Based on Their Own Race............. 15

        B.      Section 1981 "Associational Discrimination" Claims Still Require a
                Showing of Discrimination Based on the Plaintiff's Race. ................................ 17

        C.      Plaintiffs Fail to Plead Sufficient Facts to Support Their Supposed
                Association........................................................................................................ 20

        D.      Plaintiffs Do Not Allege Any Discriminatory "Contract" That They Can
                Invoke. ............................................................................................................. 21

III.    These Plaintiffs Cannot Assert a California-Unruh Act Claim. ....................................... 26

CONCLUSION.................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page**

C<small>ASES</small>

*Aaron Private Clinic Mgmt. LLC v. Berry*,
   912 F.3d 1330 (11th Cir. 2019) ...................................................................................11

*AFL-CIO v. Miami*,
   637 F.3d 1178 (11th Cir. 2011) .....................................................................................4

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) ............................................................................. passim

*Baughcum v. Jackson*,
   92 F.4th 1024 (11th Cir. 2024) ....................................................................................11

*Blackshire v. Cnty. of Yuba*,
   648 F. Supp. 3d 1221 (E.D. Cal. 2023)........................................................................28

*Bonner v. Prichard*,
   661 F.2d 1206 (11th Cir. 1981) (en banc) ...................................................................25

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)......................................................................................................19

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
   116 F.3d 1364 (11th Cir. 1997) ..................................................................................4, 5

*Bruckner v. Biden.*
   666 F. Supp. 3d 1237 (M.D. Fla. 2023).................................................................13, 14

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013)................................................................................................11, 12

*Cochrane v. Greener Energy, LLC*,
   No. 20-82154-CIV, 2021 WL 9563201 (S.D. Fla. Sept. 17, 2021).............................24

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   589 U.S. 327 (2020)............................................................................................. passim

*Cook v. Advertiser Co.*,
   458 F.2d 1119 (5th Cir. 1972) ................................................................................24, 25

**Page**

*Cox v. Nobles*,
　15 F.4th 1350 (11th Cir. 2021) ............................................................................................4

*Day v. Taylor*,
　400 F.3d 1272 (11th Cir. 2005) ...........................................................................................5

*Domino's Pizza, Inc. v. McDonald*,
　546 U.S. 470 (2006)............................................................................................... passim

*Equal Emp. Opportunity Comm'n v. STME, LLC*,
　938 F.3d 1305 (11th Cir. 2019) .........................................................................................21

*Floyd v. Amite Cnty. Sch. Dist.*,
　581 F.3d 244 (5th Cir. 2009) .............................................................................................18

*Food & Drug Admin. v. All. for Hippocratic Med.*,
　602 U.S. 367 (2024)....................................................................................................1, 10

*Frith v. Whole Foods Mkt., Inc.*,
　38 F.4th 263 (1st Cir. 2022)..............................................................................................18

*Goldstein v. Nonni's Foods LLC*,
　No. 22-81462-CIV, 2023 U.S. Dist. LEXIS 34048 (S.D. Fla. Feb. 28, 2023) .......................27

*Griffin v. Dugger*,
　823 F.2d 1476 (11th Cir. 1987) .........................................................................................27

*Holcomb v. Iona Coll.*,
　521 F.3d 130 (2d Cir. 2008)...............................................................................................18

*Huber v. Biden*,
　No. 22-15443, 2022 WL 17818543 (9th Cir. Dec. 20, 2022)................................................27

*Jacobson v. Fla. Sec'y of State*,
　974 F.3d 1236 (11th Cir. 2020) .........................................................................................12

*Jimenez v. Wellstar Health Sys.*,
　596 F.3d 1304 (11th Cir. 2010) ...................................................................................16, 24

*Johns v. Tony*,
　No. 22-61356-CIV, 2023 WL 9327362 (S.D. Fla. Dec. 20, 2023)........................................28

*Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*,
    162 F.3d 1290 (11th Cir. 1998) ............................................................24

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968)............................................................................23

*Lewis v. Governor of Ala.*,
    944 F.3d 1287 (11th Cir. 2019) (en banc) .............................................12

*Loving v. Princess Cruise Lines, Ltd.*,
    No. 08-cv-2898, 2009 WL 7236419 (C.D. Cal. Mar. 5, 2009).........................26, 27

*Lowe v. STME, LLC*,
    354 F. Supp. 3d 1311 (M.D. Fla. 2019) .................................................21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................8

*Matamoros v. Broward Sheriff's Off.*,
    2 F.4th 1329 (11th Cir. 2021) ..............................................................17

*Maxcess, Inc. v. Lucent Techs., Inc.*,
    433 F.3d 1337 (11th Cir. 2005) ............................................................4

*McDonald v. Santa Fe Trail Transp. Co.*,
    427 U.S. 293 (1976)............................................................................23

*Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*,
    493 F.3d 201 (D.C. Cir. 2007) ..............................................................12

*Moore v. Grady Memorial Hospital Corporation*,
    834 F.3d 1168 (11th Cir. 2016) ............................................................23

*Moore v. Greyhound Bus Lines, Inc.*,
    No. 15-CV-1186-CAB (MDD), 2018 WL 3361395 (S.D. Cal. July 10, 2018)......................27

*Murthy v. Missouri*,
    No. 23-411, 2024 WL 3165801 (U.S. June 26, 2024)......................................11, 12

*Nuwer v. FCA United States LLC*,
    343 F.R.D. 638 (S.D. Fla. 2023), *reconsideration denied*, No. 20-60432-CIV,
    2023 WL 4370737 (S.D. Fla. Apr. 5, 2023) ...................................................27, 28

**Page**

*Nuzzo v. Baranco*,
   No. 1:17-CV-1811-MHC-AJB, 2018 WL 11488950 (N.D. Ga. Jan. 22, 2018)................18, 21

*Parr v. Woodman of the World Life Ins. Co.*,
   791 F.2d 888 (11th Cir. 1986) ...................................................................15, 17, 18

*Pembroke Pines v. FEMA*,
   494 F. Supp. 3d 1272 (S.D. Fla. 2020) ...................................................................3, 4

*Ryzhov v. Mayorkas*,
   634 F. Supp. 3d 1107 (S.D. Fla. 2022) ...................................................................4, 20

*S. Miami v. Governor*,
   65 F.4th 631 (11th Cir. 2023) ...................................................................8, 11

*Sabater v. Am. Journey (PET), LLC*,
   570 F. Supp. 3d 1160 (S.D. Fla. 2021) ...................................................................3, 4

*Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*,
   173 F.3d 988 (6th Cir. 1999) ...................................................................18

*Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*,
   No. 05 C 5030, 2007 WL 323490 (N.D. Ill. Nov. 1, 2007)...................................................................26

*Yelapi v. DeSantis*,
   487 F. Supp. 3d 1278 (N.D. Fla. 2020)...................................................................12

**STATUTES AND COURT RULES**

15 U.S.C. § 1691(a) ...................................................................19

28 U.S.C. § 1367...................................................................28

42 U.S.C. § 1981...................................................................passim


Cal. Civ. Code § 51(b)...................................................................3, 26

Federal Rule of Civil Procedure 12(b)...................................................................passim

**Page**

**OTHER AUTHORITIES**

17A AM. JUR. 2D CONTRACTS § 102 .......................................................................................24

Defendants Citigroup Inc. and Citibank, N.A. ("Citibank") move to dismiss the Complaint (ECF No. 1) with prejudice under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiffs cannot plead a particularized injury-in-fact that is traceable to Citibank's ATM Community Network program, or redressable in this case. Thus, Plaintiffs lack Article III standing to pursue claims under 42 U.S.C. § 1981 under well-established standards the Supreme Court repeatedly and recently has emphasized. Enforcing these standing rules keeps the judiciary in the lane established for it by the Framers—adjudicating actual cases or controversies between proper parties—and prevents it from becoming a forum for abstract ideological grievances. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 386 (2024) (sincere "legal, moral, ideological, and policy concerns do not suffice" for "Article III standing").

