**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-60834-Singhal

WERNER JACK BECKER, DANA
GUIDA, individually and on behalf of
others similarly situated,

        Plaintiffs,

   v.

CITIGROUP INC. d/b/a CITIBANK and
CITIBANK, N.A.,

        Defendants.

**AMENDED CLASS ACTION COMPLAINT**

Class Plaintiffs, Werner Jack Becker and Dana Guida, file this amended class action complaint individually and on behalf of all others similarly situated against Defendants, Citigroup Inc. d/b/a Citibank and Citibank, N.A. (collectively "Citi"), and allege as follows:

**INTRODUCTION**

1.      "Discrimination on the basis of race or color is contrary to the public policy of the United States," *Burks v. Poppy Constr. Co.*, 370 P.2d 313, 317 (Cal. 1962), and is "'invidious in all contexts,'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023). Unfortunately, "the views that motivated *Dred Scott* and *Plessy* have not been confined to the past, and we must remain ever vigilant against all forms of racial discrimination." *Id.* at 268 (Thomas, J., concurring).

2.      Because "[e]liminating racial discrimination means eliminating all of it," *id.* at 206 (majority op.), Congress extended the guarantee of racial neutrality to private contracting in the Civil Rights Act of 1866, *see* 42 U.S.C. §1981; *see also SFFA*, 600 U.S. at 249 (Thomas, J.,

concurring) (noting that "the unambiguously worded Civil Rights Act of 1866 ... clearly prohibited discrimination on the basis of race"). Among other things, that guarantee prohibits discriminating against anyone because of the race of who they associate or do business with. *See, e.g.*, *Barrows v. Jackson*, 346 U.S. 249, 257–59 (1953) (declaring unlawful a restrictive racial covenant which prohibited whites from selling to blacks); *Parr v. Woodmen of the World Life Ins.*, 791 F.2d 888, 890 (11th Cir. 1986); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1488 (9th Cir. 1995).

3.      This case involves express, unabashed racial discrimination that violates federal and state law. From July 14, 2016, until now, Citi has had an express policy of charging customers different ATM fees based on race. Among other things, Citi does not charge out-of-network ATM fees to people who bank at financial institutions that it identified as "minority owned." But it does charge those fees to people who bank at other financial institutions.

4.      This policy was no secret. Citi has advertised its race-based pricing scheme, maintained it without interruption, and often boasted about it. This makes Citi's racial discrimination markedly different from the mine run of discrimination cases where intensive factual development is necessary to establish whether a defendant engaged in discrimination. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Here, it's indisputable that Citi intentionally discriminated against Plaintiffs and those similarly situated for banking with financial institutions owned by people who are not Citi's preferred race.

5.      For these and other reasons, Citi is liable to Plaintiffs and those similarly situated under both 42 U.S.C. §1981 and state law for each ATM fee they paid at Citi's ATMs.

## PARTIES

6.      Plaintiff Werner Jack Becker does not bank with Citi. He used a Citibank ATM at 8400 W. Broward Blvd., Plantation, FL 33324 and paid an out-of-network fee in July 2023. Becker's bank is Chase Bank, which is not eligible for Citi's fee-waiver policy. *See infra* ¶¶27-31.

7.      Plaintiff Dana Guida does not bank with Citi. She used a Citibank ATM at 5825 N. University Dr., Ft. Lauderdale, FL. 33321 and paid an out-of-network fee in June 2023. Guida's bank is Bank of America, which is not eligible for Citi's fee-waiver policy. *See infra* ¶¶27-31.

8.      Defendant Citigroup Inc. d/b/a Citibank ("Citigroup") is a multinational investment bank and financial services corporation headquartered in New York City, New York, and incorporated in Delaware. Citigroup is one of the largest investment banks in the world, boasting over $2 trillion in total assets and a net annual income of over $9 billion in 2023.

9.      Defendant Citibank, N.A. ("Citibank") is a subsidiary of Citigroup headquartered in New York City, New York, and incorporated in Delaware. Like its parent, Citibank is one of the largest institutions of its kind in the world, boasting over 2,000 branches spread across the United States, Mexico, and over a dozen other countries. Citibank's 654 branch locations in the United States are concentrated in major cities, including Ft. Lauderdale, Miami, New York, Chicago, Los Angeles, San Francisco, and Washington, D.C.

