**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-60834-Singhal

WERNER JACK BECKER, DANA
GUIDA, individually and on behalf of
others similarly situated,

       Plaintiffs,

v.

CITIGROUP INC. d/b/a CITIBANK and
CITIBANK, N.A.,

       Defendants.

**MEMORANDUM IN SUPPORT OF CITIGROUP INC. AND CITIBANK, N.A.'S**
**INCORPORATED MOTION TO DISMISS THE AMENDED COMPLAINT**
**<u>PURSUANT TO RULE 12(B)(1) AND 12(B)(6)</u>**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARDS ........................................................................................................ 5

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 6

ARGUMENT ...................................................................................................................... 10

I.       The Court Lacks Jurisdiction Because Plaintiffs Have Not Alleged (or Shown) That the Financial Institutions Where They Bank Are "Able and Ready" to Participate in the ATM Community Network, as Required for Article III Standing. ................................................................................................................. 10

        A.     Plaintiffs Do Not Allege that Chase or Bank of America Would be Willing to Join the Citibank ATM Community Network, Which Defeats the Injury-in-Fact and Traceability Requirements for Standing............................. 11

        B.     Plaintiffs Cannot Dodge the Need to Show a Traceable, Redressable Injury-in-Fact, as Captured by the "Able and Ready" Standard......................... 15

II.     Plaintiffs Fail to State a Claim under Section 1981 for Several Independent Reasons. ............................................................................................................... 18

        A.     Plaintiffs Cannot Allege Direct Discrimination Under Section 1981................. 18

        B.     Plaintiffs Cannot Allege Associational Discrimination Under Section 1981........................................................................................................ 24

             1.     Plaintiffs' Associational Discrimination Claims Do Not Plead Discrimination Based on Their Own Race. ............................................... 24

             2.     Section 1981 Associational Discrimination Claims Still Require a Showing of Discrimination Based on the Plaintiff's Race. .................... 25

             3.     Plaintiffs Fail to Plead Sufficient Facts to Support Their Supposed Association, Even if the Theory Were Viable. ....................................... 28

        C.     Plaintiffs Do Not Allege Any Discriminatory "Contract" That They Entered Into, or Wish to Enter Into, as Section 1981 Requires. ......................... 29

III.    These Two Florida Plaintiffs Cannot State a Claim under California's Unruh Act. ....... 33

CONCLUSION.................................................................................................................... 35

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Aaron Private Clinic Mgmt. LLC v. Berry*,
    912 F.3d 1330 (11th Cir. 2019) ....................................................................................13

*AFL-CIO v. Miami*,
    637 F.3d 1178 (11th Cir. 2011) .......................................................................................5

*Aiken v. Hackett*,
    281 F.3d 516 (6th Cir. 2002) .........................................................................................16

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
    103 F.4th 765 (11th Cir. 2024) ............................................................................. passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................................22

*Baughcum v. Jackson*,
    92 F.4th 1024 (11th Cir. 2024) ......................................................................................13

*Bierer-Carter v. United States*,
    806 F. Supp. 2d 1245 (S.D. Fla. 2011) .........................................................................17

*Blackshire v. Cnty. of Yuba*,
    648 F. Supp. 3d 1221 (E.D. Cal. 2023).........................................................................35

*Bonner v. Prichard*,
    661 F.2d 1206 (11th Cir. 1981) (en banc) ....................................................................31

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)................................................................................................27, 28

*Braunstein v. Arizona Dep't of Transp.*,
    683 F.3d 1177 (9th Cir. 2012) .......................................................................................15

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ..................................................................................6, 7

*California v. Texas*,
    593 U.S. 659 (2021)......................................................................................................16

ii

*Capek v. BNY Mellon, N.A.*,
　2016 WL 2993211 (S.D.N.Y. May 23, 2016) ........................................................................22

*City of Richmond v. J.A. Croson Co.*,
　488 U.S. 469 (1989) ...............................................................................................................19

*Clapper v. Amnesty Int'l*,
　568 U.S. 398 (2013) ...............................................................................................................14

*Cleveland Branch, N.A.A.C.P. v. City of Parma*,
　263 F.3d 513 (6th Cir. 2001) ............................................................................................20, 21

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
　68 F.4th 864 (4th Cir. 2023) ...................................................................................................21

*Cochrane v. Greener Energy, LLC*,
　2021 WL 9563201 (S.D. Fla. Sept. 17, 2021) .......................................................................30

*Coleman v. Burger King Corp.*,
　2023 WL 5507730 (S.D. Fla. Aug. 25, 2023) ..............................................................5, 33, 35

*Collins v. Select Portfolio Servicing, Inc.*,
　2023 WL 7513554 (S.D. Fla. Jan. 3, 2023) ..............................................................................5

*Comcast v. Nat'l Ass'n of Afr. Am.-Owned Media*,
　589 U.S. 327 (2020) ...............................................................................................................31

*Cook v. Advertiser Co.*,
　458 F.2d 1119 (5th Cir. 1972) ................................................................................................31

*Cox v. Nobles*,
　15 F.4th 1350 (11th Cir. 2021) .................................................................................................5

*Dep't of Com. v. New York*,
　588 U.S. 752 (2019) ...............................................................................................................22

*Domino's Pizza, Inc. v. McDonald*
　546 U.S. 470 (2006) ....................................................................................................... passim

*EEOC v. Catastrophe Mgmt. Sols.*,
　852 F.3d 1018 (11th Cir. 2016) ..............................................................................................23

*EEOC v. STME, LLC*,
　938 F.3d 1305 (11th Cir. 2019) ..............................................................................................29

*Est. of Amos ex rel. Amos v. City of Page*,
  257 F.3d 1086 (9th Cir. 2001) .......................................................................22

*Fisher v. Univ. of Texas at Austin*,
  579 U.S. 365 (2016).................................................................................19, 20

*Fisher v. Univ. of Texas at Austin*,
  758 F.3d 633 (5th Cir. 2014) .......................................................................20

*Floyd v. Amite Cnty. Sch. Dist.*,
  581 F.3d 244 (5th Cir. 2009) .......................................................................27

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................1, 12

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)......................................................................................15

*Frith v. Whole Foods Mkt., Inc.*,
  38 F.4th 263 (1st Cir. 2022)..........................................................................27

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
  458 U.S. 375 (1982)......................................................................................23

*Haaland v. Brackeen*,
  599 U.S. 255 (2023)......................................................................................16

*Holcomb v. Iona Coll.*,
  521 F.3d 130 (2d Cir. 2008).........................................................................27

*Huber v. Biden*,
  2022 WL 17818543 (9th Cir. Dec. 20, 2022) ............................................34

*In re Checking Acct. Overdraft Litig.*,
  780 F.3d 1031 (11th Cir. 2015) ..............................................................33, 34

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
  2022 WL 16729170 (11th Cir. Nov. 7, 2022).........................................34, 35

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020) ...................................................................14

*Jimenez v. Wellstar Health Sys.*,
  596 F.3d 1304 (11th Cir. 2010) ..............................................................24, 30

*Johns v. Tony*,
    2023 WL 9327362 (S.D. Fla. Dec. 20, 2023) ........................................................................35

*Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*,
    162 F.3d 1290 (11th Cir. 1998) ....................................................................................30, 31

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968) ........................................................................................................33

*Kengerski v. Harper*,
    6 F.4th 531 (3d Cir. 2021) ..............................................................................................25

*Kennedy v. Floridian Hotel, Inc.*,
    998 F.3d 1221 (11th Cir. 2021) ......................................................................................17

*Lawrence v. Dunbar*,
    919 F.2d 1525 (11th Cir. 1990) ......................................................................................17

*Lewis v. Governor of Ala.*,
    944 F.3d 1287 (11th Cir. 2019) (en banc) ......................................................................14

*Loving v. Princess Cruise Lines, Ltd.*,
    2009 WL 7236419 (C.D. Cal. Mar. 5, 2009) ..................................................................34

*Lowe v. STME, LLC*,
    354 F. Supp. 3d 1311 (M.D. Fla. 2019) ..........................................................................29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................................10, 14

*Matamoros v. Broward Sheriff's Off.*,
    2 F.4th 1329 (11th Cir. 2021) ........................................................................................26

*Maxcess, Inc. v. Lucent Techs., Inc.*,
    433 F.3d 1337 (11th Cir. 2005) ........................................................................................6

*McDonald v. Santa Fe Trail Transp. Co.*,
    427 U.S. 273 (1976) ........................................................................................................33

*Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*,
    493 F.3d 201 (D.C. Cir. 2007) ........................................................................................14

*Moore v. Grady Mem'l Hospital Corporation*,
    834 F.3d 1168 (11th Cir. 2016) ......................................................................................30

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................................33

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)...........................................................................................14

*Nuzzo v. Baranco*,
    2018 WL 11488950 (N.D. Ga. Jan. 22, 2018).............................................26, 27, 29

*Parr v. Woodmen of the World Life Ins. Co*,
    791 F.2d 888 (11th Cir. 1986) .......................................................................26, 27

*Pembroke Pines v. FEMA*,
    494 F. Supp. 3d 1272 (S.D. Fla. 2020) ...........................................................5, 6, 17

*Rothe Dev., Inc. v. United States Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016) ...................................................................................20

*Ryzhov v. Mayorkas*,
    634 F. Supp. 3d 1107 (S.D. Fla. 2022) .....................................................................6

*S. Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023) ...................................................................10, 13, 14

*Sabater v. Am. Journey (PET), LLC*,
    570 F. Supp. 3d 1160 (S.D. Fla. 2021) .................................................................5, 18