Section 1981 prohibits discrimination in the making or enforcement of contracts. The Eleventh Circuit just reaffirmed that to have Article III standing for a Section 1981 claim, the claimant must be "*able and ready*" to enter into a *contract* from which he claims he was excluded *on account of his race*. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772–75 (11th Cir. 2024). None of that is true here.

Plaintiffs (and the class they seek to represent) are individuals of all races who do not claim they face any discrimination on account of their own race. Nor do Plaintiffs themselves seek to "make [or] enforce" any contract. 42 U.S.C. § 1981. Instead, Plaintiffs seek to challenge Citibank's ATM Community Network program, under which Citibank contracts with other financial institutions, like banks and credit unions, to waive Citibank's out-of-network ATM fees for the customers of those participating institutions. In consideration, those financial institutions agree with Citibank, among other things, not to charge their own customers any portion of an ATM fee when they use a Citibank ATM, to share data, and to cooperate with Citibank in various ways.

Participating institutions may not join the program without signing the contract and undertaking such reciprocal contractual obligations to Citibank. And the program offers no such fee waiver on a customer-by-customer basis, regardless of race.

But Plaintiffs have not pleaded, and cannot plead, that their financial institutions—which are not parties in this case—would enter into such contracts with Citibank or be willing to undertake the obligations required of them to participate in the ATM Community Network program.[1] What is more, Plaintiffs cannot, in good faith, plead such allegations because Plaintiffs lack any authority to control, or any plausible basis to speak for, the commercial decisions of the unnamed institutions where they bank. Nor have Plaintiffs shown that Citibank's program, which is open to non-minority financial institutions, exposes the financial institutions where Plaintiffs bank to any unequal treatment. Without those facts about non-party banks, which are not before the Court, Plaintiffs cannot meet the basic requirements of establishing a particularized injury-in-fact that is both traceable to the challenged conduct and redressable by the Court. As a result, the necessary link between Plaintiffs' alleged injury and Citibank's conduct is broken, and Plaintiffs lack Article III standing, depriving the Court of subject matter jurisdiction.

Given this disconnect between these Plaintiffs and the Citibank program at issue, it is unsurprising that the Complaint also fails to state a Section 1981 claim on the merits, because Plaintiffs are the wrong potential parties to challenge the program. Neither of the Plaintiffs (nor a

---

[1] For the avoidance of doubt, though Citibank disputes that its ATM Community Network program has any race-based eligibility criteria, it accepts the truth of Plaintiffs' contrary assertion for the purposes of both its Rule 12(b)(1) and 12(b)(6) arguments. However, to the extent that Plaintiffs' Complaint suggests that the ATM Community Network *only* includes minority-owned financial institutions, Citibank's 12(b)(1) motion demonstrates, as a matter of public record of which the Court can take judicial notice, that 14 of 50 financial institutions in the Network are *not* "minority owned."

single member of the nationwide class they seek to represent) have alleged or could allege that they experienced any discrimination on account of "the plaintiff's race." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 327 (2020). Tacitly conceding this, Plaintiffs do not identify their own races, and their proposed class necessarily consists of individuals of literally all races and ethnicities, *e.g.*, White, Black, Asian, Hispanic. Plaintiffs cannot save their race discrimination claims by relying on a purported "association" with unidentified owners of the financial institutions where they bank, because unlike the interracial association cases on which they attempt to rely, Plaintiffs cannot allege that *their own race* matters to challenged practices.

Plaintiffs' Section 1981 claim independently fails to state a claim because the allegedly discriminatory conduct (*i.e.*, the waiver of fees for those banking with other financial institutions that participate in Citibank's ATM Community Network program) does *not concern* a legally enforceable "*contract*" under which the Plaintiffs have rights. Per the Supreme Court, "nothing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for all racial injustice. If so, it would not have been limited to situations involving contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006) (Scalia, J.).

Finally, no claims under the California Unruh Act can be brought—in an individual or class capacity—by these Plaintiffs who solely allege conduct in Florida, rather than "within the jurisdiction of" California. Cal. Civ. Code § 51(b).

## <u>LEGAL STANDARDS</u>

**Rule 12(b)(1) Factual Attack to Subject Matter Jurisdiction.** "'Jurisdictional challenges under Rule 12(b)(1) are either facial or factual attacks.'" *Pembroke Pines v. FEMA*, 494 F. Supp. 3d 1272, 1282 (S.D. Fla. 2020) (Singhal, J.) (citation omitted). When a motion to dismiss presents a "factual attack" on a plaintiff's standing, and thus attacks "subject matter jurisdiction," "the trial court is free to weigh the evidence" to "resolve disputed jurisdictional facts." *Sabater v. Am.*

*Journey (PET), LLC*, 570 F. Supp. 3d 1160, 1163 (S.D. Fla. 2021) (Singhal, J.) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)). Thus, "no presumptive truthfulness attaches to plaintiff's allegations." *Id.* When the jurisdictional facts are disputed with evidence, the plaintiff must "carry [the] burden of establishing" standing. *Id.* at 1164.[2]

**Rule 12(b)(6) Motion for Failure to State a Claim.** A court should "'dismiss a complaint if it rests only on conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts.'" *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021) (citation omitted). For each claim, the plaintiff must set forth plausible factual allegations that establish all "the material elements of a cause of action to support recovery under some 'viable legal theory.'" *AFL-CIO v. Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (citation omitted).

A motion to dismiss for failure to state a claim for relief can rely on the "'four-corners of the complaint and any documents attached,'" as well as on "'documents that are part of the public record.'" *Pembroke Pines*, 494 F. Supp. 3d at 1282 (citation omitted). "[I]nformation readily available on the websites of government agencies" can qualify as a "public record." *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111 (S.D. Fla. 2022) (collecting cases). Additionally, on a motion to dismiss, "a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity," such as "contracts" not attached to a complaint. *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005); *accord, e.g.*, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (if plaintiff "refers to certain documents in the complaint and those

---

[2] Under a facial attack on subject matter jurisdiction (*i.e.*, one solely based on the complaint), plaintiffs still must show their complaint "contain[s] sufficient non-conclusory allegations to create a plausible inference that subject matter jurisdiction exists." *Pembroke Pines*, 494 F. Supp. 3d at 1282.

documents are central to the plaintiff's claim," a court "may consider the documents part of the pleadings").