## JURISDICTION & VENUE

10.      This Court has federal question subject matter jurisdiction pursuant to 42 U.S.C. §1981 and supplemental jurisdiction over Plaintiffs' state law claim pursuant to 42 U.S.C. §1367.

11.      Venue is proper in this Court under 28 U.S.C. §1391 because a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

**I.      Citi's racially discriminatory ATM program.**

12.     Like most banks, Citi charges customers an out-of-network fee and collects their personal information in exchange for using Citi's ATMs to withdraw cash from a financial institution outside of Citi's ATM network. But unlike other banks, whether Citi imposes this fee is tied to racial considerations.

13.     On July 14, 2016, Citi announced a pilot program called the "Citi® ATM Community Network" (hereinafter "Policy"). Under this Policy, Citi waives all ATM fees at Citi branch offices for customers from certain banks, including minority-owned banks and credit unions. But Citi continues to charge ATM fees to customers from other banks.

14.     The express goal of the Policy was discriminatory. It was meant to provide cheaper access to ATMs for customers who do business with banks that are owned by, or serve, members of Citi's preferred races.

15.     The race-based nature of the Policy was not an incidental feature. The policy was launched "in consultation with" a group called the "Asset Building Policy Network," which describes itself as "a national coalition that collectively advances … long-term financial security for low- and moderate-income *communities of color*." Citi was no stranger to the Asset Building Policy Network's race-oriented goals—it had coordinated with the Network on multiple programs targeting "communities of color" since the early 2010s.

16.      Citi was not shy about the race-based nature of the Policy. In its press release introducing the Policy, Citi explicitly said the goal was to provide "surcharge-free ATM Access" to customers of "minority-owned banks and credit unions."

17.      Citi again highlighted the race-based nature of the Policy in its *2016 Global Citizenship Report*—an annual report featuring Citi's efforts to "respond[] to challenges around

the world." In its "Citizenship Performance Highlights," Citi described the policy as "providing **FREE USE OF CITI'S ATM NETWORK** to over **300,000 CLIENTS** of participating minority-owned banks and credit unions…."

18.     Citi continued to describe the Policy in race-based terms as it grew. In its *2017 Global Citizenship Report*, Citi said the policy "provide[d] fee-waived access to more than **400,000 clients** of minority-owned banks and credit unions in the U.S." Again, in its *2018 Global Citizenship Report*, Citi described the Policy as allowing "440k clients of minority-owned banks and credit unions [to] receive[] fee-waived access." Citi clarified the Policy was part of its "establish[ment of] relationships with 25 minority depository institutions, community banks and credit unions."

19.     Citi also described the Policy as race-based in a March 2020 regulatory disclosure to the District of Columbia. Citi said that under the Policy, "440,000 clients of minority-owned banks and credit unions" receive "fee-waived access" to its ATMs.

20.     On September 23, 2020, Citi included the Policy as a key component in its "Action for Racial Equity" initiative. Citi's then-CEO Michael Corbat explained that the initiative aimed to "bring[] together all the capabilities of our institution—our people, our lines of business, our balance sheet, and our philanthropy—like never before to combat the impact of racism in our economy." Citi's CFO, Mark Mason, agreed: "We are in the midst of a national reckoning on race, and words are not enough … we are determined to help close the racial wealth gap and help build an anti-racist economy and society."

21.     Citi's "Goal #1" for the "Action for Racial Equity" initiative was to "expand banking and access to credit in communities of color." The Policy featured prominently in these

efforts by, in Citi's words, "remov[ing] out-of-network fees at Citibank ATMs for customers of participating minority-owned banks and community development credit unions."

22.     Citi has frequently cited the Policy in its communications with lawmakers and regulators while touting its race-based nature. In May 2021, Citi's newly-minted CEO, Jane Fraser, described the Policy as race-based in her testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs. Fraser testified that the Policy "remov[ed] surcharge fees at Citibank ATMs for more than 440,000 customers of 28 minority-owned banks and credit unions."