*Shuford v. Ala. State Bd. of Educ.*,
    897 F. Supp. 1535 (M.D. Ala. 1995) .......................................................................19

*Stand Strong USA, Inc. v. Harwich Enterprises, LLC*,
    2020 WL 13267387 (S.D. Fla. Dec. 28, 2020) ......................................................32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..........................................................................................4, 19

*Tat Tohumculuk, A.S. v. H.J. Heinz Co.*,
    2013 WL 6070483 (E.D. Cal. Nov. 14, 2013) .......................................................34

*Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*,
    173 F.3d 988 (6th Cir. 1999) ...................................................................................27

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015)................................................................................................19

*Turcios v. Delicias Hispanas Corp.*,
    275 F. App'x 879 (11th Cir. 2008) ...................................................................16, 17

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015) ....................................................34

*Wooden v. Bd. of Regents of Univ. Sys. of Georgia*,
    247 F.3d 1262 (11th Cir. 2001) ...................................................................15, 16

## STATUTES AND RULES

15 U.S.C. § 1691(a) ..........................................................................................23

28 U.S.C. § 1367 ..............................................................................................35

42 U.S.C. § 1981 .................................................................................... passim

12 C.F.R. § 1002.5(b)(1) ..................................................................................23

Cal. Civ. Code § 51(b) .......................................................................................4

## OTHER AUTHORITIES

17A AM. JUR. 2D CONTRACTS § 102 ....................................................................30

Defendants Citigroup Inc. and Citibank, N.A. ("Citibank") move to dismiss the Amended Complaint [ECF 36] with prejudice under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## **INTRODUCTION**

Plaintiffs cannot plead a particularized injury-in-fact that is traceable to Citibank's ATM Community Network program, or redressable in this case. Thus, Plaintiffs lack Article III standing to pursue claims under 42 U.S.C. § 1981 due to settled and recent Supreme Court precedent, and this case must be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Enforcing these standing rules preserves the role established for the judiciary by the Framers—adjudicating actual cases or controversies between proper parties—and prevents it from becoming a forum for abstract grievances. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 386 (2024) (sincere "legal, moral, ideological, and policy concerns do not suffice" for "Article III standing"). Plaintiffs also fail to state cognizable claims under Section 1981 or the California Unruh statute, requiring dismissal under Rule 12(b)(6).

The Amended Complaint, filed after Citibank identified the serious standing and other defects in the case, does nothing to fix the core deficiencies in Plaintiffs' claims. Compounding its legal failings, the Amended Complaint still fails to address the following facts: (1) Plaintiffs' own racial or ethnic identity, or that Citibank has any awareness of it; (2) any information about the willingness or ability of Plaintiffs' banks to join Citibank's Network; (3) any information about the terms, conditions, or contracts financial institutions agree to in order to join the Network; (4) the identity of any supposed "owners" of Chase or Bank of America (where Plaintiffs bank), or any facts about Plaintiffs' alleged "association" with such owners.

***No Standing under Rule 12(b)(1).*** Section 1981 prohibits discrimination in the making or enforcement of contracts. The Eleventh Circuit just reaffirmed that to have Article III standing for a Section 1981 claim, the claimant must be "able and ready" to enter into a contract from which

he claims he was excluded on account of his race. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772–75 (11th Cir. 2024). None of that is true here.

Plaintiffs Werner Becker and Dana Guida object to Citibank's Community ATM Network program, through which interested and eligible financial institutions contract with Citibank to obtain a waiver of ATM fees for their customers (of all races) at Citibank-branch ATMs. In consideration, those *financial institutions*, among other things, *agree with Citibank* not to charge their own customers any portion of an ATM fee when their customers use a Citibank-branch ATM, agree to share data, and agree to cooperate with Citibank in various ways. Participating institutions cannot join the program without signing a Network contract and undertaking such reciprocal contractual obligations to Citibank.

The ATM Community Network program offers no such fee waiver on a customer-by-customer basis, regardless of race. Thus, these Plaintiffs are not "able and ready" to join the Network on their own; nor do they, or can they, allege that their banks are "able and ready" to join. Despite two bites at the apple, Plaintiffs have not pleaded, and cannot plead, that their financial institutions would enter into contracts with Citibank or be willing to undertake the requisite obligations of the Network.[1] Nor can Plaintiffs plead that those banks were or are willing to assume the obligations required of them to participate in the ATM Community Network program. Without

---

[1] The Court can conclude that if Plaintiffs believed they had a good faith basis to plausibly allege that their banks are "able and ready" to join the Network, they would have included such allegations in their amended pleading. In the Amended Complaint, Plaintiffs belatedly disclose that they bank with Chase and Bank of America. Each of these banks has tens of thousands of its own ATMs nationwide, including ATMs at many more branches than Citibank. *Compare* Bank of America 2024 Form 10-K at 2, SEC.gov, https://tinyurl.com/rvbe5ah4 ("approximately 3,800 retail financial centers, [and] approximately 15,000 ATMs") *and* JP Morgan Chase & Co., 2024 Form 10-K at 34, SEC.gov, https://tinyurl.com/4a9daddy ("4,897 retail branches"); *Manage Your Chase ATM Experience*, Chase.com, https://tinyurl.com/yvzz4pbb ("15,000 ATMs"), *with* Am. Compl. ¶ 9 ("Citibank's 654 branch locations in the United States"). It implausible to suggest that those banks have any interest in joining a Citibank ATM program.

those facts, Plaintiffs cannot meet the basic requirements of establishing an injury-in-fact that is both traceable to the challenged conduct and redressable by the Court. As a result, the necessary link between Plaintiffs' alleged injury and Citibank's conduct is broken, and Plaintiffs lack Article III standing, defeating subject matter jurisdiction.

***No Discrimination Against Plaintiffs under Section 1981.*** Given this disconnect between these Plaintiffs and the Citibank program at issue, it is unsurprising that the Amended Complaint also fails to state a Section 1981 claim on the merits. Plaintiffs cannot allege any conceivable race-discrimination claim under Section 1981 against Citibank. Plaintiffs do not disclose their race and the class they seek to represent includes individuals of all races, whose eligibility for a fee waiver is concededly determined solely by the institution with which they bank. Undisputed in this case is that neither Plaintiff experienced any discrimination because of his or her race and that Plaintiffs' own race is irrelevant to their claims.

Seeking to avoid this core defect that Plaintiffs' race does not matter, the Amended Complaint presents two contrived theories—one original theory that they wrongly claim sounds in "associational discrimination" and a new theory they wrongly claim sounds in "direct discrimination." Neither theory is available to Plaintiffs here under Eleventh Circuit and Supreme Court doctrine, and applying them to sustain any discrimination claim in this lawsuit would result in a practical and legal sea change.

Plaintiffs' newly minted direct discrimination theory lacks any legal support. It relies on a perceived-race theory that fails because Citibank does not perceive *anything* about Plaintiffs' racial identities. That theory is also foreclosed by Supreme Court precedent. Even the Supreme Court's greatest skeptics of race-based programs have long agreed that governments, and others bound by nondiscrimination laws, may act "in many permissible ways [that benefit racial minorities] that do

- 3 -

not involve classification by race." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 317 (2023) (Kavanaugh. J., concurring). Plaintiffs' direct-discrimination theory would imperil countless race-neutral programs designed to benefit minority communities—from bipartisan federal aid for historically black colleges to employer-targeting of minority applicants to encourage them to apply and compete under equal conditions for jobs.

Plaintiffs' original associational discrimination theory fails for the basic reason that it does not (and cannot) assert that any Plaintiff's *own race* matters to the asserted policy. That is a critical requirement for any cognizable associational discrimination claim. This theory fails in this case for the additional reason that Plaintiffs seek to expand the definition of "associational discrimination" beyond what any court has ever recognized—to ever-changing and unspecified shareholders of large publicly traded banks.

Finally, Plaintiffs' Section 1981 claims independently fail because the supposed discrimination does not involve a legally enforceable contract that Plaintiffs can enter into, or have rights under.

**The California Unruh Claim Is Not Extraterritorial.** These two Florida-based Plaintiffs cannot state a claim under the California Unruh Act because nothing about their claims arises "within the jurisdiction of" California. Cal. Civ. Code § 51(b). Courts routinely dismiss Unruh claims under Rule 12(b)(6) on this ground, and it is well-settled that, before class certification, each Plaintiff must be able to personally state a claim for each cause of action asserted, or face dismissal. Plaintiffs lack any authority preventing dismissal of such a claim solely because a plaintiff hopes to later certify a Rule 23 class action.

## **LEGAL STANDARDS**

**Rule 12(b)(1) Attacks on Subject Matter Jurisdiction.** "Jurisdictional challenges under Rule 12(b)(1) are either facial or factual attacks." *Pembroke Pines v. FEMA*, 494 F. Supp. 3d 1272, 1282 (S.D. Fla. 2020) (Singhal, J.). When a motion to dismiss presents a "factual attack" on a plaintiffs' standing, "the trial court is free to weigh the evidence" to "resolve disputed jurisdictional facts." *Sabater v. Am. Journey (PET), LLC*, 570 F. Supp. 3d 1160, 1163 (S.D. Fla. 2021) (Singhal, J.) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)). Thus, "no presumptive truthfulness attaches to plaintiff's allegations." *Id.* When the jurisdictional facts are disputed with evidence, the plaintiff must "carry [the] burden of establishing" standing. *Id.* at 1164. Under a facial attack to jurisdiction, plaintiffs still must show their complaint "contain[s] sufficient non-conclusory allegations to create a plausible inference that subject matter jurisdiction exists." *Pembroke Pines*, 494 F. Supp. 3d at 1282.