## FACTUAL BACKGROUND

### I.    Plaintiffs' Allegations in the Complaint (for Rule 12(b)(6) motion).

Plaintiffs Werner Jack Becker and Dana Guida, respectively, allege that they were charged an out-of-network fee at a Citibank ATM in South Florida in June 2023.  Compl.  ¶¶  6–7.  They allege that the "Citi ATM Community Network" "does not charge out-of-network ATM fees to people who bank at financial institutions that are 'minority owned.'  But it does charge those fees to people who bank at other financial institutions."  *Id.* ¶¶ 3, 13.  According to Plaintiffs, they each "banked at a 'non-'minority-owned' institution."  *Id.* ¶ 59; *see also id.* ¶ 64.

The Complaint further alleges that the Citi ATM Community Network was announced on July 14, 2016.  *Id.* ¶ 13.  That July 14, 2016, public announcement is centrally referred to in the Complaint, *Id.*  ¶¶  13, 42, 59, and thus must be considered incorporated by reference.[3]  The announcement explains that the Network consists of *participating* financial institutions who choose to join the program so that their customers will have free access to Citibank's branch ATMs in select locations in the U.S.[4]

---

[3] *See Brooks*, 116 F.3d at 1369 (when plaintiff "refers to certain documents in the complaint and those documents are central to the plaintiff's claim," a court "may consider the documents part of the pleadings"); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[T]he court may consider a document attached to a motion to dismiss … if the attached document is (1) central to the plaintiff's claim and (2) undisputed"—meaning its authenticity is unchallenged).

[4] *See* Press Release, Citigroup Inc., Citi Introduces Citi ATM Community Network (July 14, 2016), https://www.citigroup.com/global/news/press-release/2016/citi-introduces-citi-atm-community-network-providing-surcharge-free-atm-access-to-partner-credit-union-and-minority-owned-bank-customers ("The Citi ATM Community Network will mean participating organizations have free access to roughly 2,400 branch ATMs in Citi's markets in the U.S.") (last visited July 9, 2024).

Plaintiffs assert two counts, both labeled "Associational Discrimination": a claim under 42 U.S.C. § 1981, and a claim under the Unruh Act, a California statute. *Id.* at 11–12. The Complaint seeks certification of two classes (a nationwide class and a California class) of "all persons [regardless of race] in the United States who paid ATM fees at a Citi branch location" and relief including retrospective damages and an injunction ending the fee-waiver program on a going-forward basis. *Id.* ¶¶ 33, 68–69. In other words, prospectively, Plaintiffs seek to end the free transactions for others, rather than seeking to invalidate the industry-standard out-of-network fees at Citibank ATMs that they, and the putative class members, pay (and would continue to pay if Plaintiffs won). *See id.* ¶ 12 ("most banks" charge out-of-network fees).

The Complaint *fails to address*, among other matters:

- Plaintiffs' own racial or ethnic identity, or whether Citibank has any awareness of it;

- the name of, or even kind of, financial institution where Plaintiffs bank as customers and that hosted the account they withdrew money from when they used Citibank's ATM;

- any information about the willingness or ability of the financial institutions where Plaintiffs bank to join Citibank's ATM Community Network;

- the identity of any supposed "owners" of the unnamed financial institutions where Plaintiffs bank as customers or any facts about Plaintiffs' alleged "association" with them;

- any information about how Plaintiffs define "minority-owned" for purposes of their complaint, or how they claim Citibank uses this term in connection with the challenged ATM Community Network program;

- any information about how institutions come to participate in the ATM Community Network or what, if any, race-neutral criteria exist for inclusion; and

- any information about the terms, conditions or contracts financial institutions agree to in order to join the ATM Community Network.

## II.     Additional Facts About Citibank's ATM Community Network (for Rule 12(b)(1) motion).

Citibank's ATM Community Network is a program under which eligible financial institutions may choose to enter into an agreement (*i.e.*, a "Network Agreement") with Citibank regarding ATM transaction fees.  Declaration of Marco Chavarin ("Decl.") ¶¶ 4–6, attached as Exhibit 1.  If a financial institution wishes to enter the ATM Community Network, it must agree to the terms of the contract governing the network.  Decl. ¶ 5.

Those agreements contain mutual contractual promises by both the participating financial institutions (*i.e.*, "Network Institutions") and by Citibank, and the Network Agreements follow a common template, examples of which are attached hereto.  *See* Decl. ¶ 7;  Decl. Exhibits A & B.  In exchange for Citibank's agreement not to charge fees for ATM withdrawals at Citibank retail branches from Network Institution accounts, these Network Institutions must agree to several key terms.  *See generally* Exs. A & B; Decl. ¶ 6.  Among these promises, the Network Institutions must:  (1) agree not to charge their own customers any portion of an ATM fee when they use a Citibank ATM; (2) agree to assist in the distribution of Citibank-approved marketing materials relating to Citi's efforts in the ATM Community Network; (3) approve Citibank's use of the Network Institutions' trademarks; and (4) agree to data sharing with Citibank and other necessary technical conditions; (5) agree to indemnify Citibank under certain circumstances; and (6) agree to the exclusive jurisdiction of courts in New York City.  *See, e.g.*, Ex. B §§ 2.1 & 2.2(i)a–c, 7.1, 9.6.  An institution that refuses to enter into the Network Agreement may not participate in the program.  Decl. ¶ 8.

Currently, 50 financial institutions participate in the ATM Community Network.  Decl. ¶ 9; *see* Ex. C (list).  Of those financial institutions, only 36 are Minority Depository Institutions (MDIs).  *See* Decl. ¶ 10.  MDI status includes institutions either 51 percent or greater "owned by

minority individuals" or certain institutions where "a majority of the board of directors is minority" irrespective of the institution's ownership.[5]  Accordingly, about a third of all ATM Community Network participants—14 of 50—are *not* "minority owned." *Id.*; *see also* Ex. C.

## ARGUMENT

I. **The Court Lacks Jurisdiction Because Plaintiffs Have Not Alleged (or Shown) That the Financial Institutions Where They Bank Are "Able and Ready" to Participate in the ATM Community Network, as Required for Article III Standing.**

To establish standing, "[a] litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023).  As the party "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these [standing] elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In order to satisfy the injury-in-fact requirement, each plaintiff's injury needs to be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560.  Plaintiffs do not meet these requirements.

A. **Financial Institutions Where Plaintiffs Bank Must be "Ready and Able" to Join Citibank's Network.**

In *Fearless Fund*, the Eleventh Circuit showed how these injury-in-fact requirements apply to a Section 1981 claim.  *See* 103 F.4th at 772–75.  There, white plaintiff-members of a group sued a venture capital fund under Section 1981, alleging that because of each plaintiff's race, his wholly-owned businesses had been excluded from competing in a contractual grant program, which "[b]y its terms, [was] open *only* to 'black females'—and thus categorically bar[red] non-

---

[5] Minority Depository Institutions Program, Federal Deposit Insurance Corporation, https://www.fdic.gov/regulations/resources/minority/mdi.html (last visited July 9, 2024).

black applicants." *Id.* at 777.  The court explained that to make out an injury, a claim must meet

the "able-and-ready" standard as follows:

> [W]e evaluate whether [the plaintiff] has sufficiently demonstrated *an intent to take the action that she asserts is prohibited*. *See Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003).  If the plaintiff can show that she is "*able and ready*" to do so, she has demonstrated a concrete injury.  *Northeastern Fla.  Chapter, Assoc. Gen.  Contractors of Am. v. Jacksonville*, 508 U.S.  656, 666 (1993) … [T]he plaintiff must do more than baldly assert that she is 'able and ready'—she must also come forward with some 'supporting facts' indicating a likelihood that she will actually take the *proscribed action*.