23.     Again, in September 2022, Ms. Fraser described the Policy in her written testimony to lawmakers as "expanding banking services in communities of color by extending surcharge-free access to Citibank ATMs through our Citi ATM Community Network of 32 community banks, 16 of which are [minority-owned]."

24.     In November 2021, Citi featured the Policy in a brochure advertising its relationships with minority-owned banks. Citi said the Policy's intent was to "strengthen[] the economic trajectory of minority banking institutions and the communities they serve." Citi's write-up on the Policy featured a quote from its CFO, Mark Mason: "'As we continue to do the work to become an anti-racist institution and drive finance toward a more equitable and inclusive industry, we will do our part by engaging firms that reinvest into the Black community.'"

25.     In September 2022, Citi featured the Policy in its "Year Two Progress Report" on the Action for Racial Equity initiative. Citi again said the Policy had "remov[ed] out-of-network fees at Citibank ATMs for customers of participating minority-owned banks and community development credit unions."

26.     According to a December 2022 audit of Citi's Action for Racial Equity initiative, Citi's Policy is achieving its intended effect. Minority-owned banks said the Policy "'change[d] the whole dynamic' of [their] business because it resulted in more individuals banking with the MDI."

27.     Today, three types of banks are eligible for the Policy. A bank must be: (a) minority-owned; (b) a Community Development Credit Union (CDCUs); or a (c) Community Development Financial Institution (CDFI).

28.     A CDCU is a credit union that is a member of Inclusiv, a nonprofit association of banks that specialize in providing particular types of loans, "[a] safe place to save and build assets," "[a] place to conduct transactions at reasonable cost," and "[f]inancial education and counseling for its members," among other things.

29.     A CDFI is a bank that is certified by the Department of Treasury as, among other things, having customers in low-income communities. Treasury describes CDFIs' predecessors as "minority-owned banks" that "focused on low-income areas."

30.     Over 70% of banks in the Policy are minority-owned.

31.     Neither Chase Bank nor Bank of America is minority-owned, a CDCU, or a CDFI. Their customers are thus not eligible to take advantage of the Policy.

32.     Citi's inclusion of minority-owned banks in the Policy is race-based on its face. And while Citi's inclusion of CDCUs and CDFIs is not facially race-based, their inclusion was motivated by race too. In 2017, for example, Citi stated the purpose of the Policy was to target minorities. "[S]tudies show," according to Citi, "that low-income communities of color still predominantly use cash for transactions, making ATM access and fees especially important. This

offered Citi, with our large ATM network, an opportunity to leverage our resources to improve banking accessibility for all."

33.     In 2020, Citi said the Policy and it inclusion of CDCUs was part of a broader goal to "expand banking and access to credit in communities of color."

34.     And in 2021, Citi's CEO testified that "CDFIs level the playing field for underserved communities and populations, *especially communities of color*." She also testified in 2022 that "[w]e are expanding banking services in *communities of color* by extending surcharge-free access to Citibank ATMs through our Citi ATM Community Network of 32 community banks, 16 of which are [minority-owned]." The other 16 banks at the time, in other words, are CDCUs and CDFIs that are part of the program because they are in "communities of color."

35.     Citi thus includes CDCUs and CDFIs in the Policy because it perceives their customers to be minorities.

36.     Citi has no intention of ending the Policy. Citi listed the Policy in its annual disclosures to the City of Chicago 2024 and, again, highlighted its race-based criteria: "Citi ATM Community Network — Provides surcharge-free cash withdrawals and account inquiries at Citibank branch ATMs to more than 315,000 customers of 15 participating minority-owned banks and credit unions." As of the filing of this Amended Complaint,  Citi's website continues to describe the Policy as applying to "customers of participating minority-owned banks and community development credit unions." And Citi still features the Policy as part of its efforts to "Expand[] Banking And Access to Credit in Communities of Color."