**Rule 12(b)(6) Motion for Failure to State a Claim.** A court should "dismiss a complaint if it rests only on conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts." *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021). For each claim, each plaintiff must set forth plausible factual allegations that establish all "the material elements of a cause of action to support recovery under some 'viable legal theory.'" *AFL-CIO v. Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (citation omitted). A plaintiff who files "a putative class action" must still personally "state a claim for relief that is plausible on its face." *Collins v. Select Portfolio Servicing, Inc.*, 2023 WL 7513554, at *2 (S.D. Fla. Jan. 3, 2023) (Singhal, J.) (dismissing class complaint after reviewing plaintiff's specific factual allegations); *see Coleman v. Burger King Corp.*, 2023 WL 5507730, at *3 (S.D. Fla. Aug. 25, 2023) (prior to certification, plaintiffs "are asserting *only* their own claims" and must personally "state a viable claim under Rule 12(b)(6)").

A motion to dismiss for failure to state a claim for relief can rely on the "four-corners of the complaint and any documents attached," as well as on "documents that are part of the public record." *Pembroke Pines*, 494 F. Supp. 3d at 1282. "[I]nformation readily available on the websites of government agencies" can qualify as a "public record." *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111 (S.D. Fla. 2022) (collecting cases). Also, on a motion to dismiss, "a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity," such as "contracts" not attached to a complaint. *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005); *accord, e.g.*, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (if plaintiff "refers to certain documents in the complaint and those documents are central to the plaintiff's claim," a court "may consider the documents part of the pleadings").

## <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiffs (Werner Becker and Dana Guida) filed their initial complaint on May 17, 2024 [ECF 1], and Citibank moved to dismiss under Rule 12(b)(1) for lack of Article III standing and to dismiss all claims under 42 U.S.C. § 1981 and under California's Unruh Civil Rights Act for failure to state a claim. [ECF 29.] Citibank argued that these two individuals lack standing to challenge Citibank's ATM Community Network program. *See generally id.* It gave three primary reasons: (1) Plaintiffs did not (and cannot) allege that they could ever benefit from the fee-waivers provided to customers of participating financial institutions in that Network, even if the allegedly racial feature they challenge were eliminated; (2) Plaintiffs had no viable associational theory of discrimination because their race was irrelevant to their claims; and (3) the California Unruh Act's express territorial limit foreclosed these Florida Plaintiffs' claims relating to Florida conduct. *Id.* Rather than oppose that motion, Plaintiffs filed their Amended Complaint ("Am. Compl.") on July 31, 2024. [ECF 36.] The Amended Complaint involves the same two Florida-based Plaintiffs

and the same two statutory causes of action. Am. Compl. ¶¶ 6–7, Counts I–IV. While Plaintiffs

have added a lot of verbiage to the pleading, those additions do nothing to save it from dismissal.

## I.      Plaintiffs' Allegations in the Amended Complaint (for Rule 12(b)(6) motion).

Becker and Guida allege that they were each charged an out-of-network fee at a Citibank

branch ATM in Florida in June or July of 2023. Am. Compl. ¶¶ 6–7. "Like most banks," Citibank

charges other institutions' customers "an out-of-network" fee for ATM withdrawals. *Id.* ¶ 12.

The Citibank ATM Community Network was announced on July 14, 2016. *Id.* ¶ 13. The

announcement explains that the Network consists of *participating* financial institutions who join

the program so as to "dramatically expand surcharge free access to ATMs" for their customers in

Citibank's service areas, who would not otherwise be able to access a broad ATM network.[2]  While

Plaintiffs admit that Citibank's out-of-network fees predated the Community Network, they claim

that Citibank "waiv[ing] ATM fees for certain customers … while *continuing to* impose ATM fees

for" accounts not held by Network institutions was discrimination, to the extent that Citibank had

race-based criteria for admitting banks to the Network. *Id.* ¶¶ 91–92 (emphasis added).

In their original complaint, Plaintiffs were candid that to have any chance of stating a claim,

they had to rely on an "Associational Discrimination" theory. Compl. ¶¶ 11–12. Confronted with

Citibank's arguments why that theory is contrary to law, Plaintiffs have added two purported

"Direct Discrimination" counts under Section 1981 and Unruh, respectively. Plaintiffs further

pivot so that neither named Plaintiff expressly brings an Unruh associational-discrimination claim

themselves. Unlike all other counts brought "*on behalf of themselves and* all members of the

---

[2]  The July 14, 2016, public announcement is prominently referred to in the Amended Complaint, ¶¶ 3, 13, 75, 92, and is thus incorporated by reference. Press Release, Citigroup Inc., Citi Introduces Citi ATM Community Network (July 14, 2016), https://tinyurl.com/3kdvcn63. *See Brooks*, 116 F.3d at 1369 (documents "refer[red] to … in the complaint and … central to the plaintiff's claim" may be considered "part of the pleadings").

[putative class]," Becker and Guida solely seek to bring "this claim on behalf of all members of the California subclass." Am. Compl. ¶¶ 103, 109 (emphasis added).

The Amended Complaint now discloses that (i) Becker is a customer of Chase and (ii) Guida is a customer of Bank of America, which the Amended Complaint states are "not eligible for Citi's fee-waiver policy" that they challenge. Am. Compl. ¶¶ 6–7. The original complaint claimed that all financial institutions that were "minority-owned" received a fee waiver. Compl. ¶ 3. Now, the Amended Complaint concedes that Citibank's ATM Community Network has criteria that are "not facially race-based," Am. Compl. ¶ 32, as any Community Development Financial Institutions ("CDFIs") or Community Development Credit Unions ("CDCUs") are eligible to join. Plaintiffs further allege Citibank admits a third, separate, category of financial institution, "participating minority owned-banks" (*i.e.*, Minority Depository Institutions ("MDIs")). *See id.* ¶¶ 25, 27 ("Today, three types of banks are eligible for the [ATM Network]. A bank must be: (a) minority-owned; (c) a Community Development Credit Union (CDCU); *or* a (c) Community Development Financial Institution (CDFI)." (emphasis added)). Plaintiffs claim that these three categories were chosen because Citibank "perceives [their] customers … to be minorities," while it "did not perceive" customers of other banks to be minorities. *Id.* ¶ 56. Plaintiffs state that "[n]either Chase Bank nor Bank of America is minority-owned, a CDCU, or a CDFI." *Id.* ¶ 31. According to Plaintiffs, Citibank's "inclusion of minority-owned banks [MDIs] in the Policy is race-based on its face" while Citibank's "inclusion of CDCUs and CDFIs is *not* facially race-based." *Id.* ¶ 32. They further allege that the CDCU, CDFI and MDI eligibility criteria were "motivated by race" and sought "to target minorities" for greater economic opportunity. *Id.* (citing study "that low-income communities of color still predominately use cash for transactions, making ATM access and fees especially important").

The Amended Complaint proposes two classes under Rule 23 (a nationwide and a California class) of "all persons [regardless of race] in the United States who paid ATM fees at a Citi branch location" and relief including retrospective damages and an injunction ending the fee-waiver program going forward. *Id.* ¶¶ 66, 115–18. In other words, prospectively, Plaintiffs seek to end the free transactions for others, rather than to invalidate the industry-standard and preexisting out-of-network fees at Citibank ATMs that they, and the putative class members, pay (and would continue to pay if Plaintiffs won). *See id.* ¶ 12 ("most banks" charge out-of-network fees).

## II.   Additional Facts About the ATM Community Network (for Rule 12(b)(1) motion).

Citibank's ATM Community Network is a program under which eligible financial institutions may choose to enter into an agreement (*i.e.*, a "Network Agreement") with Citibank regarding ATM transaction fees. Declaration of Marco Chavarin ("Decl.") ¶¶ 4–6 [ECF 29-1], reattached for the Court's convenience as Exhibit 1.[3] If a financial institution wishes to enter the Network, it must agree to the terms of the contract governing the Network. *Id.* ¶ 5.

Those agreements contain mutual contractual promises by both the participating financial institutions (*i.e.*, "Network Institutions") and by Citibank, and the Network Agreements follow a common template, examples of which are attached hereto. *See* Decl. ¶ 7;  Decl. Exs. A & B. In exchange for Citibank's agreement not to charge fees for ATM withdrawals at Citibank retail branches from Network Institution accounts, these Network Institutions must agree to several key terms. *See generally* Decl. Exs. A & B; Decl. ¶ 6. Among these promises, the Network Institutions must: (1) agree not to charge their own customers any fee when they use a Citibank ATM; (2)

---

[3] Citibank relies on and reattaches here the July 9, 2024 Chavarin declaration and the exemplar ATM Acquiring Agreement (Ex. B to the Decl.) from its original motion to dismiss.  To avoid burdening the Court with another motion to seal, it also relies on sealed Exhibit A as an executed example of such an agreement.  *See* [ECF 31–32].

agree to assist in distributing Citibank-approved marketing materials relating to Citi's efforts in the ATM Community Network; (3) approve Citibank's use of the Network Institutions' trademarks; and (4) agree to data sharing with Citibank and other necessary technical conditions; (5) agree to indemnify Citibank under certain circumstances; and (6) agree to the exclusive jurisdiction of courts in New York City. *See, e.g.*, Decl. Ex. B §§ 2.1 & 2.2(i)a–c, 7.1, 9.6. An institution that refuses to enter into the Agreement may not participate in the program. Decl. ¶ 8.[4]

## **ARGUMENT**

I.     **The Court Lacks Jurisdiction Because Plaintiffs Have Not Alleged (or Shown) That the Financial Institutions Where They Bank Are "Able and Ready" to Participate in the ATM Community Network, as Required for Article III Standing.**

To establish standing, "[a] litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *S. Miami v. Governor*, 65 F.4th 631, 636 (11th Cir. 2023). As the party "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these [standing] elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy the injury-in-fact requirement, each plaintiff's injury needs to be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560. Plaintiffs do not meet these requirements.