*Id.* at 772 (emphasis added).

The Eleventh Circuit held that the declarations submitted in *Fearless Fund* satisfied the

"able and ready" standard based on five key facts:

> [Those declarations] (1) assert that each owner is prepared [to] enter the contest but is 'ineligible because [she is] not a black woman'; (2) describe the size of each owner's business; (3) explain that each owner has met the contest's non-race-related prerequisites; (4) specify how each owner would use the $20,000 prize if selected ….  And (5) pinpoint when the owners would apply if permitted to participate[.]

*Id.*

Here, by contrast, Plaintiffs provide no such allegations, nor can they.  Simply put, unlike

the *Fearless Fund* plaintiffs who could apply for the program at issue, Plaintiffs here are not "able

and ready" to enter Citibank's ATM Community Network program because they, as natural

persons who do not control financial institutions, cannot apply for that program on their own.  Any

possibility of realizing the benefits of the ATM Community Network depends wholly on whether

the financial institutions where Plaintiffs bank—third parties not before the Court—would choose

to apply and be "able and ready" to seek to become part of the program.  Absent this condition,

Plaintiffs cannot conceivably identify any actual or imminent injury-in-fact.  And here, there is

simply no basis for Plaintiffs to make that "able and ready" claim, for two independent reasons.

*First*, the Court cannot conclude the (unknown) financial institutions where Plaintiffs bank have any interest in participating in Citibank's program.  *Second,* the Court cannot conclude those (unknown) financial institutions would, even if interested, be willing to enter into the required Network Agreement and accept its reciprocal obligations.  Unless Plaintiffs' financial institutions both desire to participate and are willing to undertake the reciprocal burdens imposed—facts which Plaintiffs have not pleaded and have no ability to plead—they are not "able and ready" to enter the program.

A claim under Section 1981 asserting a lost benefit due to alleged racial criteria must present facts supporting a bona fide interest in and ability to "actually take" action to obtain that benefit, absent the allegedly unlawful racial criteria.  *See Fearless Fund*, 103 F.4th at 772.  So a high-school student challenging college-admission criteria lacks a federal case if he does not want to attend the defendant school, and likewise a business has only a non-actionable ideological grievance with contracting terms if it does not actually want to win the bid.  "As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question:  'What's it to you?'" A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)."  *All. for Hippocratic Medicine*, 602 U.S. at 386.

Here, Plaintiffs have not alleged that their financial institutions—competitors of Citibank in the marketplace for consumer banking customers—are even interested in joining a Citibank-branded program.  Nor could they plausibly allege this on behalf of institutions that Plaintiffs neither own nor control.

But even if they could plausibly allege those institutions' interest, Plaintiffs have not—and cannot—allege that their institutions would be willing to enter into the required Network Agreement and agree to, among other things, (a) forgo charging out-of-network fees to their own

customers when those customers use a Citibank ATM, (b) distribute Citibank's advertising materials and permit the use of their own marks in such materials, (c) participate in data sharing or co-marketing activities with Citibank, or (d) otherwise accept the terms and conditions of the Network Contracts that are preconditions for participation.  Indeed, for a large-peer competitor to Citibank, it is unfathomable.[6]  And without demonstrating the financial institutions where they bank *want to and would* enter Citibank's ATM program, with all of the required reciprocal obligations, Plaintiffs are mere "bystanders" without any individual concrete injury-in-fact, seeking improperly to "come to federal court [simply because] they believe [Citibank] is acting contrary to … federal law."  *Id.* at 1556[7]; *see also S. Miami*, 65 F.4th at 636.

Additionally, Plaintiffs' missing facts fail the requirement that even a constitutionally sufficient injury-in-fact must be "traceable" to the defendant's actions and "redressable" by the court.  *See S. Miami*, 65 F.4th at 634, 636.  As the Supreme Court has long explained and reaffirmed this term, "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'"  *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801, at *2 (U.S. June 26, 2024) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U. S. 26, 37 (1976));  *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before

---

[6] Financial institutions evaluating whether to join the program may have concerns that customers visiting a Citibank ATM may be exposed to signage and other visible promotional materials, which exposure the financial institution may prefer to avoid for its own competitive reasons.

[7] The requirement to show a willingness to participate for standing holds even where the challenged rule would prevent them from succeeding.  *See Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019); *see also Baughcum v. Jackson*, 92 F.4th 1024, 1035 (11th Cir. 2024) (prior efforts to obtain guns, and explanation of "dangerous situations for which they would like to carry weapons" supported claim of injury from limits on carry license, even when actual application would have been a "futile gesture").

the court.'" (quoting *Lujan*, 504 U.S. at 562)).   Under this principle, numerous cases have recognized as a standing defect—whether categorized as traceability or redressability—"'guesswork as to how independent decisionmakers will exercise their judgment.'"  *Murthy*, 603 U.S. at 25 (quoting *Clapper*, 568 U.S. at 413); *see, e.g.*, *Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 205 (D.C. Cir. 2007) (standing not established "[w]hen redress depends" on the cooperation of a third party not before the court).

The *en banc* Eleventh Circuit applied this rule to hold that Birmingham minimum-wage employees lacked standing to sue to bar the Attorney General's enforcement of a state law preempting local minimum wage laws, because it was "speculative" that plaintiffs' employers would comply with the local law if the suit prevailed.  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1302–05 (11th Cir. 2019) (en banc); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254–55 (11th Cir. 2020) (relying on *Lewis*; no standing in suit against the Secretary of State, where "a different, independent official" with control over the challenged matter might not follow court-ordered guidance from the Secretary).  And in *Yelapi v. DeSantis*, the court determined plaintiffs challenging the Florida governor's failure to bring an American Sign Language interpreter to press briefings had not shown an injury "traceable to—or redressable by—the Governor," because "Plaintiffs would not benefit unless … nonparty broadcast companies decided to include that interpreter in the broadcast frame."  *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278, 1283–85 (N.D.  Fla. 2020) (Winsor, J.) ("Here, there is no evidence that would support any finding on how nonparty broadcasters would respond") (citing *Lewis,* 944 F.3d at 1302).  If broadcast media cannot be assumed interested in making the (essentially costless) effort of widening their frame for an interpreter, so much less could the Court assume that unnamed financial institutions where

Plaintiffs bank would agree to the terms, conditions and obligations of the Citibank ATM Community Network.

**B.      Financial Institutions Where Plaintiffs Bank Also Need to Encounter a Racial Obstacle.**

All of the above prevents Plaintiffs from establishing Article III standing even if the Citibank ATM Community Network only admitted minority-owned institutions.  That is because Plaintiffs' claim rests on the intervening decisions of the third-party financial institutions where they bank.  Unless those institutions want to, and would, join the Network, Plaintiffs could never receive fee-free ATM transactions at Citibank.  Plaintiffs thus do not assert an injury-in-fact traceable to the ATM Community Network they challenge, or redressable by this lawsuit.  The Court need go no further.

But Plaintiffs lack standing for an independent reason:  they cannot show that, even if those financial institutions where they bank wanted to and would join the Network, those institutions would then encounter any obstacle to admission based on the race of their owners.  *Fearless Fund* characterized this as the requirement to be "able and ready" "to *take the action* that [*the plaintiff*] *asserts is prohibited*."  103 F.4th at 772 (emphasis added).