II. **Citi adopted and continued the Policy for financial reasons.**

A. **The Policy afforded Citi positive press.**

37.     Financial motivations are behind Citi's decision to adopt and continue the Policy. Citi has frequently and publicly highlighted the Policy's race-based nature, and it has received positive press and public recognition as a result.

38.     In 2018, Euromoney named Citi the "World's best bank for corporate responsibility," pointing out that "Citi supports many minority-owned banks and credit unions in the country by giving 400,000 of their clients access to its nationwide ATM network."

39.     After Citi rolled out the Action for Racial Equty initiative—which featured the ATM program—in 2020, media outlets praised Citi's commitment to "closing the racial wealth gap."

40.     In 2020, Citi was praised by BlackEnterprise.com for its "Action for Racial Equity" initiative, which included the ATM program, as an effort to "boost investment in Black-owned businesses … and advance anti-racist practices in the financial services industry."

41.     This type of press is extremely valuable to companies like Citi because many consumers will become customers of companies like Citi *because* of their racially discriminatory policies.

B. **The racial nature of the Policy helped Citi get and keep investors.**

42.     Citi has also featured the Policy prominently in its communications with investors. That decision has made good business sense too. In June 2020, for example, Citi's second-largest shareholder announced its intention to invest in companies that implement racially discriminatory policies, like Citi's ATM Policy. Implementing and maintaining the Policy has helped ensure that Citi did not lose investors like that one.

43.     Likewise, in December 2020, Citi pointed to the Policy in an effort to appease a group of shareholders who filed a proposal to force Citi to undergo an independent "racial equity audit analyzing Citi's adverse impacts on nonwhite stakeholders and communities of color." To avoid a shareholder vote on the proposal, Citi wrote a letter to the Securities and Exchange Commission arguing that, among other things, its ATM Policy already "expand[ed] banking and access to credit in communities of color" and "remove[d] out-of-network fees … for customers of participating minority-owned banks and community development credit unions," making the audit unnecessary.

44.     In the end, Citi's effort to avoid the "racial equity audit" failed. But the Policy helped ensure that the eventual findings did not hurt Citi with investors. In the final report, the auditors found the Policy kept Citi "on track" to "expand banking and access to credit in communities of color." Citi hinted at this in a corresponding press release, noting that the "audit highlights a number of areas where Citi has increased access to key resources for communities of color" and "deepened our collaboration with minority-owned depository institutions…."

45.     Citi's Policy has also corresponded to the rise of corporate Environmental and Social Governance ("ESG") ratings, which report on, among other things, a corporation's commitment to policies like Citi's. As one of the world's largest consulting firms noted, "most investors," including the "largest institutional investors," "use ESG ratings in their investment decisions" and a "bad [ESG] rating … can mean that the company is delisted or that the share is priced at a discount to the closest peers." KPMG, *Why is your ESG rating important?*, KPMG.com (accessed Apr. 15, 2024), https://perma.cc/RWC9-43H6. The Policy thus helps Citi avoid any adverse economic effects that come from a poor ESG rating.

46.     For example, in an April 2019 report titled "The Competitive Advantage of Racial Equity," an outside consulting group featured Citi's Policy as an example of a "mutually beneficial partnership[] with organizations of color." The report explained that in adopting the policy, Citi was "moving to action" by "understand[ing] the needs and behaviors of markets of color."

47.     In short, the race-based nature of the Policy has given Citi an edge with the public, regulators, lawmakers, and investors. Citi currently has no intention of relinquishing these benefits, even if it means continuing to discriminate on the basis of race.

## III.     Citi's Policy violates federal and state law.

### A.     The Policy violates 42 U.S.C. §1981 because it effects associational and direct discrimination against Plaintiffs.

48.     Courts have noted the "subtle, pervasive, and essentially irremediable nature of racial discrimination" for good reasons. *Gresham*, 730 F.2d at 1424. "[I]t demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *SFFA*, 600 U.S. at 221. And "it is becoming increasingly clear that discrimination on the basis of race—often packaged as 'affirmative action' or 'equity' programs—are based on the benighted notion 'that it is possible to tell when discrimination helps, rather than hurts, racial minorities.'" *Id.* at 261 (Thomas, J., concurring).