---

[4] Solely for purposes of this motion, Citibank does not dispute Plaintiffs' allegation that one of the eligibility categories for the Network is "minority depository institutions" ("MDIs"). Am. Compl. ¶¶ 18, 27. As such, Citibank disclaims reliance for any part of its Rule 12 challenge on the lack of "eligibility" of Plaintiffs' banks to join the Network. Instead, it relies for its challenge to standing solely on the lack of allegations and facts showing "willingness" of Plaintiffs' financial institutions to join the Network. To be clear, however—although Citibank has, concededly, shorthanded the program as relating at least in part to MDIs—factual development (in a case by proper plaintiffs) would show that each of the Network's eligibility criteria is race-neutral: status as a CDFI, CDCU, and/or as a community bank. Some but not all (or even necessarily most) such institutions also qualify as an MDI. CDFIs, CDCUs and community banks generally are small in size and have limited branch and ATM footprints, and CDFIs and CDCUs have missions of serving low- and/or moderate-income communities. *E.g.*, *id.* ¶¶ 28–29. These features distinguish them from the large national entities where Plaintiffs bank. *See id.* ¶ 31.

Despite amending their complaint to address other matters, Plaintiffs make *no* effort to plead *anything* about whether their banks would be interested in joining the Citibank Network (which provides access to a *smaller* ATM network than that of either institution, *see supra* note 1), or would be willing to accept its terms. Without that showing, Plaintiffs cannot show that their banks' nonparticipation in the Network (and the resulting denial of a fee waiver) arose from any racial eligibility requirements. And while Plaintiffs claim to have asserted a "pocketbook injury" of paying "unlawful fees," they do not challenge as unlawful merely charging out-of-network fees (which they admit is customary), only the policy of *waiving* that fee for others—as shown by their seeking to *end* rather than *expand* that fee-waiver policy as relief.

### A.    Plaintiffs Do Not Allege that Chase or Bank of America Would be Willing to Join the Citibank ATM Community Network, Which Defeats the Injury-in-Fact and Traceability Requirements for Standing.

In *Fearless Fund*, the Eleventh Circuit showed how the traditional injury-in-fact requirements apply to a Section 1981 claim. *See* 103 F.4th at 772–75. There, white plaintiff-members of a group sued a venture capital fund under Section 1981, alleging that because of each plaintiff's race, his wholly-owned business had been excluded from competing in a contractual grant program, which "[b]y its terms, [was] open *only* to 'black females'—and thus categorically bar[red] non-black applicants." *Id.* at 777. The court explained that to make out an injury, a claim must meet the "able-and-ready" standard as follows:

> [W]e evaluate whether [the plaintiff] has sufficiently demonstrated *an intent to take the action that she asserts is prohibited*. *See Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003). If the plaintiff can show that she is "*able and ready*" to do so, she has demonstrated a concrete injury. *Northeastern Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) … [T]he plaintiff must do more than baldly assert that she is 'able and ready'—she must also come forward with some 'supporting facts' indicating a likelihood that she will actually take the *proscribed action*.

*Id.* at 772 (emphasis added). The Eleventh Circuit held that the declarations submitted in *Fearless*

*Fund* satisfied the "able and ready" standard based on five key facts:

> [Those declarations] (1) assert that each owner is prepared [to] enter the contest but
> is 'ineligible because [she is] not a black woman'; (2) describe the size of each
> owner's business; (3) explain that each owner has met the contest's non-race-
> related prerequisites; (4) specify how each owner would use the $20,000 prize ….
> And (5) pinpoint when the owners would apply if permitted to participate[.]

*Id.* at 774. A claim under Section 1981 asserting a lost benefit due to alleged racial criteria must

present facts supporting a bona fide interest in and ability to "actually take" action to obtain that

benefit, absent the allegedly unlawful racial criteria. *See id.* at 772. So a high-school student

challenging college-admission criteria lacks a federal case if he does not want to attend the

defendant school, and likewise a business has only a non-actionable ideological grievance with

contracting terms if it does not actually want to win the bid. "As Justice Scalia memorably said,

Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *All. for*

*Hippocratic Med.*, 602 U.S. at 386 (quoting A. Scalia, *The Doctrine of Standing as an Essential*

*Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).

    Here, Plaintiffs provide no such allegations, nor can they. Unlike the *Fearless Fund*

plaintiffs who could apply for the program at issue, Plaintiffs here are not "able and ready" to enter

the Network because they, as natural persons who do not control financial institutions, cannot

apply for that program themselves. Rather, realizing the benefits of the Network depends wholly

on whether Plaintiffs' banks are "able and ready" to seek inclusion. Because the Amended

Complaint lacks such allegations about their banks, Plaintiffs cannot identify any actual or

imminent injury-in-fact. That forecloses Article III standing in two independent ways—each

related to the (lack of) "willingness" of those banks to join the Network.

    ***First***, Plaintiffs have not pleaded, and the Court cannot presume, that Chase and Bank of

America—direct, large peer banks—have any interest in participating in Citibank's ATM Community Network program. Nor could they plausibly allege this on behalf of institutions that Plaintiffs neither own nor control. That is sufficient to negate standing. The Court need go no further to dismiss.

**Second**, Plaintiffs have not pleaded, and the Court cannot presume, that the institutions where Plaintiffs bank (even if interested) would be willing to enter into the required Network Agreement and accept its reciprocal obligations, including comarketing with a competitor. Unless Plaintiffs' financial institutions both wish to participate and are willing to undertake the reciprocal burdens imposed—facts which Plaintiffs have not pleaded and have no ability to plead—they are not "able and ready" to enter the program. Specifically, Plaintiffs have not—and cannot—allege that their institutions would be willing to enter into the required Network Agreement and agree to, among other things, (a) forgo charging out-of-network fees to their own customers when those customers use a Citibank ATM, (b) distribute Citibank's advertising materials and permit the use of their own marks in such materials, (c) participate in data sharing or comarketing activities with Citibank, or (d) otherwise accept the terms of the Network Contracts that are preconditions for participation. And without demonstrating that the institutions where they bank *are willing to enter* by undertaking the required reciprocal obligations, Plaintiffs are mere "bystanders" without any individual concrete injury-in-fact, seeking improperly to "come to federal court [simply because] they believe [Citibank] is acting contrary to … federal law." *All. for Hippocratic Med.*, 602 U.S. at 382[5]; *see also S. Miami*, 65 F.4th at 636.

Those same missing facts also cause Plaintiffs to fail the requirement that even a

---

[5] The requirement to show a willingness to participate holds even where the allegedly unlawful feature would prevent them from succeeding. *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019); *Baughcum v. Jackson*, 92 F.4th 1024, 1035 (11th Cir. 2024).

constitutionally sufficient injury-in-fact must be "traceable" to the defendant's actions and "redressable" by the court. *See S. Miami*, 65 F.4th at 634, 636. As the Supreme Court has long held and reaffirmed last term, "it is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" (quoting *Lujan*, 504 U.S. at 562)). Thus, many cases recognize as a standing defect—whether categorized as traceability or redressability—reliance on "guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 144 S. Ct. at 1986; *see, e.g.*, *Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 205 (D.C. Cir. 2007) (redress cannot depend on the cooperation of a third party not before the court).

The *en banc* Eleventh Circuit applied this rule to hold that minimum-wage employees lacked standing to sue to bar enforcement of a state law preempting local minimum wage laws, because it was "speculative" that plaintiffs' employers would comply with the local law if the suit prevailed. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1302–05 (11th Cir. 2019) (en banc); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254–55 (11th Cir. 2020) (no standing to sue Secretary of State, where "a different, independent official" with control over the challenged matter might not follow court-ordered guidance from the Secretary). And in *Yelapi v. DeSantis*, the district court applied the above cases to determine plaintiffs challenging the Florida governor's failure to bring an American Sign Language interpreter to press briefings had not shown an injury "traceable to—or redressable by—the Governor," because "Plaintiffs would not benefit unless … nonparty broadcast companies decided to include that interpreter in the broadcast frame." 487 F. Supp. 3d 1278, 1283–85 (N.D. Fla. 2020) (Winsor, J.) ("no evidence … support[ing] any finding

- 14 -

on how nonparty broadcasters would respond"). If broadcast media cannot be assumed interested in making the (essentially costless) effort of widening their frame for an interpreter, there is no basis to assume that Chase or Bank of America (or any similar institution) would be interested in joining the Network, let alone agreeing to its terms, conditions and obligations.

**B.     Plaintiffs Cannot Dodge the Need to Show a Traceable, Redressable Injury-in-Fact, as Captured by the "Able and Ready" Standard.**

Plaintiffs may attempt to deflect their legal burden to allege injury-in-fact in three ways, but all are untenable under settled law.

***First***, Plaintiffs may argue that the "able and ready" standard applies only to "*prospective* relief" and so "has no bearing here" because Plaintiffs do not seek such relief. Plaintiffs' Response in Opposition to Defendant's Motion to Stay [ECF 37] ("Stay Opp.") at 10. As an initial matter, that is not true; the Amended Complaint, like the original complaint, seeks prospective "[i]njunctive relief prohibiting Defendants from advertising or implementing the Policy" and corresponding "[d]eclaratory relief." Am. Compl. ¶¶ 115–16. And, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *accord Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1283 (11th Cir. 2001).