In *Fearless Fund*, this additional requirement was easily satisfied, since the grant program had a *per se* exclusion of anyone but black women.  *Id.* at 772, 777.  Here, by contrast, the situation is akin to what doomed plaintiffs' claim in *Bruckner v. Biden*. 666 F. Supp. 3d 1237, 1241–43 (M.D. Fla. 2023) (Mizelle, J.).  There, plaintiffs (a contractor and its owner) challenged racial preferences in the Infrastructure Act.  *Id.* at 1241–43.  The court noted that plaintiffs' "entire theory of standing" relied on alleging that "the Infrastructure Act requires race and gender discrimination in all DOT-funded contracts."  *Id.* at 1247.  But because the government showed that "States and localities [did] not award *all* Infrastructure Act contracts on a discriminatory basis," plaintiffs'

- 13 -

failure to specify that they would bid on "an identified contract, or set of contracts, that use discriminatory means" meant they had not shown that the racial criteria of the program would affect *their* eligibility for a relevant contract, as required for standing.  *Id.* (emphasis added).  Those plaintiffs could not challenge discriminatory criteria *somewhere* in a program absent allegations as to why they expected "they w[ould] encounter unequal treatment" in their own application.  *Id.* (emphasis added).  So long as at least some contract bidders would not be subject to the Infrastructure Act's race and gender preferences, the *Bruckner* plaintiffs lacked Article III standing to challenge those.  *Id.*

Here, irrefutable facts show that the Citibank ATM Community Network admits non-minority financial institutions as well.  Decl.  ¶ 10; *see also* Ex. C.  As public governmental records reflect, 14 of the 50 Network Institutions are non-minority institutions.  *See id.*  Therefore, Plaintiffs cannot simply assert that they bank with "non-'minority-owned' institutions" (Compl. ¶ 59) to indicate that those institutions will be exposed to unequal treatment.  Instead, for standing, Plaintiffs must show that—despite many other *non-minority* institutions gaining admission to the Citibank ATM Community Network and unlocking free ATM transactions for their customers—the financial institutions where Plaintiffs bank, for some reason, will face an obstacle based on race.  They have not done so.

\* \* \*

For all these reasons, the Court should dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of Article III standing.

## II.        Plaintiffs Fail to State a Claim under Section 1981.

Similar defects afflict the merits of Plaintiffs' claims, independently requiring dismissal for failure to state a claim under Rule 12(b)(6).  Plaintiffs lack an actionable claim for a violation of Section 1981 based on discrimination against *another* entity because these Plaintiffs suffered *no* discrimination on account of *their own race*.  The Supreme Court has warned that "nothing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for all racial injustice," or permit "satellite . . . litigation" by those affected downstream by discrimination.  *Domino's Pizza*, 546 U.S. at 479.  Rather, Section 1981 addresses those circumstances where a plaintiff alleges a "defendant would have responded differently but for *the plaintiff's race*."  *Comcast*, 589 U.S. at 333 (emphasis added).  So-called "associational discrimination" claims under Section 1981 are no exception to this clear rule.  *See Parr v. Woodman of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an *interracial marriage* or [*interracial*] *association*, he alleges, by definition, that he has been discriminated against because of *his* race."(emphasis added)).

### A.        Plaintiffs Have Not Pleaded Discrimination Based on Their Own Race.

In *Comcast*, the Supreme Court took up the question of what must be proven by a Section 1981 plaintiff.  589 U.S. at 330.  In that case involving a plaintiff that was a "100% African American-owned media compan[y]," Justice Gorsuch explained for the Court that Section 1981 operates as follows:

> The guarantee that each person is entitled to the "same right . . . as is enjoyed by white citizens" directs our attention to the counterfactual—what would have happened if the plaintiff had been white? . . .  If the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the 'same' legally protected right as a white person.  Conversely, if the defendant would have responded differently *but for the plaintiff's race*, it follows that the plaintiff has not received the same right as a white person." (emphasis added).

*Id.* at 330, 333.

Consistent with this, the Eleventh Circuit long has described that "a [Section 1981] plaintiff must allege … the defendant intended to racially discriminate *against him*." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1308 (11th Cir. 2010) (emphasis added).

In this case, Plaintiffs do not ask the Court to consider "what would have happened if [the Plaintiffs] had been white," or black, or any other racial or ethnic background. *Comcast*, 589 U.S. at 333. Their Complaint does not even plead that the Plaintiffs belong to, or are perceived as belonging to (by Citibank or otherwise), any racial group. Nothing in their Complaint suggests that "[Citigroup] would have responded differently" in its ATM fee charges "but for the plaintiff[s'] race." *Id.*[8] Rather, it alleges that *all* "people who bank at other financial institutions" that are not "minority-owned" are treated identically. Compl. ¶ 3. Accordingly, the core question of Section 1981—was your race relevant?— is answered "no" by the Complaint. *See id.*

Because of that necessary conclusion, the Complaint seeks to skirt these rules using the rubric of "Associational Discrimination," Compl. at 11–12, and by claiming that their purported association with "non-minority" owners of the financial institution where they bank gives them a Section 1981 claim. *Id.* ¶¶ 2, 23. As explained below, this is not the law. Were the Court to permit this case to proceed under this breathtakingly broad construction of Section 1981, it would work a radical transformation beyond anything Congress authorized, or the courts have approved.

---

[8] For that matter, nor do Plaintiffs allege any differential treatment among "people who bank at financial institutions that are 'minority-owned'" based on their race; on Plaintiffs' telling, they are all equally able to access the fee waiver program. Compl. ¶ 3.

**B.      Section 1981 "Associational Discrimination" Claims Still Require a Showing of Discrimination Based on the Plaintiff's Race.**

So-called "Associational Discrimination" claims are cognizable under Section 1981 in the Eleventh Circuit in a specific circumstance that Plaintiffs here seek to elide, namely, those like interracial associations where the plaintiff's race matters to the allegedly discriminatory conduct by the defendant.  Because Plaintiffs' claims arise outside that interracial context *and* because Plaintiffs cannot allege that their race otherwise matters to their claims, they cannot rely on associational discrimination and their claim must be dismissed.

Plaintiffs seek to rely on *Parr*, 791 F.2d at 892, for the proposition that Section 1981 makes actionable a claim for discrimination against a person based on "the race of who they associate or do business with."  Compl. ¶ 2.  Neither the Eleventh Circuit's *Parr* decision, nor the other circuits that follow that decision, have ever endorsed so sweeping a principle.

In reality, what *Parr* holds is that a claim "of discrimination based upon an interracial marriage is cognizable under [S]ection 1981." 791 F.2d at 890.  Parr was a white man married to a black woman, *id.* at 889, who alleged a prospective employer discriminated against him "because of his interracial marriage," *id.* at 890.  The court concluded the Section 1981 claim was actionable, importing similar principles from Title VII, because "[w]here a plaintiff claims discrimination based upon an *interracial marriage* or [*interracial*] *association*, he alleges, by definition, that he has been discriminated against because of *his* race."  *Id.* at 892 (second emphasis in original).