49.     For these reasons, it is irrelevant whether Citi's Policy resulted from racial animus towards any particular group. Federal courts have repeatedly affirmed that "liability for intentional discrimination under § 1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 (11th Cir. 1999); *see also Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987) (holding that union leaders' racially disparate treatment of members violated §1981 "regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities") (citations omitted).

This is because "racial discrimination is invidious in all contexts." *SFFA*, 600 U.S. at 214 (cleaned up); *see also id.* at 266 (Thomas, J., concurring) ("I would have thought that history had by now taught a 'greater humility' when attempting to 'distinguish good from harmful uses of racial criteria.'").

50.     This case is no different. By charging its customers, including Plaintiffs (*supra* ¶¶6-7), different prices based on race, the Policy violates federal law.

51.     The Civil Rights Act of 1866 provides that persons of all races "have the same right … to make and enforce contracts," which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(a)-(b).

52.     This broad language "covers *all* contracts" and "embrace[s] all aspects of the contractual relationship." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 303–04 (1994). The statute thus bars a defendant from "charg[ing] a higher price on account of … race." *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, No. 05 C 5030, 2007 WL 3232490, at *4 (N.D. Ill. Nov. 1, 2007).

53.     It is also well established that §1981 targets all racial discrimination in contracting, irrespective of which races are favored or disfavored. *McDonald*, 427 U.S. at 295 (holding that white employees could bring discrimination claims under §1981 because "by its broad terms," §1981 "proscribe[s] discrimination [in contracting] against, or in favor of, any race" (emphasis added)); *accord, e.g.*, *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258 (4th Cir. 2001) ("It is … well established that both whites and members of racial minorities may sue for violations of § 1981").

54.     Federal courts have also long held that §1981 supports "cases involving discriminatory action taken directly against a [plaintiff] because of the [plaintiff's] relationship to, association with, or advocacy of" individuals of a race disfavored by the defendant. *Bilello v. Kum & Go, LLC*, 374 F.3d 656, 660 (8th Cir. 2004) (collecting cases); *see also Parr*, 791 F.2d at 890. For example, a §1981 claim lies when the defendant "has taken action against [the plaintiff] because" of the race of those the plaintiff "contracts with." *Symington*, 51 F.3d at 1488.

55.     The Policy violates §1981 in two ways. *First*, Citi systematically charges different fees based on skin color. If a bank is "minority owned," then Citi does not charge customers of that bank out-of-network fees for using Citi ATMs. But Citi charges those fees to customers who Citi knows have accounts (and thus a commercial relationship) with other banks that are not part of Citi's Policy. That violates §1981, and it has harmed each Plaintiff. *See supra* ¶¶6-7.

56.     *Second,* Citi also perceives customers of minority-owned banks, CDCUs, and CDFIs in the Policy to be minorities because, for example, those banks serve "communities of color." Citi thus directly discriminated against Plaintiffs because it did not perceive them to be minorities. *See, e.g.*, *Capek v. BNY Mellon, N.A.*, 2016 WL 2993211, at *3 (S.D.N.Y. May 23, 2016) (relying on, *inter alia*, *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012), to explain that §1981 bars discrimination where the defendant "'perceived'" plaintiff "to be a member of a protected class"); *Est. of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1094 (9th Cir. 2001) ("That Amos was actually white does not make that discrimination or its resulting injury less direct.").

**B.      The Policy violates California's Unruh Civil Rights Act because it effects associational and direct discrimination.**

57.     The Unruh Civil Rights Act was designed to "'banish[]'" and "'eradicat[e]'" all discrimination "in California business establishments." *White v. Square, Inc.*, 446 P.3d 276, 279

(Cal. 2019) (citations omitted). It "prohibits arbitrary discrimination, both benign and improperly intentioned, against minorities or majorities," *Park Redlands Covenant Control Comm. v. Simon*, 226 Cal. Rptr. 199 (Cal. Ct. App. 1986), including "discrimination in the form of pricing differentials," *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1050 (9th Cir. 2000).