In any event, Plaintiffs need to show a concrete injury traceable to the alleged unlawful criteria—and "able and ready" just stands as a shorthand for the "likelihood that [a plaintiff] will actually take" the action that is (allegedly) unlawfully "proscribed." *Fearless Fund*, 103 F.4th at 772. And Plaintiffs ignore that a person "must show *more than he is 'able and ready'*" to apply in the future to obtain "damages rather than [or in addition to] prospective relief." *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012) (emphasis added). Rather, when a plaintiff claims past unequal treatment, he needs to show (in the case of his own application for a

benefit) that his application "has *actually* been treated differently," and to actually *obtain* damages, he needs to further show that the process would not have resulted in "the same decision regardless." *Wooden*, 247 F.3d at 1278; *see, e.g.*, *Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002) (plaintiff seeking damages must allege that "under a race-neutral policy they would have received the benefit"). Otherwise, plaintiffs would be able to obtain a windfall for benefits that they never would have obtained irrespective of any unlawful limitation. Here, Plaintiffs' Amended Complaint does not allege that Chase or Bank of America sought access to the Network and was denied within the Plaintiffs' four-year proposed limitations window, or would have sought, absent any racial limitation, access to the Network during that period.

**Second**, Plaintiffs allege that they are excused from any further standing showing because they have alleged a "classic pocketbook injury"—the payment of "*unlawful* fees." Stay Opp. at 10 (emphasis added). But there is nothing unlawful about an ATM fee. Indeed, Plaintiffs themselves allege that ATM fees are customary, and that these fees predated the Network. Am. Compl. ¶¶ 12, 91. Further, as the Supreme Court has repeatedly emphasized of late, a "pocketbook injury" does not permit standing where, as here, "the plaintiffs nevertheless fail to satisfy the traceability requirement." *California v. Texas*, 593 U.S. 659, 669 (2021). For example, in evaluating an Equal Protection challenge to federal foster care and adoption rules, the Supreme Court rejected Texas's claim that its "direct pocketbook injury" conveyed standing where "Texas would continue to incur the complained-of-costs" even if it prevailed. *Haaland v. Brackeen*, 599 U.S. 255, 296 (2023).

**Third,** Plaintiffs are wrong that Citibank's motion to dismiss for lack of subject matter jurisdiction is intertwined with the merits, such that it can be deferred. Courts may construe jurisdiction "as a direct attack on the merits" when "the jurisdictional question [is] intertwined

*with a substantive element of the statutory claim.*" *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x 879, 881 (11th Cir. 2008) (emphasis added); *see, e.g.*, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (issues are intertwined when "[t]he pertinent inquiry will resolve both the question of subject matter jurisdiction and a necessary element of the [asserted] claim"). By contrast, when a challenge "stems from Article III's case or controversy requirement" rather than "the elements of [plaintiff's] discrimination claim," the issues are not "inextricably intertwined" and the standing challenge should not be deferred. *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1231–32 (11th Cir. 2021) (factual challenge under Rule 12(b)(1) was proper); *see, e.g.*, *Bierer-Carter v. United States*, 806 F. Supp. 2d 1245, 1249 (S.D. Fla. 2011).

Here, none of Citibank's standing arguments (*i.e.*, whether Chase and Bank of America would be interested in joining the Network and accepting its terms, and thus whether any racial criteria would be applied to those banks *at all*), depends on whether such criteria meet the "substantive elements" of liability under Section 1981 are met. Simply switching the law and the claim proves the point: if Plaintiffs claimed the Network violated the *Florida Civil Rights Act* by unlawfully extending fee waivers based on *female* ownership, Citibank's standing argument would be exactly the same.

\* \* \*

For all these reasons, the Court should dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of Article III standing. Based on the concessions in Plaintiffs' Amended Complaint, the Court can now do this under the facial-challenge rubric, by simply concluding that the complaint lacks any allegations that Chase or Bank of America want to join the Network. *Pembroke Pines*, 494 F. Supp. 3d at 1282 (facial challenge evaluates if the complaint "contain[s] sufficient non-conclusory allegations to create a plausible inference that subject matter jurisdiction exists."). Alternatively,

the Court can reach the second-aspect of Citibank's "willingness" argument, and hold—under a "factual" challenge to standing—that the undisputed factual evidence Citibank submits again shows a requirement that an interested financial institution also must agree to contractual undertakings, which further defeats standing. *Sabater*, 570 F. Supp. 3d at 1163 (when jurisdiction is disputed with evidence, plaintiff must "carry [the] burden of establishing" standing).

## II.      Plaintiffs Fail to State a Claim under Section 1981 for Several Independent Reasons.

Similar defects afflict the merits of Plaintiffs' Section 1981 claims, independently requiring dismissal for failure to state a claim under Rule 12(b)(6).

### A.      Plaintiffs Cannot Allege Direct Discrimination Under Section 1981.

After Citibank filed its original motion to dismiss explaining that Plaintiffs' sole claims based on associational discrimination failed as a matter of law, Plaintiffs amended their complaint to add direct discrimination counts under Section 1981. Under this theory, Plaintiffs claim that Citibank chose three categories of institutions to be eligible for the Network because it "believes that the *customers* of these banks are minorities." Am. Compl. ¶ 98 (emphasis added). This argument fails of its own weight: it would hold that thousands of public and private programs that benefit persons of all races, but were *designed* to expand opportunities for minorities and others, are unlawful direct discrimination. Plaintiffs' new claim conflicts with (1) binding case law on the definition of racial discrimination; (2) binding case law on Section 1981's scope; and (3) the bounds of claims based on "perceived" race.

*First*, benefiting a category of institution (be it a school, financial institution, or other business) with a motivation of benefiting minority individuals dealing with that institution—where the institution does not *limit* its services to minorities—has long been recognized by the Supreme Court and other courts to be a *permissible*, race-*neutral* action. Plaintiffs therefore cannot state a claim for intentional discrimination by alleging that Citibank's inclusion of CDCUs, CDFIs and

MDIs "was motivated by race." *Id.* ¶ 32. *See, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989) (endorsing, as consistent with the Equal Protection Clause, expanding construction-contract opportunities for Minority Business Enterprises via "a race-neutral program of city financing for small firms [that] would, *a fortiori*, lead to greater minority participation"); *see id.* at 526 (Scalia, J., concurring in judgment) (lawful for a state to achieve inclusive ends "in many permissible ways that do not involve classification by race" but do "have racially disproportionate impact," such as "a preference for small businesses, or even for new businesses"). Likewise, "local housing authorities may choose to foster diversity and combat racial isolation with race-neutral tools, and mere awareness of race … does not doom that endeavor at the outset." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 544–45 (2015). And the Eleventh Circuit holds that "affirmative recruitment" of minorities is "a neutral measure." *Shuford v. Ala. State Bd. of Educ.*, 897 F. Supp. 1535, 1553–54 (M.D. Ala. 1995) (citing *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1571 (11th Cir. 1994), and *Peightal v. Metro. Dade Cnty.*, 26 F.3d 1545, 1557–58 (11th Cir. 1994)).

While the Amended Complaint relies heavily on the Supreme Court's statements in the *Harvard* case, Plaintiffs ignore the many times the Justices have contrasted unlawful race-based decision making with "many permissible ways [of boosting minority opportunity] that do not involve classification by race," *SFFA*, 600 U.S. at 317 (Kavanaugh. J., concurring) (quoting *Croson*, 488 U.S. at 526 (Scalia, J.)). That includes (for example) the University of Texas's admittedly racially motivated program of promoting diversity in college admission by setting aside seats for the top performers at each of its public schools. *See Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 385–86 (2016) (explaining that "the Top Ten Percent Plan, *though facially neutral*, *cannot be understood apart from its basic purpose*, *which is to boost minority enrollment*."

(emphasis added)); *id.* at 410 (Alito, J., dissenting, joined by Roberts, C.J., and Thomas, J.) (concluding University of Texas had failed to show it could not accomplish its diversity goals by "race-neutral options, such as expanding the Top Ten Percent Plan"); *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016) (noting the Supreme Court has "characterize[ed] as *'race neutral'* alternatives *designed to advance the same ends as affirmative action* programs but that do not rely on racial criteria" (emphasis added)). This case law forecloses Plaintiffs' direct discrimination counts, which claim the alleged Network's eligibility categories are discriminatory because they were adopted with an aim of improving financial access for "customers of these banks [who] are minorities." Am. Compl. ¶ 98.

Ruling that Plaintiffs' sweeping new conception of discrimination survives dismissal would be shattering to hundreds of state and federal efforts to address persistent racial disparities by race-neutral means that, while serving everyone, historically or disproportionately serve minority communities—such as targeted homeownership initiatives, or grant programs for historically black colleges and universities.[6] On Plaintiffs' telling, these are direct discrimination by the federal government against all other home buyers or all other schools' students based on their perceived race, drawn from "the views that motivated *Dred Scott* and *Plessy*." Am. Compl. ¶ 1. The same goes for programs like the Texas Top Ten Percent Plan that benefit geographically diverse schools as "racially neutral alternatives [for] achieving diversity," *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 647 (5th Cir. 2014), or the common practice of advertising in "local

---

[6] *See, e.g.*, H.R. Rep. No. 108-164 (2003) (downpayment initiative designed to "further the goal" of the President "of increasing the number of minority homeowners"), *enacted as amended*, P.L. 108-186, 117 Stat. 2685 (Dec. 16, 2003); Collin Binkley, *Trump Signs Bill Restoring Funding for Black Colleges*, AP (Dec. 19, 2019) https://tinyurl.com/4h4t628p; P.L. 116-91, 133 Stat 1189 (Dec. 19, 2019) (purpose to "reauthorize funding programs for historically Black colleges and universities and other minority-serving institutions" under 20 U.S.C. § 1067q).

newspapers … with predominantly black readerships" to ensure effective outreach to black Americans, *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 532 (6th Cir. 2001); *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (explaining that "to improve racial diversity and inclusion by way of race-neutral measures [is] a practice that the Supreme Court has consistently declined to find constitutionally suspect"), *cert. denied*, 2024 WL 674659 (U.S. Feb. 20, 2024).