Echoing this, Judge Newsom (the author of *Fearless Fund*) recently recognized for the Eleventh Circuit that *Parr*'s "language and logic" undermine the contention that a plaintiff need not invoke one's own "protected class" in order "to state a claim for discrimination so long as one is discriminated against because of association with a member of a protected class."  *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1335 (11th Cir. 2021).  As helpfully summarized by

another court in this Circuit, "[t]hose cases applying the associational-discrimination theory in [ ] a § 1981 context have involved *association or relation by the employee with a person of the opposite race*, and thus, logically, are examples of [a defendant's] *discrimination against the [plaintiff] on account of the [plaintiff's] race, since underlying these cases is racial animus due the employee of X-race being associated with a person of Y-race*." *Nuzzo v. Baranco*, No.  1:17-CV-1811-MHC-AJB, 2018 WL 11488950, at \*14 (N.D.  Ga.  Jan.  22, 2018) (citing *Parr*, 719 F.2d at 892) (emphasis added).

Many other circuits understand *Parr* the same way.  *See, e.g.*, *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022) (citing *Parr* to conclude that Title VII permits interracial association claims, but not claims where "all that matters is the race of [other] persons" besides the plaintiff); *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) ("[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination *because of the employee's own race*."); *Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 250 (5th Cir. 2009) ("The association cases are predicated on animus against the employee because of his association with *persons of another race*.") (citing *Parr*, 791 F.2d at 892); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) (relying on *Parr* to conclude that a "white employee who is discharged because his child is biracial is discriminated against *on the basis of his race*") (emphasis added).

Here, Plaintiffs' theory of discrimination does not arise in the interracial context, nor does it depend in any way on the race of the Plaintiffs.  Per Plaintiffs' allegations (and in reality), Citibank treats white or black out-of-network customers identically.  Indeed, as noted, Plaintiffs do not disclose their race or ever allege that Citibank considered (or even knew) the Plaintiffs' race when determining whether they would incur an out-of-network ATM fee.  Put more simply, while

Citibank's ATMs require a user to enter his or her personal PIN, they do not ask any user to enter their race.

Nor could Plaintiffs claim otherwise since minority-owned institutions are bound to serve customers of every race equally.  *See, e.g.*, 15 U.S.C.  § 1691(a) (Equal Credit Opportunity Act). The only critical fact that matters, per Plaintiffs, is the *race of the owners* of the *financial institution where they bank*—if those owners are white, then supposedly a white plaintiff (and a black plaintiff) are equally disadvantaged.  In other words, the plaintiffs' race is not a but-for cause of the alleged discrimination.  *See Bostock v. Clayton Cnty.,* 590 U.S. 644, 656 (2020) ("[A] but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause.").

That associational discrimination claims lie only where a plaintiff's race matters to the claim (*i.e.*, the interracial context) also follows from the Supreme Court's decision in *Domino's Pizza*, 546 U.S. at 473–74. In *Domino's Pizza*, McDonald alleged discrimination against a company he *owned* on the basis of *his* race, which thereby caused *him* economic and emotional injury.  *Id.*  The Court unanimously rejected his ability to assert such a claim in place of his company, even though he was the sole shareholder and the alleged discrimination against his company was on the basis of *his* race.  *Id.* at 476.  The Court emphasized that treating Section 1981 as a "remedy for all racial injustice"—contrary to "text" and "congressional intent"—would produce "satellite § 1981 litigation of immense scope." *Id.*  Even though McDonald's theory seemed modest (permitting suit by the target of discrimination for harm to his own business), accepting it "would permit class actions by all the minority employees of the nonbreaching party to a broken contract" or "any company failing to receive a contract award" so long as they "alleg[ed] that the reason … was racial animus against them." *Id.*  Plaintiffs' expansion of Section

1981 goes far beyond McDonald's theory, to approve a wide swath of satellite litigation from individuals unable to even plead that their race—let alone "racial animus against them"—drove any decision.  *Id.*

### C.      Plaintiffs Fail to Plead Sufficient Facts to Support Their Supposed Association.

As explained above, Eleventh Circuit case law forecloses Plaintiffs' associational theory. But that theory also fails because Plaintiffs have failed to allege sufficient factual matter to support an associational theory, in any event, for two reasons.

*First*, the Complaint asserts that Plaintiffs are being penalized for associating with "individuals of a [non-minority] race," specifically, the "owne[rs]" of their financial institutions. Compl. ¶¶ 4, 23.  But Plaintiffs do not state whether their financial institutions are in fact majority-owned by non-minority "individuals," rather than (for example) investment companies like BlackRock, who Plaintiffs note in their Complaint as the "second-largest shareholder" of Citigroup itself.  *Id.* ¶ 16.[9]

*Second*, even if Plaintiffs had alleged individual natural persons "own" their financial institution, the only "association" alleged between Plaintiffs and any such persons is that Plaintiffs state that they maintain a banking account with that financial institution. *Id.* ¶ 6, 7. Accepting that theory has two problems.  Initially, it would require the Court to reject the conclusion of some

---

[9] Large publicly-traded financial institutions like Bank of America or Wells Fargo are likewise owned in significant part by institutional investors like Vanguard and BlackRock that, in turn, are not natural persons.  *See* Wells Fargo & Company, SEC Schedule 14 A, at 143, https://www.sec.gov/Archives/edgar/data/72971/000007297124000084/wfc-20240315.htm  (last visited July 9, 2024);  Bank of America, SEC Schedule 14A, at 48, https://www.sec.gov/Archives/edgar/data/70858/000119312524064529/d529855ddef14a1.pdf (last visited July 9, 2024); *see also Ryzhov*, 634 F. Supp. 3d at 1111 (information "available on the websites of government agencies" judicially noticeable on a motion to dismiss for failure to state a claim).

courts (not yet resolved by the Eleventh Circuit) that "a significant relationship—such as an intimate or familial relationship" is required "to support an associational discrimination claim." *Lowe v. STME, LLC*, 354 F. Supp. 3d 1311, 1314–15 (M.D. Fla. 2019) (citing cases); *see Nuzzo*, 2018 WL 11488950, at *14 (concluding that "[c]ases applying the associational-discrimination theory require a significant relationship between the employee and the third party").

Finally, it would require the Court to hold, without authority, that an arm's-length transactional relationship with an entity constitutes "association" with its shareholders—who, assuming a publicly traded bank, are unknown to Plaintiffs and constantly changing. *Cf. Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1319 (11th Cir. 2019) (concluding a statutory associational discrimination claim under Americans with Disabilities Act could not be based on "contact with certain unknown individuals," but only a "known association" with a "specific disabled individual").

The Court should reject Plaintiffs' unprecedented proposed expansion of the associational discrimination doctrine, particularly where they appear to have strategically omitted even the most basic details about their financial institutions and their supposed "owners."