58.     It makes no difference in how the company frames its "pricing differential." *Id.* Whether it charges one race more, or gives one race a discount, the company equally violates Unruh. *Cf. Koire v. Metro Car Wash*, 707 P.2d 195, 200 (Cal. 1985) ("The plaintiff was adversely affected by the price discount. His female peers were admitted to the bar free, while he had to pay.").

59.     Unruh has also long prohibited discriminating against a person of any race for doing business with those of a disfavored race. *See* Cal. Civ. Code §51(e)(6) (defining protected characteristics to "include[] … that the person is associated with a person who has … any particular characteristic"). That is because Unruh has "been liberally applied to all types of business activities." *Jackson v. Superior Ct.*, 36 Cal. Rptr. 2d 207 (Cal. Ct. App. 1994). In fact, the statute expressly prohibits discriminating against a person for entering any type of contract or business relationship. Cal. Civ. Code §51.5(a). Being a "customer[]" or a "business associate[]" is protected under Unruh. *Id.*; *see Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1126–27 (9th Cir. 2008) (Unruh prohibits "discrimination in 'relationships similar to the proprietor/customer relationship'").

60.     Even before Unruh was amended to expressly prohibit such discrimination, the Supreme Court of California held that Unruh prohibited a landlord from discriminating against a white tenant because that tenant sublet to a Black renter. *Winchell v. English*, 133 Cal. Rptr. 20 (Cal. Ct. App. 1976). And more recently, the California Court of Appeal held that Unruh prohibited

a finance company from paying car dealerships less when the dealerships entered sales contracts with women rather than men. *See Dep't of Fair Emp. & Hous. v. M&N Fin. Corp.*, 284 Cal. Rptr. 3d 477 (Cal. Ct. App. 2021).

61.     All of this distills to a simple rule: anyone who is "subjected to … [a] defendant's [race]-based price differential … must be considered persons denied the rights provided in" Unruh. *Angelucci v. Century Supper Club*, 158 P.3d 718, 727 (Cal. 2007) (cleaned up).

62.     Like with §1981, the Policy violates Unruh in two ways. *First*, if a bank is "minority owned," then Citi did not charge customers of that bank out-of-network fees for using Citi ATMs. But Citi charged those fees to customers who Citi knew had accounts (and thus a commercial relationship) with other banks that were not part of the Policy. That violates Unruh, and it has harmed each Plaintiff. *See supra* ¶¶6-7.

63.     *Second,* Citi also perceives customers of minority-owned banks, CDCUs, and CDFIs in the policy to be minorities because those banks serve "communities of color." Citi thus discriminated against Plaintiffs because it did not perceive them to be minorities. *See* Cal. Civ. Code §51(e)(6) (defining the terms "race," "color," and "ancestry" to "include[] a *perception* that the person has [a protected] characteristic or characteristics … or that the person is associated with a person who has, or is *perceived* to have, [a protected] characteristic or characteristics." (emphasis added)).

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs incorporate all prior allegations.

65.     Plaintiffs brings this action individually and on behalf of all other persons similarly situated ("the Classes") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

66.     Plaintiffs propose the following Class definitions and seek certification of such Classes, subject to amendment based on information obtained through discovery:

> **National Class (§1981):** All persons in the United States who paid ATM fees at a Citi branch location in the last four years.
>
> **California Subclass (Unruh Civil Rights Act):** All persons in California who paid ATM fees at a Citi branch location in the last three years.

67.    Excluded from the Classes are Citi's officers, directors, employees, and agents; any entity in which Citi has a controlling interest; and affiliates, legal representatives, attorneys, successors, heirs, and assigns of Citi. Excluded also from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

68.    Plaintiffs reserve the right to amend the definitions of the Classes or add a class or subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

69.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims for each Class Member.

70.    This action satisfies the requirements for a class action under Rule 23, including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

71.    <u>Numerosity</u>. The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Classes are numerous, consisting of at least thousands of customers that Citibank charged ATM fees under its racially discriminatory Program.