*Second*, this "direct" theory conflicts with the Supreme Court's explanation of Section 1981's scope in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 473–74 (2006). In *Domino's*, a plaintiff CEO claimed that Domino's had violated his right "to 'make and enforce contracts' without respect to race," by discriminating against his company because of his *own* race and thereby causing *him* economic (and emotional) injury. *Id.* (quoting 42 U.S.C. § 1981(a)). In rejecting his claim, the Court emphasized that treating Section 1981 as a "remedy for *all* racial injustice"—contrary to "text" and "congressional intent"—would produce "satellite § 1981 litigation of immense scope." *Id.* at 479. Accepting even McDonald's modest theory (permitting suit for harm to his *own* business) would logically "permit class actions by," for example, "all the minority employees of the nonbreaching party to a broken contract" who alleged a breach based on "racial animus against them." *Id.* Similarly, Plaintiffs assert that they may sue because Citibank has refused to contract with banks based on their customers' perceived demographics, causing them economic injury. That is the exact "satellite § 1981 litigation of immense scope" *Domino's* rejected—except instead of extending a claim properly belonging to Bank of America or Chase alone to all its "employees," *id.*, Plaintiffs would go further to impermissibly confer a claim on any of those banks' tens of millions of customers, so long as they had once used a Citibank ATM.

*Third*, Plaintiffs' theory of direct discrimination based on Citibank's supposed

- 21 -

"perception" of the racial identity of customers of those financial institutions in the program compared to the supposed "perception" of the racial identity of customers of those financial institutions outside the program (*e.g.*, Chase and Bank of America) lacks legal and factual support. At the outset, Plaintiffs' "perceived" race cases, *see* Am. Compl. ¶ 56, relate to "*mistak[ing]*" *particular* people to be a *particular* race (or another protected status). *See Est. of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001) (officers incorrectly believed driver was Native American) (emphasis added); *Capek v. BNY Mellon, N.A.*, 2016 WL 2993211, at *2 (S.D.N.Y. May 23, 2016) (employee asserted work assignments based on being "mistakenly perceived" as Jewish). The Amended Complaint does not (and could not) assert that Citibank had an opportunity to view or otherwise gain information that would cause Citibank to learn (mistakenly or otherwise) Plaintiffs' racial identity or to learn of the racial identity of customers who bank with participating Network institutions. Accordingly, Plaintiffs' "perception" case law is wholly inapposite, and cannot support their direct discrimination claims.

Trying to overcome the lack of support in case law, Plaintiffs contend that Citibank "believes that the customers of these banks are minorities" whenever a bank is either "(a) minority-owned; (b) a CDCU; or (c) a CDFI." Am. Compl. ¶ 98. And, vice versa, Plaintiffs contend that Citibank "did not perceive them [*i.e.*, the Plaintiffs] to be minorities." *Id.* ¶ 99. These contentions are not consistent with "common sense," such that they cannot be credited as "plausible on [their] face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (explaining that courts are not required "to exhibit a naiveté from which ordinary citizens are free"). To illustrate, Plaintiffs offer no factual content giving rise to a plausible allegation that that Citibank ***believes every customer*** of the credit unions in the Network—for example, Maroon Financial Credit Union (which serves the University of Chicago community), or

the Finest Federal Credit Union, which is "chartered specifically to serve the needs of police and all law enforcement personnel"—is a racial minority.[7] Similarly, MDIs, *e.g.,* Am. Compl. ¶¶ 18, 26, must by law be open (and are open) to customers of all races, including white customers. *See, e.g.*, 15 U.S.C. § 1691(a) (Equal Credit Opportunity Act); 12 C.F.R. § 1002.5(b)(1). Those same laws require large financial institutions and others that do not participate in the ATM Community Network to serve customers of every race and any notion that all of those banks' customers are non-minorities would be preposterous.

If Plaintiffs instead mean that that banks inside the Network may have **large numbers** of minority customers and/or that financial institutions outside the Network may have smaller numbers of minority customers, such an argument would necessarily sound in "disparate impact." But that cannot give rise to a direct discrimination claim for Plaintiffs either because the Supreme Court holds that a Section 1981 claim can only be founded on intentional discrimination; alleged disparate impact is not enough. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 386 (1982) (Section 1981 does not reach conduct that "merely result[s] in a disproportionate impact on a particular class" rather than "purposeful discrimination")*; see also EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024–26, 1032 (11th Cir. 2016) (distinguishing disparate-impact and intentional claims and collecting Section 1981 and Title VII cases to reject claim that it was intentional discrimination to ban dreadlocks that are "culturally associated with black persons").

---

[7] *Become a Member*, Maroon Financial Credit Union, https://tinyurl.com/5n7386mx; The Finest, https://thefinestfcu.org/.

**B.      Plaintiffs Cannot Allege Associational Discrimination Under Section 1981.**

**1.      Plaintiffs' Associational Discrimination Claims Do Not Plead Discrimination Based on Their Own Race.**

In *Comcast v. Nat'l Ass'n of Afr. Am.-Owned Media*, the Supreme Court took up the question of what must be proven by a Section 1981 plaintiff. 589 U.S. 327, 330, 333 (2020). In considering a plaintiff that was a "100% African American-owned media compan[y]," Justice Gorsuch explained for the Court how Section 1981 operates:

> The guarantee that each person is entitled to the "same right . . . as is enjoyed by white citizens" directs our attention to the counterfactual—what would have happened if the plaintiff had been white? . . . If the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the 'same' legally protected right as a white person. Conversely, if the defendant would have responded differently *but for the plaintiff's race*, it follows that the plaintiff has not received the same right as a white person." (emphasis added).

*Id.* Consistent with this, the Eleventh Circuit long has described that "a [Section 1981] plaintiff must allege … the defendant intended to racially discriminate *against him*." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1308 (11th Cir. 2010) (emphasis added). Plaintiffs' failure to identify their own race is a tacit concession that Justice Gorsuch's counterfactual analysis dooms them, because their race is irrelevant to any benefit they claim not to have received.

Here, Plaintiffs do not ask the Court to consider "what would have happened if [the Plaintiffs] had been white," or black, or any other racial or ethnic background. *Comcast*, 589 U.S. at 333. Rather, they allege that *all* "people who bank at other financial institutions" (or at least, large commercial banks) that are not "minority-owned" are treated identically based on their bank's eligibility. Am. Compl. ¶¶ 3, 27 (amending the original complaint's allegation to exclude

- 24 -

CDCUs or CDFIs from claim that minority ownership is necessary).[8] Accordingly, the core question of Section 1981—was your race relevant?— is answered "no" by the complaint. *See id.*

Because of that necessary conclusion, Plaintiffs' Amended Complaint seeks to skirt these rules in two ways. The first is Plaintiffs' newly minted direct discrimination claim, which fails as described above. The second, as in the prior complaint, is a claim of "Associational Discrimination," Am. Compl. at 19–20, claiming that their purported association with "non-minority" owners of Chase or Bank of America permits a Section 1981 claim. *Id.* ¶¶ 2, 23. Although associational discrimination can exist in the proper case, Plaintiffs' assertion of this theory fails the legal and factual requirements necessary to invoke it. Were the Court to let this case to proceed under this breathtakingly broad construction of Section 1981, it would work a radical transformation beyond anything Congress authorized, or the courts have approved.

### 2.    Section 1981 Associational Discrimination Claims Still Require a Showing of Discrimination Based on the Plaintiff's Race.

"Associational discrimination" claims are only actionable under Section 1981 in the Eleventh Circuit in a specific circumstance that is missing here. That term is something of a "misnomer" because in order to be actionable, an associational discrimination theory critically depends on whether the race of the Plaintiff matters to the claim alleged. *See Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021) ("In a practical sense, the name [associational discrimination] is a misnomer because, when you discriminate against an [individual] because of his association with someone of a different race, you are in effect discriminating against him 'because of his own race'"). Because Plaintiffs do not (and cannot) contend their race matters, they cannot rely on an

---

[8] Likewise, Plaintiffs do not allege any differential treatment among "people who bank at financial institutions that are 'minority-owned'" based on their race; on Plaintiffs' telling, customers of such banks are all equally able to access the fee waiver program. Am. Compl. ¶ 3.

associational discrimination theory, and their claim must be dismissed.

Plaintiffs' Amended Complaint continues to rely on *Parr v. Woodmen of the World Life Ins. Co*, 791 F.2d  888, 892 (11th Cir. 1986), for the proposition that Section 1981 makes actionable a claim for discrimination against a person based on "the *race* of *who* they *associate* or do business *with*." Am. Compl. ¶ 2 (emphasis added). Neither the Eleventh Circuit's *Parr* decision, nor the other circuits that follow it, have ever endorsed so sweeping a principle.