### D.     Plaintiffs Do Not Allege Any Discriminatory "Contract" That They Can Invoke.

The Section 1981 claim should also be dismissed because it is not based on any "contract" that Plaintiffs allege was discriminatory *and* that Plaintiffs either entered into, or wish to enter into. Plaintiffs recognize they cannot participate in the contracts between their financial institutions and Citibank. Compl. ¶ 23. As such, Plaintiffs' Complaint attempts to manufacture a different interaction that they seek to attack using Section 1981. Indulging every possible inference, Plaintiffs appear to allege that they and other out-of-network individuals who are customers of financial institutions other than Citibank enter into implied unwritten contracts with Citibank at

the time they use a Citibank ATM.  *See id.* ¶ 21–23.  Plaintiffs then seek the benefit received by

those customers of ATM Community Network participating banks, who are able to withdraw funds

from a Citibank ATM without paying any fee.  If that latter arrangement is the alleged contract

that Plaintiffs seek to enjoy (and none other is available), the problem for Plaintiffs is that the

arrangement that Plaintiffs covet is entirely unsupported by consideration and therefore is not a

contract.  There is, as a matter of law, no contract between Citibank and those customers because

those customers give no consideration to Citibank when they use a Citibank ATM.  This too dooms

Plaintiffs' Section 1981 claim.

*First*, Section 1981 grants "[a]ll persons" the "same right … as enjoyed by [other races]"

to "the making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.  § 1981(a)–

(b).  The Supreme Court recognizes this as an "explicit statutory requirement that the plaintiff be

the 'perso[n]' whose 'right … to make-and-enforce contracts,' § 1981(a), was 'impair[ed],'

§ 1981(c), on account of race." *Domino's Pizza*, 546 U.S. at 478 (ellipses in original).  *See also*

*Comcast*, 589 U.S. at 335–36 (Section 1981 allows a plaintiff to bring a discrimination claim when

he is being denied "the same opportunity to enter into contracts as [a defendant] extends to white

offerees" (or members of another race)).

In other words, Congress enacted Section 1981 as a carefully-calibrated statute that only

"offers relief when racial discrimination *blocks the creation of a contractual relationship*, [or]

when racial discrimination *impairs an existing contractual relationship*, so long as *the plaintiff has*

*or would have rights under the existing or proposed contractual relationship*." *Domino's Pizza*,

546 U.S. at 479, 476 (emphasis added).  The Supreme Court has consistently interpreted Section

1981 in line with the historical design of this and other similar Reconstruction-Era civil rights

laws, namely, to secure "the great fundamental rights", including "to make contracts", necessary to put formerly enslaved Americans in parity with "freemen." *Jones v. Alfred H. Mayer Co*., 392 U.S. 409, 432 (1968); *see id.* at 441 ("It is idle to say that a man is free who cannot … buy and sell, *who cannot enforce his rights*." (emphasis added)).  None of that is to undermine that Section 1981 should be understood "to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race," and thus "protect whites as well as nonwhites."  *McDonald v. Santa Fe Trail Transp. Co*., 427 U.S. 293, 295 (1976).  But it is to recognize that the evil Section 1981 sought to rectify is an abridgment of the right *to contract*.

*Second*, Plaintiffs do not plead that they seek "the same opportunity" to create a contractual relationship like that between Citibank and the participant institutions in the ATM Community Network, since Plaintiffs themselves are not financial institutions. *Comcast*, 589 U.S. at 335–36. Nor do Plaintiffs seek to plead any "impairment" of any "proposed contractual relationship" that the financial institutions where they bank might enter into with Citibank.[10] *Domino's Pizza*, 546 U.S. at 479, 476.  Instead, Plaintiffs allege—in a single conclusory sentence—that "[b]y imposing ATM fees for one set of customers but not others, Citi's Policy denied Plaintiffs and Class Members the enjoyment of 'all benefits, privilege[s], terms and conditions of the *contractual relationship' between Citi and users of its ATMs*." Compl. ¶ 60 (quoting 42 USC § 1981) (emphasis added).

---

[10] That approach would be unavailing since the Network contracts their financial institutions would need to enter into with Citibank explicitly disclaim any third-party beneficiaries. *See, e.g.*, Ex. B, § 9.3 (No Third-Party Beneficiaries).  *See Moore v. Grady Memorial Hospital Corporation*, 834 F.3d 1168, 1175 (11th Cir. 2016) (holding that absent contractual intent to confer third-party beneficiary status, a Section 1981 claim cannot proceed).

To be viable, a Section 1981 claim must allege that the discriminatory arrangement challenged is indeed a "bargained-for exchange supported by good and sufficient consideration … in other words, a contract." *Fearless Fund*, 103 F.4th at 775. *See also Cochrane v. Greener Energy, LLC*, No. 20-82154-CIV, 2021 WL 9563201, at *3 (S.D. Fla. Sept. 17, 2021) (explaining that "mutual consideration" is a necessary element for a contract under Florida law) (Singhal, J.). By contrast, "gratuitous promises" will not be enforced by courts because they lack consideration from the opposing party. *See, e.g.*, 17A AM. JUR. 2D CONTRACTS § 102 (Gratuitous promises distinguished) ("The *consideration*, in the legal sense of the word, of a contract *is the quid pro quo, that which the party to whom a promise is made does or agrees* to do in return for the promise. Courts attempt to prevent the enforcement of gratuitous promises. When one receives a naked promise and the promise is broken, he or she is not worse off than previously . … Such promises are not made within the scope of transactions intended to confer rights enforceable at law." (emphasis added)).

Eleventh Circuit precedent holds that a Section 1981 claim cannot proceed where the claim relies on an agreement that lacks consideration. *See Jimenez*, 596 F.3d at 1309 ("medical staff privileges" could not constitute "consideration" on implied contract as they were wholly revocable); *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc*., 162 F.3d 1290, 1311–1313 (11th Cir. 1998) ("It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration."). Similarly, in a decision that binds the Eleventh Circuit, the pre-split Fifth Circuit held that a claim alleging racial discrimination in the placement of a wedding announcement in a newspaper could not "arise under the right to contract" under Section 1981 because the "newspaper received no pecuniary [or other] consideration from any

- 24 -

person" submitting their information for potential publication.  *Cook v. Advertiser Co.*, 458 F.2d 1119, 1122 (5th Cir. 1972).[11]

Again, the Eleventh Circuit's recent decision in *Fearless Fund* is instructive for drawing the line.  There, Fearless Fund disputed that any "contract" was being extended to the winners of its grants, contending its grant program amounted to "discretionary gifts." *Fearless Fund*, 103 F.4th at 779.  In turn, the plaintiff (represented by the same counsel as here) freely conceded that Section 1981 places no restrictions on "true 'charity'" or "anyone … giving away their money for free."  Reply Br., *Fearless Fund*, No.  23-13138 (11th Cir.), 2024 WL 81432, at *1.  Nor did the Eleventh Circuit question that premise.  *See Fearless Fund*, 103 F.4th at 779 ("Fearless isn't simply donating money; it's orchestrating a bargained-for exchange in which both parties obtain valuable benefits and undertake meaningful obligations.").  Instead, the court based its decision on the premise that a plaintiff *does* need to show the benefit it sought were issued pursuant to a contract but found that the contest rules clearly set forth a contract, where both parties exchanged valuable promises (and the agreement was originally designated "A CONTRACT").  *Id.* at 776.