72.    <u>Commonality and Predominance</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

16

73.     Whether under the Policy Citi charged ATM fees based on the race of the owner of the bank or credit union its customers did business with;

74.     When Citi became aware of the illegality of the Policy;

75.     How many times, and from how many customers, Citi charged ATM fees, beginning on July 14, 2016;

76.     Whether Citi's racially discriminatory actions violate 42 U.S.C. §1981;

77.     Whether Citi's racially discriminatory actions violate the Unruh Civil Rights Act;

78.     Whether Plaintiffs and Class Members are entitled to actual, compensatory, statutory, or punitive damages, statutory penalties, or declaratory or injunctive relief, as allowable by federal or state law.

79.     <u>Typicality</u>. The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Classes because Plaintiffs' claims are based on the same legal theories and violations of law. Plaintiffs' grievances, like the proposed Class Members' grievances, all arise out of the same business practices and course of conduct by Citi.

80.     <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs' counsel are competent and experienced in litigating civil rights cases and mass actions.

81.     <u>Predominance</u>. Citi has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiffs and Class Members were charged the same discriminatory fees at Citi ATMs. The common issues arising from Citi's conduct affecting the Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

82.     <u>Superiority</u>. A class action is a superior method for the fair and efficient adjudication of this case because class proceedings are superior to all other available methods for fair and efficient adjudication of this case, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

83.     It would be a substantial hardship for most individual members of the Classes to prosecute individual actions, many of whom are not in a position to incur the expense of retaining their own counsel to prosecute individual actions.

84.     The litigation of individual cases would create inconsistent results, with some members of the Classes recovering but not others, and some courts declaring that Citi is liable for discrimination but potentially not others, establishing incompatible standards of conduct for Defendants. By contrast, if this Court adjudicates Citi's liability for all the members of the Classes, it can resolve their claims all at once, without inconsistent or varying results, thus achieving global relief and judicial efficiency.

85.     A class action will permit an orderly and expeditious administration of the Class claims, fostering economies of time, effort, and expense. If the Class Members are forced to bring individual suits, the transactional costs, including those incurred by Citi, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and legal issues.

86.     This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Classes include only customers who were charged ATM fees at Citi branch locations, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Classes do not

contain so many persons that it would make the Class notice procedures unworkable or overly expensive. And the identity of the Class Members can be identified from Citi's records, such that direct notice to the Class Members would be appropriate.

87.　　In addition, Citi has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CLAIMS FOR RELIEF

### COUNT I
### Civil Rights Act of 1866, 42 U.S.C. §1981
### (Associational Discrimination)

88.　　Plaintiffs incorporate all prior allegations.

89.　　Plaintiffs bring this claim on behalf of themselves and all members of the Classes.

90.　　Federal civil rights law provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(a)-(b).

91.　　Citi created the Policy which waived ATM fees for certain customers based on the race of the owners of their bank or credit union, while continuing to impose ATM fees for all other customers of all other banks not in the Policy.

92.　　Plaintiffs and Class Members used a Citi branch ATM on or after July 14, 2016, when Citi launched the Policy, were charged a fee for doing so, and were thus harmed by Citi's racial discrimination.

93.　　Plaintiffs' and Class Members' use of a Citi branch ATM constituted a contract.

94.     By imposing ATM fees for one set of customers but not for others, Citi's Policy denied Plaintiffs and Class Members "the same right[s]" in the "mak[ing] and enforc[ing] [of] contracts" with Citi because of race. 42 U.S.C. §1981(a).

**COUNT II**
**Civil Rights Act of 1866, 42 U.S.C. §1981**
**(Direct Discrimination)**

95.     Plaintiffs incorporate all prior allegations.

96.     Plaintiffs bring this claim on behalf of themselves and all members of the Classes.

97.     Federal civil rights law provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(a)-(b).

98.     To qualify for the Policy, a bank must be: (a) minority-owned; (b) a CDCU; or (c) a CDFI. Citi set these criteria because it believes that the customers of these banks are minorities.

99.     Plaintiffs and Class Members used a Citi branch ATM on or after July 14, 2016, when Citi launched the Policy, were charged a fee for doing so, and thus paid ATM fees because Citi did not perceive them to be minorities.