In reality, what *Parr* holds is that a claim "of discrimination based upon an interracial marriage is cognizable under [S]ection 1981." 791 F.2d at 890. Parr was a white man married to a black woman, *id.* at 889, who alleged a prospective employer discriminated against him "because of his interracial marriage," *id.* at 890. The court concluded the Section 1981 claim was actionable, importing similar principles from Title VII, because "[w]here a plaintiff claims discrimination based upon an *interracial marriage* or [*interracial*] *association*, he alleges, by definition, that he has been discriminated against because of *his* race." *Id.* at 892 (second emphasis in original).

Echoing this, Judge Newsom (the author of *Fearless Fund*) recently recognized for the Eleventh Circuit that *Parr*'s "language and logic" undermine the contention that a plaintiff need not invoke one's own "protected class" in order "to state a claim for discrimination so long as one is discriminated against because of association with a member of a protected class." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1335 (11th Cir. 2021). As summarized by an in-Circuit court, "cases applying the associational-discrimination theory in a [ ] § 1981 context have involved *association or relation by the employee with a person of the opposite race*, and thus, logically, are examples of [a defendant's] *discrimination against the [plaintiff] on account of the [plaintiff's] race, since underlying these cases is racial animus due the employee of X-race being associated with a person of Y-race*." *Nuzzo v. Baranco*,  2018 WL 11488950, at *14 (N.D. Ga. Jan. 22, 2018)

- 26 -

(citing *Parr*, 719 F.2d at 892) (emphasis added).

Many other circuits understand *Parr* the same way. *See, e.g.*, *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022) (citing *Parr* to conclude that Title VII permits interracial association claims, but not claims where "all that matters is the race of [other] persons" besides the plaintiff); *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) ("[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination *because of the employee's own race*."); *Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 250 (5th Cir. 2009) ("The association cases are predicated on animus against the employee because of his association with *persons of another race*.") (citing *Parr*, 791 F.2d at 892); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) (relying on *Parr* to conclude that a "white employee who is discharged because his child is biracial is discriminated against *on the basis of his race*" (emphasis added)).

Here, Plaintiffs' associational discrimination theory does not arise in the interracial context, nor does it depend in any way on the race of the Plaintiffs. Per the Amended Complaint (and in reality), Citibank treats similarly situated white or black out-of-network customers identically. Indeed, Plaintiffs do not disclose their races or allege that Citibank knew their particular race when determining whether they would incur an out-of-network fee. Put more simply, while Citibank's ATMs require a user to enter his or her personal PIN, they do not ask any user to enter their race.

Nor could Plaintiffs claim otherwise since minority-owned institutions serve customers of every race. The only critical fact that matters, per Plaintiffs, is the *race of the owners* of the *financial institution where they bank*—if those owners are white (and the bank is not a CDCU or CDFI), then supposedly a white plaintiff (and a black plaintiff) are equally disadvantaged. In other words, the plaintiffs' race is not a but-for cause of the alleged discrimination. *See Bostock v.*

*Clayton Cnty.,* 590 U.S. 644, 656 (2020) ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.").

That associational discrimination claims lie only where a plaintiff's race matters to the claim also follows from *Domino's*. As explained, the Supreme Court refused to allow a plaintiff to bring a Section 1981 suit based on a breach of contract with his wholly-owned company, despite claiming discrimination on the basis of *his* race that caused *him* economic injury. 546 U.S. at 473–74. The Court rejected reading the statute to permit "satellite § 1981 litigation of immense scope," such as "class actions by … minority employees" claiming the breach arose from "racial animus against them." *Id.* at 479. Plaintiffs' associational claim would expand Section 1981 far *beyond* McDonald's theory, to approve a wide swath of satellite litigation from persons unable to even plead that their race—let alone "racial animus against them"—drove any decision. *Id.*

### 3. Plaintiffs Fail to Plead Sufficient Facts to Support Their Supposed Association, Even if the Theory Were Viable.

As explained above, Eleventh Circuit case law forecloses Plaintiffs' associational theory because their race does not matter to the claims they assert. But that theory fails for another simple reason: despite adding many cases to their Amended Complaint and stay opposition in response to Citibank's arguments, Plaintiffs have offered no case—and Citibank is aware of none—supporting an associational claim with regard to publicly traded companies. The Court should reject Plaintiffs' unprecedented proposed expansion of this doctrine.

*First*, the Amended Complaint asserts that Plaintiffs are being penalized for associating with "individuals of a [non-minority] race disfavored by the defendant," specifically, the "owne[rs]" of their financial institutions. Am. Compl. ¶¶ 4, 54. But Plaintiffs not only fail to state their banks' owners, but whether their banks are even owned by non-minority "individuals," rather than the type of institutional investors who commonly invest in large public companies.

**Second**, even if Plaintiffs had alleged individual natural persons "own" Chase and Bank of America, the only "association" alleged with any such persons is that Plaintiffs maintain a banking account with that financial institution. *Id.* ¶¶ 6–7. Accepting that theory has two problems. Initially, it would require the Court to reject some courts' holdings (not yet resolved by the Eleventh Circuit) that "a significant relationship—such as an intimate or familial relationship" is required "to support an associational discrimination claim." *Lowe v. STME, LLC*, 354 F. Supp. 3d 1311, 1314–15 (M.D. Fla. 2019) (citing cases); *see Nuzzo*, 2018 WL 11488950, at *14 (concluding that "[c]ases applying the associational-discrimination theory require a significant relationship [with] the third party"). Finally, it would require the Court to hold, without authority, that an arm's-length transactional relationship with an entity is "association" with its shareholders—who, for publicly traded banks like Chase and Bank of America, are unknown to Plaintiffs and constantly changing. *Cf. EEOC v. STME, LLC*, 938 F.3d 1305, 1319 (11th Cir. 2019) (concluding a statutory associational discrimination claim under the ADA could only be based on a "known association" with a "specific disabled individual," not "contact with certain unknown individuals").

### C.    Plaintiffs Do Not Allege Any Discriminatory "Contract" That They Entered Into, or Wish to Enter Into, as Section 1981 Requires.

The Section 1981 claim should also be dismissed on the independent ground that it is not predicated on any "contract" that Plaintiffs allege was discriminatory *and* that Plaintiffs either entered into, or wish to enter into.

To start, Plaintiffs do not seek "the same opportunity" to create a contractual relationship like that between Citibank and the participant institutions in the ATM Community Network, since Plaintiffs are not financial institutions. *Comcast*, 589 U.S. at 335–36. Nor do Plaintiffs seek to plead any "impairment" of any "proposed contractual relationship" that the financial institutions

where they bank might enter into with Citibank.[9] *Domino's*, 546 U.S. at 479, 476. So Plaintiffs'

Amended Complaint attempts to manufacture a different contractual relationship for Section 1981.

It alleges that "Plaintiffs' and Class Members' use of a Citi branch ATM constituted a contract,"

and that "[b]y imposing ATM fees for one set of customers but not others, Citi's Policy denied

Plaintiffs and Class Members 'the *same right[s]* in the '*mak[ing] and enforc[ing]* [of] contracts'

with Citi." Am. Compl. ¶¶ 93–94, 101 (quoting 42 U.S.C. § 1981) (emphasis added).

   To be viable, a Section 1981 claim must allege that the discriminatory arrangement

challenged is indeed a "bargained-for exchange supported by good and sufficient consideration …

in other words, a contract." *Fearless Fund*, 103 F.4th at 775*; see also Cochrane v. Greener Energy,*

*LLC*, 2021 WL 9563201, at *3 (S.D. Fla. Sept. 17, 2021) ("mutual consideration" is necessary for

a contract under Florida law) (Singhal, J.). By contrast, "gratuitous promises" lacking

consideration from the opposing party will not be enforced by courts. *See, e.g.*, 17A AM. JUR. 2D

CONTRACTS § 102 ("The *consideration*, in the legal sense of the word, of a contract *is the quid*

*pro quo, that which the party to whom a promise is made does or agrees* to do in return for the

promise. … When one receives a naked promise and the promise is broken, he or she is not worse

off than previously. … Such promises are not made within the scope of transactions intended to

confer rights enforceable at law." (emphasis added)).

   Eleventh Circuit precedent holds that a Section 1981 claim cannot proceed where it relies

on an agreement that lacks consideration. *See Jimenez*, 596 F.3d at 1309 ("medical staff privileges"

could not constitute "consideration" on implied contract as they were wholly revocable); *Johnson*

---

   [9] That approach would fail since Plaintiffs would need to plead third-party beneficiary
status, yet the Network contracts explicitly disclaim any third-party beneficiaries. *See, e.g.*, Decl.
Ex. B, § 9.3 (No Third-Party Beneficiaries). *See Moore v. Grady Mem'l Hospital Corporation*,
834 F.3d 1168, 1175 (11th Cir. 2016).

*Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311–13 (11th Cir. 1998) ("a promise is not enforceable unless it is supported by consideration."). Similarly, in a decision that binds the Eleventh Circuit, the pre-split Fifth Circuit held that a claim alleging racial discrimination in the placement of a wedding announcement could not "arise under the right to contract" under Section 1981 because the "newspaper received no pecuniary [or other] consideration from any person" submitting their information for publication. *Cook v. Advertiser Co.*, 458 F.2d 1119, 1122 (5th Cir. 1972); *see Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Again, the Eleventh Circuit's recent decision in *Fearless Fund* is instructive. There, the defendant Fearless Fund disputed that any "contract" was being extended to the winners of its grants, contending its grant program amounted to "discretionary gifts." *Fearless Fund*, 103 F.4th at 779. In turn, the plaintiff (represented by the same counsel as here) conceded that Section 1981 places no restrictions on "true 'charity'" or "anyone … giving away their money for free." Reply Br., *Fearless Fund*, No. 23-13138 (11th Cir.), 2024 WL 81432, at *1. Nor did the Eleventh Circuit question that premise. *See Fearless Fund*, 103 F.4th at 779 ("Fearless isn't simply donating money; it's orchestrating a bargained-for exchange in which both parties obtain valuable benefits and undertake meaningful obligations."). Instead, the court rested on the premise that a plaintiff *does* need to show the benefit it sought was issued pursuant to a contract, but found that the contest rules clearly set forth a contract, as both parties exchanged valuable promises (and the agreement was originally designated "A CONTRACT"). *Id.* at 776.