Here, Plaintiffs' Complaint does not suggest any "good and sufficient consideration" offered by the fee-waiver ATM users to Citibank.  *Id.*  They do not plead that *such free-users* of the ATM who bank with other financial institutions offer Citibank anything of value or incur some detriment or offer some promise to access the free ATM service.  *But see Fearless Fund*, 103 F.4th at 775 (contest winner, in exchange for $20,000 and valuable mentorship, "grants Fearless permission to use its idea, name, image, and likeness for promotional purposes and agrees to

---

[11] Pre-1981 decisions of the old Fifth Circuit constitute Eleventh Circuit precedent. *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

indemnify Fearless to arbitrate any disputes that might arise").  Rather, the fee-waived ATM users simply receive a gratuitous benefit that they themselves cannot enforce.[12]

In sum, Section 1981 is an appropriate vehicle to vindicate a right to enter into a contract on the same terms as another, without reference to race.  But it is not an appropriate vehicle for these Plaintiffs to challenge a non-contractual arrangement under which they have no rights.

## III.    These Plaintiffs Cannot Assert a California-Unruh Act Claim.

In addition to their Section 1981 claim, Plaintiffs also bring an Unruh Act claim "on behalf of themselves" and a "California Subclass." Compl.  ¶¶ 33, 62.  The sole conduct Plaintiffs allege is that they "used a Citibank ATM" once each, either in Plantation or Fort Lauderdale, Florida in June 2023 (*id.* ¶¶ 7, 8).  *See also id.*  ¶ 11 (alleging venue here "because a substantial part of the events giving rise to [their] claims occurred in the [the Southern] District [of Florida].");  Civil Cover Sheet 1 (ECF No. 1-1) (indicating that "First Listed Plaintiff" Becker resides in "Broward County, FL").  These two Plaintiffs alleging only Florida-based conduct cannot assert an Unruh Act claim, on behalf of themselves or anyone else, notwithstanding their proposed class certification.

The Unruh Act, California Civil Code § 51 *et seq.*, prohibits various forms of discrimination against "[a]ll persons within the jurisdiction of this state." Cal. Civ. Code § 51(b). In light of its clear text, "[i]t is well-settled that the Unruh Act applies only within California." *Loving v. Princess Cruise Lines, Ltd.*, No.  08-cv-2898, 2009 WL 7236419, at *8 (C.D.  Cal.  Mar.

---

[12] Plaintiffs' citation in the Complaint to a case involving a discriminatory price differential provides no help.  *See* Compl.  ¶ 21 (quoting *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, No.  05 C 5030, 2007 WL 323490, at *4 (N.D.  Ill.  Nov. 1, 2007)).  That type of case involves a quintessential contract—the offer of a good or service in exchange for money.  In *Williams-Ellis*, the defendant agreed to provide the black plaintiff-customer a haircut for $65 while offering to provide the same haircut to a white plaintiff-customer for $40.  *See id.* at *1–2, 4.

5, 2009); *accord, e.g.*, *Huber v. Biden*, No.  22-15443, 2022 WL 17818543, at *2 (9th Cir. Dec.
20, 2022) (Plaintiff "cites no authority applying the Unruh Act extraterritorially, nor offers any
basis to overcome the statute's plain language or the presumption against extraterritorial
application of California law"); *Moore v. Greyhound Bus Lines, Inc.*, No. 15-CV-1186-CAB
(MDD), 2018 WL 3361395, at *2 (S.D. Cal. July 10, 2018) (collecting cases for the proposition
that "Unruh has limited geographical scope and only applies to discrimination that takes place
within California").  So an ATM charge incurred at a Florida ATM offers no basis for the
application of the Unruh Act.  All Unruh claims in the Complaint must therefore be dismissed.
*See, e.g.*, *Moore*, 2018 WL 3361395, at *2 (denying leave to amend as futile to add an Unruh claim
based on events "in Denver, Colorado"); *Huber*, 2022 WL 17818543, at *2 (affirming dismissal
of Unruh claim because plaintiff did "not allege that she suffered the challenged discrimination
while in California").

Seeking to certify a putative class action does not eliminate the need to have a named
plaintiff who can invoke the Unruh Act.  To represent a class against a defendant on a particular
claim, "it is not enough that a named plaintiff can establish a case or controversy between himself
and the defendant by virtue of having standing as to just one of many claims he wishes to assert.
Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class
unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin v.
Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).  As applied to state law causes of action with no
extraterritorial reach, class-action plaintiffs "may assert a state statutory claim only if a named
plaintiff resides in that state."  *Goldstein v. Nonni's Foods LLC*, No. 22-81462-CIV, 2023 U.S.
Dist. LEXIS 34048, at *7 (S.D.  Fla.  Feb.  28, 2023); *see Nuwer v. FCA United States LLC*, 343
F.R.D. 638, 648 n.4 (S.D. Fla. 2023), *reconsideration denied*, No. 20-60432-CIV, 2023 WL

4370737 (S.D. Fla. Apr. 5, 2023) (Singhal, J.) (declining to endorse view "that a named plaintiff has standing to bring a representative claim based on a statute from a state in which he does not reside"). And neither Plaintiff here claims to be a California resident or to have been injured in California.

Finally, "[b]ecause of the similar analysis applied to both § 1981 claims and Unruh Act claims, courts may analyze § 1981 and Unruh Act claims together." *Blackshire v. Cnty. of Yuba*, 648 F. Supp. 3d 1221, 1237 (E.D. Cal. 2023). Accordingly, the Unruh Act claims should also be dismissed for the above reasons that Plaintiffs' Section 1981 claims fail.[13]

## CONCLUSION

The Court should dismiss the case for lack of Article III standing. In the alternative, the Court should dismiss with prejudice the Section 1981 and California Unruh Act claims.

---

[13] Plaintiffs invoke federal-question jurisdiction for their Section 1981 claims and seek to bring their Unruh Act claims via supplemental jurisdiction under 28 U.S.C. § 1367. Compl. ¶ 10; *see* Civil Cover Sheet at II (Basis of Jurisdiction). Plaintiffs' Unruh claims fail on the law, as described. But after dismissing Plaintiffs' Section 1981 claims, the Court may also "decline to exercise supplemental jurisdiction," a practice which "the Eleventh Circuit encourages" when dismissal comes before trial. *Johns v. Tony*, No. 22-61356-CIV, 2023 WL 9327362, at *2 (S.D. Fla. Dec. 20, 2023) (Singhal, J.) (declining jurisdiction over state law claims where Section 1983 claims were dismissed with prejudice), *appeal filed*, No. 24-10172 (11th Cir.).

Dated: July 10, 2024                     Respectfully submitted,

                                         /s/ Eliot Pedrosa
                                         Eliot Pedrosa
                                         Florida Bar No. 182443
                                         epedrosa@jonesday.com
                                         JONES DAY
                                         600 Brickell Avenue, Suite 3300
                                         Miami, FL 33131
                                         Telephone:  (305) 714-9700
                                         Facsimile:  (305) 714-9799

                                         Jayant W. Tambe (*admitted pro hac vice*)
                                         Alexander V. Maugeri (*admitted pro hac vice*)
                                         JONES DAY
                                         250 Vesey Street
                                         New York, NY 10281
                                         Telephone: (212) 326-3939
                                         Facsimile: (212) 755-7306
                                         amaugeri@jonesday.com
                                         jtambe@jonesday.com

                                         Christopher Pagliarella (*admitted pro hac vice*)
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C.  20001
                                         Telephone: (202) 879-3939
                                         Facsimile: (202) 626-1700
                                         cpagliarella@jonesday.com

                                         ***Attorneys for Defendants***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on July 10, 2024, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Eliot Pedrosa*
Eliot Pedrosa

***Attorney for Defendants***