100.    Plaintiffs' and Class Members' use of a Citi branch ATM constituted a contract.

101.    By imposing ATM fees for one set of customers but not for others, Citi's Policy denied Plaintiffs and Class Members "the same right[s]" in the "mak[ing] and enforc[ing] [of] contracts" with Citi because of race. 42 U.S.C. §1981(a).

## COUNT III
## California Unruh Civil Rights Act, Cal. Civ. Code §§51-52
## (Associational Discrimination)

102.    Plaintiffs incorporate all prior allegations.

103.    Plaintiffs bring this claim on behalf of all members of the California subclass.

104.    Unruh provides, "No business establishment of any kind whatsoever shall discriminate against … any person in this state on account of [race], or of the person's … business associates … because the person is perceived to have [a particular race], or because the person is associated with a person who has, or is perceived to have, [a particular race]." Cal. Civ. Code §51.5(a); *see also* Cal. Civ. Code §51(b).

105.    Citi created the Policy which waived ATM fees for certain customers based on the race of the owners of their bank or credit union, while continuing to impose ATM fees for all other customers of all other banks not in the Policy.

106.    Plaintiffs and Class Members used a Citi branch ATM on or after July 14, 2016, when Citi launched the Policy, were charged a fee for doing so, and were thus harmed by Citi's racial discrimination.

107.    By imposing ATM fees for one set of customers but not for others, Citi's Policy "subjected" Plaintiffs and Class Members to a "[race]-based price differential," in violation of Unruh. *Angelucci*, 158 P.3d at 727.

## COUNT IV
## California Unruh Civil Rights Act, Cal. Civ. Code §§51-52
## (Direct Discrimination)

108.    Plaintiffs incorporate all prior allegations.

109.    Plaintiffs bring this claim on behalf of themselves and all members of the California subclass.

110.    Unruh provides, "No business establishment of any kind whatsoever shall discriminate against … any person in this state on account of [race], or of the person's … business associates … because the person is perceived to have [a particular race], or because the person is associated with a person who has, or is perceived to have, [a particular race]." Cal. Civ. Code §51.5(a); *see also* Cal. Civ. Code §51(b). The term "race" "includes a perception that the person has any particular [race] or that the person is associated with a person who has, or is perceived to have, any particular [race]." *Id.* §51(e)(6).

111.    To qualify for the Policy, a bank must be: (a) minority-owned; (b) a CDCU; or (c) a CDFI. Citi set these criteria because it believed that the customers of these banks are minorities.

112.    Plaintiffs and Class Members used a Citi branch ATM on or after July 14, 2016, when Citi launched the Policy, were charged a fee for doing so, and thus paid ATM fees because Citi did not perceive them to be minorities.

113.    By imposing ATM fees on Plaintiffs and Class Members, Citi's Policy "subjected" them to a "[race]-based price differential," in violation of Unruh. *Angelucci*, 158 P.3d at 727.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and provide the following relief against Defendants, jointly and separately:

114.    An Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Classes;

115.    Declaratory relief declaring the Policy violates federal and California law;

116.    Injunctive relief prohibiting Defendants from advertising or implementing the Policy;

117.    Equitable relief requiring restitution and disgorgement of ATM fees wrongly collected under the Policy;

118.    Actual, compensatory, statutory, and punitive damages, and statutory damages, in an amount to be determined, as allowable by federal and California law;

119.    Attorneys' fees, costs, and any other expenses;

120.    Pre- and post-judgment interest on any amounts awarded;

121.    All other relief to which Plaintiffs and the Classes are entitled;

122.    Such other and further relief this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all claims in this Complaint so triable. Plaintiffs also respectfully request leave to amend this Complaint to conform to the evidence if such amendment is needed for trial.

Respectfully submitted,

Dated: July 31, 2024

/s/  *Daniel Shapiro*
Daniel J. Shapiro (Fla. Bar No. 1011108)
Bryan Weir (*pro hac vice*)
Brandon M. Haase* (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
bryan@consovoymccarthy.com
brandon@consovoymccarthy.com

* Supervised by principals of the firm admitted to practice in Virginia

*Counsel for Plaintiffs*