Here, Plaintiffs' Amended Complaint does not suggest any "good and sufficient consideration" offered by the fee-waiver ATM users to Citibank. *Id*. Such users do not offer Citibank anything of value or offer some promise to access the free ATM service. *But see Fearless Fund*, 103 F.4th at 775 (contest winner, in exchange for $20,000 and valuable mentorship, "grants

Fearless permission to use its idea, name, image, and likeness for promotional purposes and agrees to indemnify Fearless to arbitrate any disputes that might arise"). *See Stand Strong USA, Inc. v. Harwich Enterprises, LLC*, 2020 WL 13267387, at \*4 (S.D. Fla. Dec. 28, 2020) (Singhal, J.) (consideration under Florida law, as elsewhere, "consist[s] of either a benefit to the promisor or a detriment to the promisee." (quoting *Dorman v. Publix-Saenger-Sparks Theatres, Inc.*, 184 So. 886, 889 (Fla. 1938)). Rather, the fee-waived ATM users simply receive a gratuitous benefit that they themselves cannot enforce.

Despite amending their complaint to now assert that their exchange of a fee for use of a Citi ATM is a contract, Plaintiffs still do not claim that fee-waived users participate in a contract. They allege that "Citi charges customers an out-of-network fee and collects their personal information in exchange for using Citi's ATMs to withdraw cash." Am. Compl. ¶ 12. Assuming that exchanging a fee to withdraw cash *is a contract*, it *cannot* be *the contract* on which these Plaintiffs sue. That is because Plaintiffs do not claim discrimination in paying the fee, since they concede that fee predates, and does not arise from, the Network. Am. Compl. ¶¶13, 91. A Plaintiff in a Section 1981 claim must sue based on the preferential contract they allege others received.[10] *See Domino's*, 546 U.S. at 476, 479 (Congress calibrated Section 1981 to only "offer[] relief when *racial discrimination blocks the creation of a contractual relationship*, [or] when *racial discrimination impairs an existing contractual relationship*, so long as *the plaintiff has or would have rights under the existing or proposed contractual relationship*." (emphasis added)).

This requirement of a legally enforceable contract is no mere technicality, to be overlooked. It is a fundamental element of the Section 1981 cause of action Congress enacted. 42 U.S.C.

---

[10] Even Plaintiffs' authority compares *two contractual arrangements*—both money for a service, with a race-based discount. *See* Am. Compl. ¶ 52 (citing *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, 2007 WL 323490, at \*4 (N.D. Ill. Nov. 1, 2007)).

§ 1981(a)-(b). The Supreme Court consistently has interpreted Section 1981 in line with the historical design of this and other similar Reconstruction-Era civil rights laws, namely, to secure "the great fundamental rights," including "to make contracts," necessary to put formerly enslaved Americans in parity with "freemen." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 432 (1968); *see id.* at 441 ("It is idle to say that a man is free who cannot … buy and sell, who *cannot enforce his rights*." (emphasis added)). None of that undermines that Section 1981 applies to "protect whites as well as nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 293, 295 (1976). But it shows that the evil Section 1981 sought to rectify is a discriminatory abridgment of the right *to contract*; it does not provide a path to claim discrimination as to a *non*-contractual arrangement, under which Plaintiffs cannot "have rights." *Domino's*, 546 U.S. at 476.

## III.    These Two Florida Plaintiffs Cannot State a Claim under California's Unruh Act.

Becker's and Guida's claims under California's Unruh Act should likewise be dismissed. "A nonnamed class member is not a party to the class action *before the class is certified*.'" *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015). Thus, any claims sought to be advanced by unnamed putative class members are "hypothetical claims," not "live claims" that can sustain a case. *Id.* In turn, when named plaintiffs in a putative statutory class action have "failed to state a claim" in their own name "on which relief can be granted," including by alleging conduct outside a statute's territorial reach, their claims must be dismissed. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253, 273 (2010) (dismissal proper where only "live claims"—those of named plaintiffs—took place outside the territorial scope of the securities law). So "a named Florida plaintiff" in a class action who brought a claim "under, for instance, Georgia's consumer-protection statute—and on behalf of Georgia consumers" without alleging Georgia conduct "would fail to state a viable claim under Rule 12(b)(6)." *Coleman*, 2023 WL 5507730, at *3.

The same rule applies to Unruh. Because "[i]t is well-settled that the Unruh Act applies only within California." *Loving v. Princess Cruise Lines, Ltd.*, 2009 WL 7236419, at *8 (C.D. Cal. Mar. 5, 2009), claims that do not allege that a plaintiff "suffered the challenged discrimination while in California" are properly dismissed under Rule 12(b)(6) for failure to state a claim. *See, e.g.*, *Huber v. Biden*, 2022 WL 17818543, at *2 (9th Cir. Dec. 20, 2022) (affirming dismissal); *Tat Tohumculuk, A.S. v. H.J. Heinz Co.*, 2013 WL 6070483, at *7 (E.D. Cal. Nov. 14, 2013) (dismissing claim). And because putative class members' claims are merely "hypothetical," *Overdraft Litig.*, 780 F.3d at 1037, a non-California plaintiff cannot avoid dismissal by asserting a claim is on behalf of absent class members not yet part of the litigation. *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (dismissing Unruh claim in putative class action by Florida plaintiff).

The Amended Complaint asserts two Unruh Act claims: one "*on behalf of themselves and all members of the California subclass,*" and one *only* "on behalf of all members of the California subclass." Am. Compl. ¶¶ 103, 109 (emphasis added). But the only claims properly before the Court prior to certification are Plaintiffs' own. And here, the sole conduct Plaintiffs allege is that they "used a Citibank ATM" once each, in Plantation and Fort Lauderdale, Florida, between June and July 2023 (*id.* ¶¶ 6, 7); *see also id.* ¶ 11 (alleging venue here "because a substantial part of the events giving rise to [their] claims occurred in the [the Southern] District [of Florida]."); Civil Cover Sheet 1 [ECF 1-1] ("First Listed Plaintiff" resides in "Broward County, FL"). As Plaintiffs allege only Florida-based conduct, they cannot state any California Unruh claims.

Plaintiffs' stay opposition cited an unpublished Eleventh Circuit decision concluding that a named plaintiff's ability to raise "causes of action under" various state laws asserted to cover class members is "a Rule 12(b)(6)" issue, rather than an *Article III standing* issue. *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 16729170, at *5 (11th Cir. Nov. 7, 2022). District courts

in this Circuit, before and after *Zantac*, have disagreed on this point. *See Coleman*, 2023 WL 5507730, at \*5 (noting disagreement but determining to follow the unpublished *Zantac* decision). But the disagreement is irrelevant here; *Zantac* expressly permits dismissal if named plaintiffs have failed to *state a claim* under the elements of state law—including any territorial elements. *Zantac*, 2022 WL 16729170, at \*5; *see Coleman*, 2023 WL 5507730, at \*3.

Lastly, "[b]ecause of the similar analysis applied to both § 1981 claims and Unruh Act claims, courts may analyze § 1981 and Unruh Act claims together." *Blackshire v. Cnty. of Yuba*, 648 F. Supp. 3d 1221, 1237 (E.D. Cal. 2023). Accordingly, the Unruh Act claims should also be dismissed for the above reasons that Plaintiffs' Section 1981 claims fail.[11]

## CONCLUSION

The Court should dismiss the action for lack of Article III standing under Rule 12(b)(1), either facially based on the Amended Complaint, or factually based on Citibank's evidence. In the alternative, the Court should dismiss with prejudice all of the Section 1981 and California Unruh Act claims for failure to state a claim under Rule 12(b)(6).

---

[11] As described, Plaintiffs' Unruh claims fail on the law. But alternatively, after dismissing Plaintiffs' Section 1981 claims, the Court may "decline to exercise supplemental jurisdiction," a practice which "the Eleventh Circuit encourages" when dismissal comes before trial. *Johns v. Tony*, 2023 WL 9327362, at \*2 (S.D. Fla. Dec. 20, 2023) (Singhal, J.) (declining jurisdiction over state law claims after dismissing Section 1983 claims with prejudice), *appeal filed*, No. 24-10172 (11th Cir.); *see* Am. Compl. ¶ 10 (supplemental jurisdiction for Unruh under 28 U.S.C. § 1367).

Dated: August 14, 2024

Respectfully submitted,

*/s/ Eliot Pedrosa*
Eliot Pedrosa
Florida Bar No. 182443
epedrosa@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone:  (305) 714-9700
Facsimile:  (305) 714-9799

Jayant W. Tambe (*admitted pro hac vice*)
Alexander V. Maugeri (*admitted pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
amaugeri@jonesday.com
jtambe@jonesday.com

Christopher Pagliarella (*admitted pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
cpagliarella@jonesday.com

***Attorneys for Defendants***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 14, 2024, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Eliot Pedrosa*
Eliot Pedrosa

***Attorney for Defendants***
