**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-60834-Singhal

WERNER JACK BECKER, DANA
GUIDA, individually and on behalf of others
similarly situated,

        Plaintiffs,

v.

CITIGROUP INC. d/b/a CITIBANK and
CITIBANK, N.A.,

        Defendants.

**PLAINTIFFS' OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    Citi's discriminatory ATM Policy. ....................................................... 2

    B.    The Policy harmed Plaintiffs. ..................................................... 6

STANDARD OF REVIEW ........................................................................................... 7

ARGUMENT ..................................................................................................................... 8

    I.    Plaintiffs have standing because Citi's discriminatory
          Policy directly injured them. ........................................................ 8

    II.    Plaintiffs state claims for direct and associational discrimination. ............................ 16

          A.    Plaintiffs allege direct discrimination. ........................................... 16

          B.    Plaintiffs state a claim for associational discrimination. ............................... 23

          C.    Citi charging Plaintiffs an ATM fee in exchange
              for withdrawing cash is a contract. ................................................ 29

    III.    The Amended Complaint states the subclass's claim under
           California's Unruh Civil Rights Act. ............................................ 32

CONCLUSION .............................................................................................................. 35

i

## **TABLE OF AUTHORITIES**

**CASES**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) (en banc) ................................................................. 18

*Adewumi v. Wellstar Med. Grp.*,
   2022 WL 22286841 (N.D. Ga. July 12, 2022).......................................................... 23

*Am. Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) ......................................................................... 11, 12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 255 (1986)......................................................................................... 23

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)............................................................................................ 18, 19

*Baytree of Inverrary Realty Partners v. City of Lauderhill*,
   873 F.2d 1407 (11th Cir. 1989) ................................................................... 8, 9, 25, 28

*Bell v. Miedema*,
   2020 WL 5230581 (M.D. Fla. Sept. 2, 2020) ............................................................ 7

*Bobbitt by Bobbitt v. Rage Inc.*,
   19 F. Supp. 2d 512 (W.D.N.C. 1998) ...................................................................... 30

*Braunstein v. Ariz. Dep't of Transp.*,
   683 F.3d 1177 (9th Cir. 2012) ................................................................................. 14

*Brown v. Google LLC*,
   685 F. Supp. 3d 909 (N.D. Cal. 2023) ..................................................................... 32

*Capek v. BNY Mellon, N.A.*,
   2016 WL 2993211 (S.D.N.Y. May 23, 2016) ............................................... 10, 16, 22

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989)................................................................................................. 19

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
   218 L. Ed. 2d 71 (Feb. 20, 2024) ............................................................................ 20

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
   68 F.4th 864 (4th Cir. 2023) ................................................................................... 20

*Coleman v. Burger King Corp.*,
   2023 WL 5507730 (S.D. Fla. Aug. 25, 2023)...................................................... 34, 35

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
   589 U.S. 327 (2020) ............................................................................ 24, 26

*DeMatteis v. Eastman Kodak Co.*,
   511 F.2d 306 (2d Cir. 1975) ................................................................... 28

*Des Vergnes v. Seekonk Water Dist.*,
   601 F.2d 9 (1st Cir. 1979) ................................................................. 12, 26

*Diverse Power, Inc. v. City of LaGrange*,
   934 F.3d 1270 (11th Cir. 2019) (citation omitted) ..................................... 7

*Domino's Pizza, Inc. v. McDonald*,
   546 U.S. 470 (2006) ........................................................ 21, 22, 29, 31

*Drake v. Minn. Min. & Mfg. Co.*,
   134 F.3d 878 (7th Cir. 1998) ................................................................. 28

*Edwards v. Acadia Realty Tr., Inc.*,
   2001 WL 34104845 (M.D. Fla. Jan. 10, 2001) ............................ 10, 25, 28

*Est. of Amos ex rel. Amos v. City of Page, Ariz.*,
   257 F.3d 1086 (9th Cir. 2001) ............................................................... 10

*Faraca v. Clements*,
   506 F.2d 956 (5th Cir. 1975) ........................................................... 23, 27

*Ferrill v. Parker Grp., Inc.*,
   168 F.3d 468 (11th Cir. 1999) ............................................................... 24

*Fisher v. Univ. of Tex. at Austin*,
   579 U.S. 365 (2016) ............................................................................. 19

*Floyd v. Bridgman*,
   2021 WL 795999 (S.D. Fla. Mar. 2, 2021) ............................................ 23

*FPL Food, LLC v. U.S. Dep't of Agric.*,
   671 F. Supp. 2d 1339 (S.D. Ga. 2009) .................................................. 10

*Frith v. Whole Foods Mkt., Inc.*,
   38 F.4th 263 (1st Cir. 2022) .................................................................. 27

*Gordon v. City of Cartersville, Ga.*,
   522 F. Supp. 753 (N.D. Ga. 1981) ......................................... 10, 13, 25, 28

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
   992 F.3d 1299 (11th Cir. 2021) ........................................... 18, 20, 21

*Hall v. Lowder Realty Co.*,
   160 F. Supp. 2d 1299 (M.D. Ala. 2001) ................................................................. 10

*Hill v. Shell Oil Co.*,
   78 F. Supp. 2d 764 (N.D. Ill. 1999) ....................................................................... 30

*Holcomb v. Iona Coll.*,
   521 F.3d 130 (2d Cir. 2008)................................................................................... 27

*In re Cap. One Consumer Data Sec. Breach Litig.*,
   488 F. Supp. 3d 374 (E.D. Va. 2020) .................................................................... 32

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
   2022 WL 16729170 (11th Cir. Nov. 7, 2022)............................................. 32, 33, 34

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ........................................................................ 14, 15

*Jones v. Alfred H. Mayer Co.*,
   392 U.S. 409 (1968)................................................................................................. 1

*Jones v. UPS Ground Freight*,
   683 F.3d 1283 (11th Cir. 2012) ........................................................................ 10, 16

*Kelser v. Alcazar Shriners*,
   2007 WL 484551 (M.D. Ala. Feb. 9, 2007) ......................................... 9, 10, 13, 25

*Kengerski v. Harper*,
   6 F.4th 531 (3d Cir. 2021) ................................................................................ 27, 28

*Lewis v. Governor of Ala.*,
   944 F.3d 1287 (11th Cir. 2019) ............................................................................. 14

*Long v. Aronov Realty Mgmt., Inc.*,
   645 F. Supp. 2d 1014 (M.D. Ala. 2009) ................................................................ 13

*Lowe v. STME, LLC*,
   354 F. Supp. 3d 1311 (M.D. Fla. 2019)................................................................. 29

*Matamoros v. Broward Sheriff's Off.*,
   2 F.4th 1329 (11th Cir. 2021) ................................................................................ 27

*McDonald v. Santa Fe Trail Transp. Co.*,
   427 U.S. 273 (1976)................................................................................ 1, 23, 24, 27

*Midnight Sessions, Ltd. v. City of Phila.*,
   1990 WL 107351 (E.D. Pa. July 23, 1990)............................................................ 13

iv

*Milton v. Milligan*,
  2013 WL 828591 (N.D. Fla. Mar. 5, 2013) .......................................................................... 29

*Morrison v. Amway Corp.*,
  323 F.3d 920 (11th Cir. 2003) ............................................................................................. 8

*Park Sch. of Bus., Inc. v. Symington*,
  51 F.3d 1480 (9th Cir. 1995) ......................................................................................... 25, 26

*Parr v. Woodmen of the World Life Ins. Co.*,
  791 F.2d 888 (11th Cir. 1986) ............................................................................... 24, 25, 26, 28

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  2022 WL 20099419 (N.D. Fla. Nov. 22, 2022) ............................................................... 20

*Riccobono v. Whitpain Twp.*,
  497 F. Supp. 1364 (E.D. Pa. 1980) ..................................................................................... 13

*Rivers v. Roadway Exp., Inc.*,
  511 U.S. 298 (1994) .............................................................................................................. 29

*Scott v. Greenville Cnty.*,
  716 F.2d 1409 (4th Cir. 1983) ............................................................................................. 12

*Senter v. JPMorgan Chase Bank, N.A.*,
  810 F. Supp. 2d 1339 (S.D. Fla. 2011) ............................................................................... 32

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .............................................................................................................. 19

*Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*,
  173 F.3d 988 (6th Cir. 1999) ......................................................................................... 26, 27

*Transmax Prods., LLC v. Swartzberg*, 2020 WL 5095370
  (N.D. Ga. Aug. 28, 2020) ......................................................................................... 10, 25, 28

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) .............................................................................................................. 26

*Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*,
  2007 WL 3232490 (N.D. Ill.) ......................................................................................... 30, 31

*Wilson v. EverBank, N.A.*,
  77 F. Supp. 3d 1202 (S.D. Fla. 2015) ................................................................................. 34

*Wooden v. Bd. of Regents*,
  247 F.3d 1262 (11th Cir. 2001) ........................................................................................... 15

*Wygant v. Jackson Bd. of Educ.*,
   476 U.S. 267 (1986) ....................................................................................... 19

*Yelapi v. DeSantis*,
   487 F. Supp. 3d 1278 (N.D. Fla. 2020) ........................................................ 15

*Young Apartments, Inc. v. Town of Jupiter, Fla.*,
   529 F.3d 1027 (11th Cir. 2008) ........................................................ 8, 9, 25, 28

**STATUTES**

42 U.S.C. § 2000e-2 .......................................................................................... 26

42 U.S.C. § 1981 ......................................................................... 23, 24, 29, 32

Fla. Stat. Ann. § 760.10(1)(a) .......................................................................... 27

**OTHER AUTHORITIES**

Gov't Accountability Off., *Consumer Privacy: Better Disclosures Needed on Information Sharing by Banks and CreditUnions*, GAO-21-36, gao.gov (October 22, 2020),
   https://perma.cc/3YUE-TVRL ....................................................................... 31

## INTRODUCTION

Imagine a big bank's owners have controversial views on civil rights issues and what it means to be "American." They also want to help individuals who they think share those views—even if those individuals are customers of other banks. So, they continue to charge ATM fees to customers of most other banks, but they decide to waive those fees for customers of "White-owned banks" and customers of banks that serve "White communities." The reasons for the policy, the bank proudly explains, is "we are in the midst of a national reckoning on race, and words are not enough." And "we will do our part by engaging firms that reinvest into the White community." The bank's CEO then testifies before Congress that "we are expanding banking services in White communities by extending surcharge-free access to our ATMs to White-owned banks and banks that serve White communities." The CEO also testifies that the banks in its policy "level the playing field for White communities and populations."

This hypothetical doesn't require much imagination. It's the type of thing that was happening in 1866, and why Congress passed §1981's ban on racial discrimination in contracting. *See generally Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422-36 (1968). It's also what Citi is doing today. Though Citi swapped "White" for "minority" in the above statements, its racial discrimination is just as illegal under §1981—a "broad" law that "proscribe[s] discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). That law's "broad" application has left Citi with little space to defend its policy. As a result, Citi responded to this lawsuit with sleights of hand and novel arguments for why the people most harmed by its policy—those that have actually paid the discriminatory fees—are powerless to fix that grievous harm. The Court should reject Citi's clever attempts to wiggle out of liability for its express racial discrimination.

1

Carrying the hypothetical forward, is it really Citi's position that it could charge ATM fees for everyone but customers of *White*-owned banks and banks that "serve White communities"? And is it really Citi's position that people charged those racially discriminatory fees can't challenge them? That cannot be right, and it isn't right here either. Racial discrimination is invidious in all contexts. That includes the racial discrimination at the core of Citi's ATM policy. Plaintiffs are among those who have paid Citi's ATM fees. They have standing to challenge those fees and they have stated a claim under §1981. The Court should deny Citi's motion to dismiss.

## **BACKGROUND**

### A.    **Citi's discriminatory ATM Policy.**

Like most banks, Citi typically charges non-Citi customers an out-of-network fee and collects their personal information in exchange for using Citi's ATMs. Am. Compl. ¶12. Unlike most banks, however, whether Citi charges that fee depends on race. *Id.* In 2016, Citi announced a program called the "Citi® ATM Community Network" (the "Policy"). *Id.* ¶13. Under the Policy, which is still in force today, Citi waives all ATM fees at Citi branch offices for customers from certain banks, including minority-owned banks and credit unions. *Id.* But Citi continues to charge ATM fees to customers from other banks. *Id.*

The express goal of the Policy was racial discrimination. *Id.* ¶14. It was meant to provide cheaper access to ATMs for customers who do business with banks that are owned by, or serve, members of Citi's preferred races. *Id.* The race-based nature of the Policy was not an incidental feature. *Id.* ¶15. The Policy was launched "in consultation with" a group called the "Asset Building Policy Network," which describes itself as "a national coalition that collectively advances … long-term financial security for low- and moderate-income communities of color." *Id.* Citi was no

stranger to the Asset Building Policy Network's race-oriented goals—it had coordinated with the Network on multiple programs targeting "communities of color" since the early 2010s. *Id.*

Citi was not shy about the race-based nature of the Policy. *Id.* ¶16. In its 2016 press release introducing the Policy, Citi explicitly said the goal was to provide "surcharge-free ATM Access" to customers of "minority-owned banks and credit unions." *Id.* ¶¶13, 16. Citi again highlighted the race-based nature of the Policy in its *2016 Global Citizenship Report*, describing it as providing use of ATMs for clients of "participating minority-owned banks and credit unions." *Id.* ¶17.

Citi continued to outline the race-based nature of the Policy as it grew. In its *2017 Global Citizenship Report*, Citi said the Policy "provide[d] fee-waived access to more than 400,000 clients of minority-owned banks and credit unions in the U.S." *Id.* ¶18. Again, in its *2018 Global Citizenship Report*, Citi described the Policy as allowing "440k clients of minority-owned banks and credit unions [to] receive[] fee-waived access." *Id.* Citi clarified that the Policy was part of its "establish[ment of] relationships with 25 minority depository institutions, community banks and credit unions." *Id.* And Citi described the Policy in a March 2020 regulatory disclosure, explaining that under the Policy, "440,000 clients of minority-owned banks and credit unions" receive "fee-waived access" to its ATMs. *Id.* ¶19.

Then, in September 2020, Citi included the Policy as a key component in its "Action for Racial Equity" initiative. *Id.* ¶20. Citi openly and proudly touted the initiative as race-based. *See id.* ¶¶20-21. Citi's "Goal #1" for the "Action for Racial Equity" initiative was to "expand banking and access to credit in communities of color." *Id.* ¶21. Citi's then-CEO explained that the initiative aimed to "bring[] together all the capabilities of our institution—our people, our lines of business, our balance sheet, and our philanthropy—like never before to combat the impact of racism in our economy." *Id.* ¶20. Citi's CFO agreed: "We are in the midst of a national reckoning on race, and

3

words are not enough … we are determined to help close the racial wealth gap and help build an anti-racist economy and society." *Id.* Citi's ATM Policy featured prominently in these efforts by, in Citi's words, "remov[ing] out-of-network fees at Citibank ATMs for customers of participating minority-owned banks and community development credit unions." *Id.* ¶21.

In the following years, Citi continued to tout the Policy as a part of its race-based Action for Racial Equity initiative. *See id.* ¶¶24-25. In November 2021, Citi featured the Policy in a brochure advertising its relationships with minority-owned banks. *Id.* ¶24. There, Citi explained that the Policy's intent was to "strengthen[] the economic trajectory of minority banking institutions and the communities they serve." *Id.* Citi's writeup on the Policy featured a quote from its CFO: "'As we continue to do the work to become an anti-racist institution and drive finance toward a more equitable and inclusive industry, we will do our part by engaging firms that reinvest into the Black community.'" *Id.* Then, in September 2022, Citi featured the Policy in its "Year Two Progress Report" on the Action for Racial Equity initiative. *Id.* ¶25. Citi again said the Policy had "remov[ed] out-of-network fees at Citibank ATMs for customers of participating minority-owned banks and community development credit unions." *Id.* According to a December 2022 audit of Citi's Action for Racial Equity initiative, Citi's Policy is achieving its intended effect. *Id.* ¶26. Minority-owned banks said that the Policy "'change[d] the whole dynamic' of [their] business because it resulted in more individuals banking with the MDI." *Id.*

Citi has also frequently cited the Policy in its communications with lawmakers and regulators while touting its race-based nature. *Id.* ¶22. In May 2021, Citi's newly-minted CEO, Jane Fraser, described the Policy as race-based in her testimony before the United States Senate. *Id.* Fraser testified that the Policy "remov[ed] surcharge fees at Citibank ATMs for more than 440,000 customers of 28 minority-owned banks and credit unions." *Id.* Again, in September 2022,

Ms. Fraser described the Policy in her written testimony to lawmakers as "expanding banking services in communities of color by extending surcharge-free access to Citibank ATMs through our Citi ATM Community Network of 32 community banks, 16 of which are [minority-owned]." *Id.* ¶23. And in December 2020, when a group of shareholders filed a proposal to force Citi to undergo an independent "racial equity audit analyzing Citi's adverse impacts on nonwhite stakeholders and communities of color," Citi tried to avoid a shareholder vote on that proposal by writing a letter to the SEC highlighting the Policy. *Id.* ¶43. Citi's letter argued that the Policy already "expand[ed] banking and access to credit in communities of color" and "remove[d] out-of-network fees … for customers of participating minority-owned banks and community development credit unions," making the proposed audit unnecessary. *Id.*

Today, three types of banks are eligible for the Policy. *Id.* ¶27. A bank must be: (a) minority-owned; (b) a Community Development Credit Union (CDCU); or a (c) Community Development Financial Institution (CDFI). *Id.* Citi established these criteria because it believes that the customers of these banks are minorities. *Id.* ¶98. A CDCU is a credit union that is a member of Inclusiv, a nonprofit association of banks that specialize in providing particular types of financial products. *Id.* ¶28. A CDFI is a bank that is certified by the Department of Treasury as, among other things, having customers in low-income communities. Treasury describes CDFIs' predecessors as "minority-owned banks" that "focused on low-income areas." *Id.* ¶29. Over 70% of banks included in the Policy are minority-owned. *Id.* ¶30.

Citi's inclusion of minority-owned banks in the Policy is race-based on its face. *Id.* ¶32. And while Citi's inclusion of CDCUs and CDFIs is not facially race-based, Citi made clear that their inclusion was motivated by race too. *Id.* In 2017, for example, Citi stated the purpose of the Policy was to target minorities. *Id.* "[S]tudies show," according to Citi, "that low-income

communities of color still predominantly use cash for transactions, making ATM access and fees especially important. This offered Citi, with our large ATM network, an opportunity to leverage our resources to improve banking accessibility for all." *Id.* In 2020, Citi said that the Policy and its inclusion of CDCUs was part of a broader goal to "expand banking and access to credit in communities of color." *Id.* ¶33. And in 2021, Citi's CEO testified that "CDFIs level the playing field for underserved communities and populations, especially communities of color." *Id.* ¶34. She also testified that "[w]e are expanding banking services in communities of color by extending surcharge-free access to Citibank ATMs through our Citi ATM Community Network of 32 community banks, 16 of which are [minority-owned]." *Id.* The other 16 banks, in other words, are CDCUs and CDFIs that are part of the Policy because they are in "communities of color." *Id.*

   **B.     The Policy harmed Plaintiffs.**

   Plaintiffs Werner Jack Becker and Dana Guida do not bank with Citibank. *Id.* ¶¶6-7. Becker's bank is Chase Bank, which is not eligible for Citi's fee-waiver Policy, and Becker used a Citibank ATM at 8400 West Broward Boulevard, Plantation, Florida and paid an out-of-network fee in July 2023. *Id.* ¶6. Guida's bank is Bank of America, which is not eligible for Citi's fee-waiver Policy, and Guida used a Citibank ATM at 5825 North University Drive, Fort Lauderdale, Florida and paid an out-of-network fee in June 2023. *Id.* ¶7. Becker and Gouda's use of a Citi branch ATM constituted a contract because they paid an out-of-network fee and provided their personal information in exchange for withdrawing cash from their accounts. *Id.* ¶¶12, 93, 100.

   Becker and Guida have asserted two sets of claims based on these allegations. The first set (Counts 1 and 3) are associational discrimination claims. If a bank is "minority owned," then Citi does not charge customers of that bank out-of-network fees for using Citi ATMs. But Citi charges those fees to customers who Citi knows have accounts (and thus a commercial relationship) with

other banks that are not part of Citi's Policy. That means Citi discriminates based on the race of those who Plaintiffs associate with. The second set (Counts 2 and 4) are direct discrimination claims. Citi also perceives customers of minority-owned banks, CDCUs, and CDFIs in the Policy to be minorities because, for example, those banks serve "communities of color." And Citi waives fees for those customers based on that perception. Citi thus directly discriminated against Plaintiffs because it did not perceive them to be minorities.

## **STANDARD OF REVIEW**

"On a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute." *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1273 (11th Cir. 2019) (citation omitted). That is also true for the facts that establish standing. "At the motion to dismiss stage, courts must evaluate standing based on the facts alleged in the complaint." *Bell v. Miedema*, 2020 WL 5230581, at *1 (M.D. Fla. Sept. 2, 2020). "And a plaintiff's burden is satisfied if it has alleged facts that plausibly establish standing." *Id.*

Citi attempts to circumvent that standard by manufacturing a factual attack on Plaintiffs' standing. Citi attaches a declaration and exhibits (Doc. 41-1) about the terms and conditions that financial institutions must accept to take part in the Policy. Citi then asserts that Plaintiffs' banks are not "able and ready" to apply for the Policy because doing so would require accepting those terms and conditions. Even accepting that this is a factual, rather than facial attack, this information is irrelevant to Plaintiffs' standing. As discussed at length below, the "able and ready" standard does not apply to Plaintiffs' associational discrimination claims. Thus, this factual attack does not deprive Plaintiffs of the ordinary pleading standards for their allegations and claims.

In addition, Citi's jurisdictional arguments are intertwined with the merits. Those arguments boil down to the view that Plaintiffs were not really harmed because of Citi's racially

discriminatory Policy. That is the core merits issue that the Court must decide. *See Morrison v. Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003) ("[J]urisdiction becomes intertwined with the merits of a cause of action when 'a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief.'"). Because Citi's ostensibly "factual" attack on jurisdiction is "intertwined with the merits of a cause of action," it must be evaluated under the ordinary pleading standards. *Id.*

## ARGUMENT

I.      **Plaintiffs have standing because Citi's discriminatory Policy directly injured them.**

**A.** Plaintiffs' standing is straightforward. For their associational discrimination claims, Citi charged Plaintiffs higher ATM fees because they did not bank with financial institutions that were minority-owned. That direct, pocketbook injury has long granted standing to plaintiffs under discrimination laws, including §1981. "[A] non-minority plaintiff has standing to allege that it was injured by defendants' discriminatory animus toward third parties." *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1038-39 (11th Cir. 2008); *see also Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1408 (11th Cir. 1989). This is not a form of third-party standing—Plaintiffs do not seek to vindicate the rights of their banks. Rather, Plaintiffs' "own injury," caused by discrimination against third parties, "is sufficient to confer standing, separate from the question of whether the non-minority plaintiff also has standing to vindicate the rights of [the] third parties." *Young Apartments*, 529 F.3d at 1038-39.

This theory of standing is well-established in the Eleventh Circuit. For example, in *Young Apartments*, a landlord alleged that the Town of Jupiter eliminated affordable housing for Hispanic immigrants. 529 F.3d at 1032. The Eleventh Circuit held the landlord had standing because it "suffered a financial injury based on lost rent and the lost sale of its property" that it alleged "was

caused by Jupiter's enactment of the" allegedly discriminatory measures. *Id.* at 1038-39. The court rejected the district court's holding that the landlord "lacked 'standing to complain of the alleged racial or ethnic discrimination by' Jupiter, because it believed that 'a non-Hispanic landlord lacks standing to bring a race discrimination claim on behalf of its Hispanic residents.'" *Id.* at 1039. The district court "ignore[d] that Young Apartments is suing Jupiter to remedy its *own* mistreatment, which it claims resulted from Jupiter's discriminatory targeting of its Hispanic tenants." *Id.* The Eleventh Circuit applied "the uncontroversial principle that it is unconstitutional for a state actor, motived by discriminatory animus, to interfere with an individual's right to contract or associate with members of a protected class." *Id.*

The Eleventh Circuit has applied this principle elsewhere. In *Baytree*, 873 F.2d at 1407, a city refused to amend a zoning ordinance to allow a developer to build low-income housing, *id.* at 1408. The developer alleged that decision "was influenced by [city] residents' expressed fears that low cost housing would cause an influx of black residents." *Id.* The district court held "that Baytree, a non-minority developer, had no standing because it was asserting the rights of hypothetical third persons." *Id.* The Eleventh Circuit reversed: "Baytree argues its own injury from zoning decisions which are motivated by racial animus, not the injury that would be incurred by prospective tenants." *Id.*

This theory has been upheld in this circuit's district courts as well. For example, in *Kelser v. Alcazar Shriners*, 2007 WL 484551 (M.D. Ala. Feb. 9, 2007), the landlord canceled a "Latino Night" event allegedly because it "did not want any Latinos in the facility," *id.* at *1. The court held the event planner had standing to challenge that decision because "[t]he Eleventh Circuit has expressly recognized that §1981 prohibits discrimination based on racial association," and the landlord "interfere[d] with [his] contract rights because of his association with Latino persons."

*Id.* at \*2. *Kelser* aligns with other district courts on this point. *See, e.g.*, *Gordon v. City of Cartersville, Ga.*, 522 F. Supp. 753, 756-57 (N.D. Ga. 1981) (collecting cases); *Transmax Prods., LLC v. Swartzberg*, 2020 WL 5095370, at \*5-\*6 (N.D. Ga. Aug. 28, 2020) (collecting cases); *Edwards v. Acadia Realty Tr., Inc.*, 2001 WL 34104845, at \*8 (M.D. Fla. Jan. 10, 2001) (collecting cases). Just as in these examples, Plaintiffs allege that Citi's discrimination against banks that Plaintiffs do business with has caused direct monetary harm to Plaintiffs.

Plaintiffs' direct discrimination claims are even more straightforward. Citi also perceives customers of minority-owned banks, CDCUs, and CDFIs in the Policy to be minorities because, for example, those banks serve "communities of color." *See supra* 2-6. Citi thus directly discriminated against Plaintiffs because it did not perceive them to be minorities. *See, e.g., Capek v. BNY Mellon, N.A.*, 2016 WL 2993211, at \*3 (S.D.N.Y. May 23, 2016) (relying on, *inter alia*, *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012), to explain that §1981 bars discrimination where the defendant "'perceived'" plaintiff "to be a member of a protected class"); *see also Est. of Amos ex rel. Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1094 (9th Cir. 2001) ("That Amos was actually white does not make that discrimination or its resulting injury less direct.").

Traceability and redressability follow naturally from these principles. On traceability, plaintiffs need only plausibly allege that defendants' policy likely caused them to pay higher fees. *See, e.g.*, *Hall v. Lowder Realty Co.*, 160 F. Supp. 2d 1299, 1314-15 (M.D. Ala. 2001); *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339, 1358 (S.D. Ga. 2009). Plaintiffs' allegations easily clear this bar. They allege that Citi charged them fees because they were not customers of banks in the Policy, *i.e.*, they paid a fee because they did not associate with minority-owned banks

in the Policy. Plaintiffs' payment of the fee is thus directly traceable to the discriminatory Policy. And Plaintiffs' injuries are redressable by an award of monetary damages.

**B.** Defendants eschew Plaintiffs' standing theory and focus instead on the "able and ready" standing theory in *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, 103 F.4th 765 (11th Cir. 2024). The "able and ready" standard, however, applies "when a plaintiff requests prospective relief," and it requires courts to "evaluate whether she has sufficiently demonstrated an intent to take the action that she asserts is prohibited." *Id.* at 772. That theory is irrelevant in this case because Plaintiffs are seeking retrospective relief against discrimination that has already happened. Plaintiffs have already paid an ATM fee. And that injury-in-fact is traceable to Citi's Policy because, if Plaintiffs banked at one of the minority-owned banks in that Policy, they would not have paid the ATM fee. *Fearless Fund*'s standing analysis has no application here.

Defendants argue (at 12-13) that Plaintiffs "cannot identify any actual or imminent injury-in-fact" because their claims "depend[] wholly on whether Plaintiffs' banks *are* 'able and ready' to seek inclusion" in the Policy. Mot. 12 (emphasis added); *see also id*. (arguing "that a person must show more than he is able and ready *in the future* to obtain damages" (emphasis added)). But Plaintiffs are not seeking redress for any injury their banks suffer. Nor does Citi explain how the banks' willingness to participate in the Policy *in the future* could affect Plaintiffs' *past* injury. It doesn't make any sense. To recover for past discrimination, what is relevant is that Citi gave a race-based benefit to the customers of minority-owned banks *because* those banks were minority-owned; and Citi didn't provide that benefit to Plaintiffs because they banked elsewhere. That is a quintessential injury in fact—pocketbook harm. Nothing more is needed to establish standing for past harm.

Defendants are correct (at 15) that Plaintiffs have included a request for injunctive relief in their complaint. And *that* is where the "able and ready" standard comes into play, just not in the way Defendants think. To obtain that future injunctive relief, Plaintiffs must establish that *they* are "able and ready" to use Citi's ATMs again and, as a result, the Policy should be enjoined so they aren't charged the discriminatory fee. That's what *Fearless Fund* meant when it said, "[g]enerally, when a plaintiff requests prospective relief, we evaluate whether she has sufficiently demonstrated an intent to take the action that she asserts is prohibited." 103 F.4th at 772.

Distilled to its essence, Citi's standing argument is a direct assault on associational standing. As the Fourth Circuit explained decades ago, the "heart of" an associational "discrimination claim is that [the plaintiff] was singled out for adverse treatment because defendants believed he was willing to contract with and otherwise associate with" individuals based on race. *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1415-16 (4th Cir. 1983). Thus, an associational discrimination plaintiff "need neither allege nor show that members of a minority group will in fact" participate in a program "in order to satisfy standing requirements." *Id.* Far from requiring that a member of the disfavored class must be "able and ready" to participate, mere "uncertainty surrounding" whether there would be "actual patronage" by members of a certain race does not defeat associational standing. *Id.* Or as the First Circuit put it, a Section 1981 plaintiff "need not even be able to identify any specific member of the class who suffered or may suffer discrimination." *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 14 (1st Cir. 1979). All that is needed for standing is to show that the defendant "with a racially discriminatory intent, interferes with his right to make contracts" with members of a disfavored race. *Id.*

These well-established principles have been applied for decades by district courts. In *Gordon*, for example, the court explained that "[t]here is no requirement" under §1981 "that a

minority suffer injury before the white plaintiff may recover." 522 F. Supp. at 757. Said differently, there is no requirement to show that members of a certain race are "able and ready." Instead, "there can be no question" that a §1981 plaintiff "has standing to seek damages against the defendants" when they impair a contract based on discriminatory reasons. *Id.* Thus, in *Kelser*, the event organizer did not have to prove that Latinos were "able and ready" to attend "Latino Night." He simply had to allege that "he 'sought to make and form contracts with members of a protected class, Latino;' and the defendants interfered with his ability to make and form those contracts because of race." *Kelser*, 2007 WL 484551, at *1. Similarly, in *Long v. Aronov Realty Management., Inc.*, an individual who wished to open a sports bar "that would cater to African-Americans" did not have to show that Black customers were "able and ready" to patronize his bar. 645 F. Supp. 2d 1014, 1019 (M.D. Ala. 2009). It was enough that he alleged that defendant was "aware that [plaintiff] was planning on opening a sports bar catering to African-Americans, and that he was the former owner of a bar with a 'black format.'" *Id.*; *see also Midnight Sessions, Ltd. v. City of Phila.*, 1990 WL 107351, at *11 (E.D. Pa. July 23, 1990) (owner of dance hall allegedly denied license on the basis of the race of its potential patrons did not have to show minorities were "able and ready" to patronize dance hall); *Riccobono v. Whitpain Twp.*, 497 F. Supp. 1364, 1373 (E.D. Pa. 1980) (individual denied building permit for roller rink because "blacks [] might patronize the proposed roller rink" did not need to show that Black customers were "able and ready" to patronize business). Were it otherwise, a harmed plaintiff's associational discrimination claims would turn on proving abstract, backward-looking conjecture rather than, like here, the defendant's express and open discriminatory policy. *Cf. Gordon*, 522 F.Supp. at 757 (crediting §1981 claim even though "the defendants' alleged discriminatory conduct was really directed at an as yet unidentifiable group of people, i. e., blacks who might become tenants of the housing").

All of this is why Citi doesn't cite *any* case where the "able and ready" standard was applied to a claim for past relief. Nor are Plaintiffs aware of any. In fact, one of Citi's own cases shows why the "able and ready" standard doesn't apply in this context. In *Braunstein v. Arizona Department of Transportation*, 683 F.3d 1177 (9th Cir. 2012), the plaintiff brought a damages claim against a discriminatory public contracting program. But the plaintiff never even "submit[ted] a quote or a bid" to be a part of the program. *Id*. at 1185. He argued that he didn't need to apply; "he need only establish that he was 'able and ready'" to participate. *Id*. And he pointed to cases where courts applied that standard. But "the plaintiffs in those cases," the court explained, "sought prospective relief against government affirmative action programs." *Id*. at 1186. Because his claims were "for damages rather than prospective relief," he needed to show he was already injured by the discrimination, *i.e.*, that the "program affected him personally." *Id*. at 1185-86. And "[a]t oral argument, [the plaintiff] was unable to explain how the … program adversely affected him personally." *Id*. at 1187. That is far afield from here, where Plaintiffs have alleged a classic, direct monetary injury.[1]

The other cases that Citi marshals (at 14-16) are all just as inapposite. Citi's primary case other than *Fearless Fund—Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019)—is about plaintiffs suing the wrong defendant for injunctive relief. *Id.* at 1301. The same is true with *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), where the Plaintiffs sued the Secretary of State rather than the local officials charged with implementing the law, *id.* at 1253-54. By contrast, Plaintiffs here are suing Defendants who have already discriminated against them

---

[1] The case was also decided at summary judgment after "[t]he court found that Braunstein alleged sufficient injury to survive a motion to dismiss for lack of standing," *Braunstein*, 683 F.3d at 1183.

and are seeking monetary damage to compensate that past discrimination. The "effect of the court's judgment on the defendant"—an order to pay monetary damages—would "directly redress any injury" plaintiffs suffered. *Id.*

*Yelapi v. DeSantis* is more of the same. 487 F. Supp. 3d 1278 (N.D. Fla. 2020). There, deaf plaintiffs sued the Governor seeking an injunctive "order requiring live, televised, in-frame American Sign Language … interpretation at all of the Governor's press conferences and news briefings." *Id.* at 1280. That is not the posture here, once again—Plaintiffs sue for monetary damages. But setting that aside, the problem in *Yelapi* was that the "Plaintiffs trace their injury to the lack of ASL interpretation on television or online streaming services. But … the Governor's office does not control these services." *Id.* at 1284. So an order against the Governor wouldn't redress the plaintiffs' injury. *Id.* Here, however, Citi completely controls the eligibility criteria for the Policy; and it decided to make the Policy race based.

*Wooden v. Board of Regents* is even farther out. 247 F.3d 1262 (11th Cir. 2001). There, the Court applied what is known as the "same decision" defense to liability under §1983. *Id.* at 1276-77. "[W]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." *Id.* Even if the "same decision" defense applies, that is an issue for summary judgment or trial like in *Wooden*. Whether Citi would have made the "same decision" and charged Plaintiffs fees even despite its racially discriminatory criteria is a fact issue at the core of the merits. *See, e.g.*, *Morrison*, 323 F.3d at 927 (collecting cases) ("[A] jurisdictional issue … intertwined with the underlying merits … should … [be] resolved under Rule 56 instead of Rule 12(b)(1).").

In sum, the "able and ready" standard applies "when a plaintiff requests prospective relief." That standard is inapplicable to a claim seeking retrospective relief for a pocketbook harm that has already happened. Plaintiffs thus have standing to challenge the fees that they paid.

**II.    Plaintiffs state claims for direct and associational discrimination.**

**A.      Plaintiffs allege direct discrimination.**

The Amended Complaint alleges a plausible claim for direct discrimination. Citi perceives customers of the banks in its Policy to be minorities. Am. Compl. ¶56 And it doesn't charge those customers ATM fees based on that perception. *Id.* That perception-based discrimination violates §1981. *See, e.g., Capek*, 2016 WL 2993211, at *3 (citing *Jones*, 683 F.3d at 1299) (§1981 bars discrimination where the defendant "'perceived'" plaintiff "to be a member of a protected class").

**1.** Citi's primary response to this claim is not based in law; it's based in policy. Citi contends (at 18-21) that the Policy is a "race-*neutral* action" and ruling for Plaintiffs "would be shattering to hundreds of state and federal efforts to address persistent racial disparities by race-neutral means." There is a glaring problem, however, with Citi's parade of horribles: the Amended Complaint alleges the Policy is *not* race-neutral. Citi specifically chose the banks in the Policy *because* they serve minorities:

- "Citi's 'Goal #1' for the 'Action for Racial Equity' initiative was to 'expand banking and access to credit in communities of color.'" Am. Compl. ¶21.

- "Ms. Fraser described the Policy in her written testimony to lawmakers as 'expanding banking services in communities of color by extending surcharge-free access to Citibank ATMs.'" ¶23.

- "Citi's writeup on the Policy featured a quote from its CFO, Mark Mason: 'As we continue to do the work to become an anti-racist institution and drive finance toward a

16

more equitable and inclusive industry, we will do our part by engaging firms that reinvest into the Black community.'" ¶24.

- "In 2020, Citi said the Policy and it[s] inclusion of CDCUs was part of a broader goal to 'expand banking and access to credit in communities of color.'" ¶33.

- "And in 2021, Citi's CEO testified that 'CDFIs level the playing field for underserved communities and populations, *especially communities of color*.' She also testified in 2022 that '[w]e are expanding banking services in *communities of color* by extending surcharge-free access to Citibank ATMs through our Citi ATM Community Network of 32 community banks, 16 of which are [minority-owned].' The other 16 banks at the time, in other words, are CDCUs and CDFIs that are part of the program because they are in 'communities of color.'" ¶34.

- "Citi still features the Policy as part of its efforts to 'Expand[] Banking And Access to Credit in Communities of Color.'" ¶36.

- "To avoid a shareholder vote on the proposal, Citi wrote a letter to the Securities and Exchange Commission arguing that, among other things, its ATM Policy already 'expand[ed] banking and access to credit in communities of color….'" ¶43.

- "In the final report, the auditors found the Policy kept Citi 'on track' to 'expand banking and access to credit in communities of color.' Citi hinted at this in a corresponding press release, noting that the 'audit highlights a number of areas where Citi has increased access to key resources for communities of color' and 'deepened our collaboration with minority-owned depository institutions….'" ¶44.

Yet even if the Policy were race-neutral, that still wouldn't help Citi's policy arguments. *Most* discriminatory programs and policies are race-neutral on their face. *See generally Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).[2] That doesn't mean those policies are somehow exempt from anti-discrimination laws. Instead, courts analyze those policies using the *Arlington Heights* framework, which "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. That analysis starts with looking at the "impact of the official action [and] whether it 'bears more heavily on one race than another.'" *Id.* Then courts look at the "historical background of the decision," "[t]he specific sequence of events leading up [to] the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures," and "contemporary statements by [the defendant], minutes of its meetings, or reports." *Id.* at 267-68. Additional factors such as "the foreseeability of the disparate impact; [] knowledge of that impact; [] and the availability of less discriminatory alternatives" are also relevant. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). That analysis will show whether the facially race-neutral program or policy was adopted for unlawful discriminatory reasons.

The *Arlington Heights* framework also addresses Citi's unfounded concern (at 19) that crediting Plaintiffs' claims would outlaw "mere awareness of race." A race-neutral policy violates §1981 when it has a discriminatory purpose. "Discriminatory purpose … implies more than intent as volition or intent as *awareness of consequences*." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 810 (11th Cir. 2022) (en banc) (emphasis added). "[A] discriminatory purpose implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.*

---

[2] Where a program is explicitly race-based, as here, proving discriminatory intent is simple. The plaintiff can just point to that explicit racial criterion. But "[i]t is a rare case … where there exists actual direct evidence of discrimination." *Copley v. Bax Glob., Inc.*, 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000).

(cleaned up). *Arlington Heights* shows whether a race-neutral policy has a "discriminatory purpose" or whether it exhibits a "mere awareness of race." 429 U.S. at 266-68.

Citi's claim (at 19-20) that Plaintiffs' claims somehow conflict with *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181 (2023), is just as unfounded. *Harvard* addressed university admissions policies that triggered strict scrutiny because those policies expressly used race as a factor in admissions decisions. "Strict scrutiny" in that context requires, among other things, the college to "prov[e] a 'nonracial approach' would not promote its interest in the educational benefits of diversity 'as about as well and at tolerable administrative expense.'" *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 377 (2016). The existence of race-neutral alternatives shows that the defendant doesn't need to use race to achieve its goals. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986). Race-neutral alternatives, in other words, disprove narrow tailoring. The Court did *not* hold in *Harvard* or elsewhere that all facially neutral college admissions policies are necessarily legal. Quite the opposite: *Harvard* itself explained that "what cannot be done directly cannot be done indirectly." 600 U.S. at 230. Nowhere has the Court implicitly undone its bedrock precedent *Arlington Heights* for discrimination in college admissions, much less outside that narrow context.[3]

Indeed, the *Arlington Heights* framework is alive and well in the admissions context. For example, one of the nation's best public high schools recently changed its admissions policy in a

---

[3] The same is true for *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989). *See* Mot. 19. There, a city had an explicitly race-based public contracting program that required contractors to subcontract at least 30% of each contract to "Minority Business Enterprises." *Croson*, 488 U.S. at 477-78. That triggered strict scrutiny, and the city justified that law as trying to remedy the city's prior discriminatory public works programs. *Id.* at 478-80. The Court noted the city did not even consider race-neutral alternatives even though it was the city's burden to do so. *Id.* at 507. And the existence of such alternatives would have shown that the city didn't need to use race to achieve its goals. *Id.* It did not mean, however, that those alternatives would have been *per se* legal standing alone.

race-neutral way. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 871 (4th Cir. 2023) (en banc). The plaintiff claimed the school adopted that race-neutral policy with the intent to discriminate against Asian Americans to bring down that racial group's admissions numbers. *Id.* at 885. The district court applied the *Arlington Heights* framework and agreed that was the school's purpose—to discriminate against Asian Americans. *Id.* at 880. The Fourth Circuit applied *Arlington Heights* when it disagreed and reversed. *Id.* at 879-80 (4th Cir. 2023) (en banc). The dissent applied *Arlington Heights* too. *Id.* at 893-94 (Rushing, J., dissenting). So did Justice Alito when he dissented from the denial of certiorari: "Even a policy that is race neutral on its face may be [unlawful] if it is adopted for a 'racially discriminatory intent or purpose.'" *Coal. for TJ v. Fairfax Cnty. Sch. Bd.,* 218 L. Ed. 2d 71 (Feb. 20, 2024) (Alito, J., dissenting from the denial of certiorari). Citi's suggestion that companies can adopt race-neutral programs for race-based reasons has no toehold in the law. And its view (at 20) that applying *Arlington Heights* to those programs "would be shattering to hundreds of state and federal efforts to address persistent racial disparities" is rhetoric disconnected from reality. The *Arlington Heights* framework *already applies* to those "efforts."

What does this all mean for this case? Well, the Court doesn't need to run through the *Arlington Heights* framework because Citi has been explicit over the years that the banks in the Policy were chosen by racial criteria. *See supra* 2-6, 16-17. Yet even if the Court needed to apply *Arlington Heights*, the "factors require a fact intensive examination of the record." *Greater Birmingham Ministries*, 992 F.3d at 1322 n.33. That inquiry is not appropriate at the pleading stage. *See, e.g.*, *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 2022 WL 20099419, at *3 (N.D. Fla. Nov. 22, 2022) ("Defendants overextend by asking this Court to resolve, on a motion

20

to dismiss, claims that require this Court to undertake a complex, fact-intensive inquiry" that *Arlington Heights* requires).

Plaintiffs have alleged sufficient facts, however, even in the alternative universe where Citi hadn't already revealed its motivation repeatedly, directly, and publicly. Citi concedes (at 23) that the Policy has a "disparate impact"—which is the start of the *Arlington Heights* analysis. The "historical background of the decision" and "[t]he specific sequence of events leading up [to] the challenged decision" add more. For example, Citi pointed to "the Policy as a key component in its 'Action for *Racial* Equity' initiative." Am. Compl. ¶20 (emphasis added). And that initiative was intended "to help close the racial wealth gap and help build an anti-racists economy and society." *Id.* The Policy is also a "substantive departure" from Citi's normal operations. Citi's standard policy is to charge ATM fees to customers of other banks. *Id.* ¶12. It has chosen to waive those fees however, for minority-owned banks, CDFIs, and CDCUs because those banks are in "underserved communities of color, *especially communities of color*." *Id.* ¶¶33-34. This all also shows the "disparate impact" was "foreseeab[le]" and that Citi had "knowledge of that impact." *Greater Birmingham*, 992 F.3d at 1322. Plaintiffs have stated a direct discrimination claim.

**2.** Next, Citi stretches the Court's opinion in *Domino's Pizza, Inc. v. McDonald* beyond recognition. 546 U.S. 470, 473-74 (2006). That case considered whether the term "make contracts" in §1981 extends to suits where the plaintiff is not a party to the contract. *Id.* at 475. The Court held it does not: "Any claim brought under § 1981 … must initially identify an impaired 'contractual relationship,' under which the *plaintiff* has rights." *Id.* at 476 (emphasis added). In other words, §1981 does not confer rights upon non-parties to the contract, which is why the Court said that §1981 is not an "omnibus remedy for *all* racial injustice." *Id.* at 479. The Court reaffirmed the "obvious" import of §1981: the law "offers relief when racial discrimination blocks the creation

of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.* at 476.

Plaintiffs specifically allege that Citi's discrimination impaired contracts to which they were parties. They allege that "Plaintiffs' use of a Citi branch ATM constituted a contract." Am. Compl. ¶93. And they allege that "[b]y imposing ATM fees for one set of customers but not others, Citi's policies denied Plaintiffs… 'the same right[s]' in the 'mak[ing] and enforc[ing]' of contracts' with Citi because of race." *Id.* ¶94; *see also id.* ¶¶100-01. This is an easy application of §1981's "obvious" coverage.

Citi knows that Plaintiffs' theory rests on the contract they formed with Citi during the ATM transaction. Citi acknowledges that theory when it makes arguments about that contract elsewhere in its brief. *See* Mot. 29-30. But that contract doesn't fit with *Domino's* holding. So to make *Domino's* apply, Citi shifts to another contract: a potential contract between Citi and Plaintiffs' banks (where Plaintiffs would not be parties to the contract). Here again, Plaintiffs aren't suing on behalf of their banks. *See* Mot. 21 (arguing that Plaintiffs' theory is that "Citibank has refused to contract with [their] banks."). Plaintiffs have their own independent claims against Citi based on their own contracts because Citi's program intentionally imposes a fee on them, but not others, based on their perceived race. *Domino's* core holding is inapplicable.

**3.** Finally, Citi takes a small swipe at perception-based discrimination claims. *See* Mot. 21-22. Citi doesn't contest that §1981 prohibits discrimination based on an individual's perceived race. *See, e.g.*, *Capek*, 2016 WL 2993211, at *2-*3. Instead, it suggests (at 22) that perception-based discrimination is unlawful only when the defendant "*mistak[es] particular* people to be a *particular* race (or another protected status)." But there is nothing in the text of §1981 or cases

applying it that limit perception-based discrimination in that way. *See, e.g.*, *Adewumi v. Wellstar Med. Grp.*, 2022 WL 22286841, at *10 (N.D. Ga. July 12, 2022) ("A person's *color* is closely tied to his ancestry and could result in his being perceived as a 'physiognomically distinctive sub-grouping of homo sapiens', which in turn could be the subject of discrimination.").

Citi also (at 22-23) contends that there is a factual defect in the Amended Complaint. Plaintiffs' contentions about Citi's perceptions, the bank argues, "are not consistent with 'common sense,' such that they cannot be credited as 'plausible on [their] face." But many of Plaintiffs allegations are simply quoting what Citi's own leaders have been saying about the program for nearly a decade. *See supra* 2-6, 16-17. And those allegations easily clear Plaintiffs' pleading burden to plausibly allege that Citi charged them higher fees because Citi did not perceive them to be minorities. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Floyd v. Bridgman*, 2021 WL 795999, at *11 (S.D. Fla. Mar. 2, 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ). Plaintiffs have stated a claim for direct discrimination.

### B.     Plaintiffs state a claim for associational discrimination.

#### 1.     Associational discrimination prohibits discriminating against a person because of another's race.

Section 1981 "by its broad terms" is meant "to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). The law has long "enjoy[ed] … broad interpretation of its breadth of coverage." *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975). That scope comes directly from the text, which guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). And the "right" to "make and enforce contracts" includes "the

making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* §1981(b). Section 1981 requires only that a plaintiff "plead and ultimately prove that, but for race, it would not have suffered" unequal treatment in contracting. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

Section 1981 thus prohibits more than discrimination based on "animus" against the plaintiff's own race. *See, e.g.*, *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 (11th Cir. 1999) ("§1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus."). It also bars discrimination against a plaintiff that results from favoritism towards another person's race, and discrimination based on the "'racial character'" of the plaintiff's "association" with others. *McDonald*, 427 U.S. at 287; *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986); *see supra* 2-6, 16-17. In short, if a plaintiff suffers any unequal treatment in contracting "because of race"—*anyone's* race—the plaintiff suffers an injury under §1981. *Comcast*, 589 U.S. at 336 (quotation marks omitted).

Despite all this, Citi argues that the discrimination must be "based on the plaintiff's [own] race." Mot 24-28. Citi's primary authority on this point is *Parr*. That case addressed allegations that a company refused to hire a man because of his interracial marriage; the man asserted both §1981 and Title VII claims against the company. *Parr*, 791 F.2d at 889. In summarizing its holding, the Eleventh Circuit said that there is no requirement that a plaintiff's §1981 claim rest on discrimination "because of *his* race." *Id.* at 890 (emphasis in original). Here is the entire summary:

> No requirement exists that a plaintiff specifically state that he was discriminated against because of an interracial marriage or that he was discriminated against *because of his race* to allege discrimination based on an interracial marriage.

*Id.* (emphasis added).  A §1981 plaintiff needs to show only that he was harmed by discrimination against someone else because of *that* person's race.

Scores of cases in this circuit confirm this principle. The developers in *Young Apartments* and *Baytree*, for example, asserted valid discrimination claims based on the race of the residents in their developments. Whether the developers themselves were White, Black, Hispanic, or otherwise was completely irrelevant. *See Young Apartments.*, 529 F.3d at 1039-41; *Baytree*, 873 F.2d at 1409.[4] In *Kelser*, the event planner asserted a valid claim for the landlord cancelling "Latino night" because of the attendees' race. 2007 WL 484551, at *1. The planner's own race made no difference. These cases are not outliers. *See, e.g.*, *Edwards*, 2001 WL 34104845, at *5, *8; *Gordon*, 522 F. Supp. at 756-57. In *Transmax*, for example, the defendant made the exact argument Citi does. 2020 WL 5095370, at *5-*6. And the Court rejected it: "It is immaterial that Defendants' alleged discrimination was not directed at the race ascribed to Transmax." *Id.* at *5.

Courts outside this circuit agree. In *Park Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995), a college sued "Arizona's designated guarantor of student loan programs" because it allegedly terminated the college's participation in its loan-guarantee program "because most of [the college's] students are minorities," *id.* at 1483. The Ninth Circuit held that the college had not stated a claim: "a § 1981 cause of action need only allege that [the] plaintiff suffered discrimination … on the basis of race." *Id.* at 1487 (quotation marks omitted). The plaintiff college's own race was irrelevant to the decision. It was enough that the defendant "has taken action against [the

---

[4] *Young Apartments* involved a claim under §1983 rather than §1981 and *Baytree*'s reasoning relied on precedents decided under both statutes. But §1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.'" *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991). In such cases, "[t]he section 1981 claim [is] effectively merged into the section 1983 claim for racial discrimination" and is subject to the same analysis. *Id.* So *Young* and *Baytree* are instructive here.

college] because it contracts with minority students." *Id.* at 1488. Likewise, in *Des Vergnes v. Seekonk Water Dist.*, the First Circuit held that a developer, despite having "no racial identity," could nonetheless "invoke 1981" to challenge a racially discriminatory municipal action against its homebuyers because "one need not be a member of the racial class protected by the statute." 601 F.2d 9, 14 (1st Cir. 1979). These cases all show that associational claims under §1981 do not "depend[] on whether the race of the Plaintiff matters to the claim alleged." Mot. 25.

Citi tries to make this case about Title VII, relying almost exclusively on out-of-circuit precedents interpreting that statute (Mot. 25-27). But "[i]t is … well settled that section 1981 and Title VII are not coextensive in coverage." *Parr*, 791 F.2d at 890. Title VII precedent is "well and good for understanding Title VII," but it may not "tell us [anything] about §1981," *Comcast*, 589 U.S. at 337, particularly where the statutes diverge, *see, e.g., id.* (declining to import Title VII's later-enacted "motivating factor" test into §1981). And §1981 has "been phrased in broad and general terms" while Title VII "is a detailed statutory scheme" that "enumerates specific unlawful employment practices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013).

To wit, Title VII makes it "an unlawful employment practice for an employer" to discriminate against "any individual …because of *such individual's* race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (emphasis added). That specific language—that the discrimination be "because of *such individual's* race"—led Citi's out-of-circuit authorities (at 25, 27) to conclude that the plaintiff's own race matters to assert associational discrimination claims under Title VII. For example, in *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, the Sixth Circuit explained that "Title VII as actually worded … prohibits discrimination 'because of such individual's race.'" 173 F.3d 988, 995 (6th Cir. 1999). And it concluded, as result, that a plaintiff needs to show that he was discriminated against (at least

26

"indirectly") because of his own race. *Id.* at 994-95. Citi's other cases mirrored that analysis. *See also Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022) (reading "because of such individual's race" to mean "that when assessing a Title VII discrimination claim, the proper focus is on the protected characteristic of the individual plaintiff"); *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (similar); *Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021) (similar).[5] On the other hand, Section 1981's "broad terms," *McDonald*, 427 U.S. at 295, contain no similar limitation and instead "enjoy … broad interpretation of its breadth of coverage." *Faraca*, 506 F.2d at 959.

Citi's reliance (at 26) on *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329 (11th Cir. 2021), is misplaced for the same reason. *Matamoros* was about whether the Florida Civil Rights Act recognized associational discrimination claims based on a third-party's disability, not §1981 or even racial discrimination generally. Like Title VII, that law requires the discrimination be "because of *such* individual's race." Fla. Stat. Ann. §760.10(1)(a) (emphasis added); *see Matamoros*, 2 F.4th at 1334-35. And that language led the *Matamoros* court to refuse to recognize (before Florida's own courts) that the Florida Civil Rights Act authorizes associational discrimination claims that don't turn on the plaintiff's *own* race. *Id.* ("Matamoros's reliance on Title VII caselaw is likewise misplaced."); *see also id.* (addressing the Title VII portion of *Parr*). Whatever "skeptic[ism]" *Matamoros* expressed in dicta about associational discrimination claims under Title VII and the Florida Civil Rights Act has no bearing on the §1981 claims here.

---

[5] While *Floyd v. Amite Cty. Sch. Dist.*, involved claims under both Title VII and Section 1981, the Fifth Circuit's decision rested only on Title VII's language and it applied that language to §1981 too. 581 F.3d 244, 250 (5th Cir. 2009) ("This [associational discrimination] analysis was clearly framed in a manner *consistent with the language of Title VII*, which bars discrimination on the basis of the employee's race.") (emphasis added). The court made the mistake of interpreting the two statutes as co-extensive despite their different text.

### 2.   Plaintiffs allege a viable "association" with their banks.

Citi briefly argues (at 27-28) that Plaintiffs have not alleged a viable "association" to support their claims. To that end, Citi posits that an associational discrimination claim is viable only where the association is "'a significant relationship—such as an intimate or familial relationship.'" Mot. 29. But that ignores *Young Apartments* and *Baytree*, where the developers obviously didn't have an "intimate or familiar relationship" with their actual and potential residents. *Young Apartments.*, 529 F.3d at 1039-41; *Baytree*, 873 F.2d at 1409. That didn't stop them from having viable associational discrimination claims. And an "intimacy" requirement is hard to square with *Parr*, which favorably cited the Second Circuit's recognition of a home sale as a sufficient association under §1981. 791 F.2d at 890 (citing *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306 (2d Cir. 1975)). Other circuits have expressly rejected Citi's argument in various contexts. *See Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 884 (7th Cir. 1998) ("[W]e do not believe that an objective 'degree of association' is relevant to this inquiry" under §1981 and Title VII); *Kengerski*, 6 F.4th at 538 ("[T]he 'degree of association is irrelevant'" under Title VII). There is also no textual reason to read an "intimate or familial relationship" standard into §1981.

It is not a surprise, then, that courts within this Circuit have simply assumed that arms-length transactions are sufficient for associational discrimination claims. *See, e.g.*, *Transmax*, 2020 WL 5095370, at *6 (landlord and minority tenant). And that includes prospective business relationships where the third parties aren't even known yet and it would be *impossible* to have an "intimate" relationship. *See, e.g.*, *Gordon*, 522 F. Supp. at 755 (developer & potential minority buyers). In *Edwards*, shoppers pleaded a valid §1981 claim after being banned for "verbal[ly] defen[ding] … minorities in the mall," despite the fact that they "[did] not allege[] that they were associating with the minorities *at all*." *Edwards*, 2001 WL 34104845, at *4, *5 (emphasis added).

28

In *Milton v. Milligan*, the court recognized a tenant's §1981 claim when his lease was terminated because "he associated with and hired [an] African American." 2013 WL 828591, at *3 (N.D. Fla. Mar. 5, 2013). And Citi's own case stayed agnostic on the question of whether an "intimate" association is necessary. *See Lowe v. STME, LLC*, 354 F. Supp. 3d 1311, 1314-15 (M.D. Fla. 2019). Commercial relationships like the ones here are thus sufficient to support associational discrimination claims.[6]

Citi also briefly argues (at 28) the status of Plaintiffs' banks—that they are very large—matters and implies that they cannot be classified racially. But Citi's own Policy is predicated on assigning race to financial institutions. Am. Compl. ¶3 (fee waiver given to customers of "institutions that [Citi] identified as 'minority owned'"). And contrary to Citi's suggestion otherwise (at 28), Plaintiffs specifically alleged that their banks were "not minority owned," *id.* ¶31, and therefore "not eligible for Citi's fee waiver policy," *id.* ¶6-7.

### C. Citi charging Plaintiffs an ATM fee in exchange for withdrawing cash is a contract.

Section 1981 prohibits racial discrimination that prevents a plaintiff from "making" a contract as well as racial discrimination in the "performance," "terms," and conditions of the contractual relationship." 42 U.S.C. §1981(a), (b). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship' … under which the plaintiff has rights." *Domino's*, 546 U.S. at 476. But the law "embrace[s] all aspects of the contractual relationship." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 303 (1994). For example, §1981 bars a

---

[6] As Citi acknowledges (at 29), its citation to *EEOC v. STME, LLC* involves a different statute (the ADA) and a different issue. 938 F.3d 1305, 1319 (11th Cir. 2019). There, the court held that for an ADA associational discrimination claim, a non-disabled plaintiff could show that she suffered disability discrimination if the defendant knew she had an association with a disabled person. *Id.* The Eleventh Circuit did not discuss the degree of association required. *See id.*

defendant from "charg[ing] a higher price on account of … race. Discriminatory pay requirements are sufficient to state a claim under § 1981." *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, 2007 WL 3232490, at *4 (N.D. Ill.).

Citi violated that prohibition. Citi allowed Plaintiffs to withdraw cash from its ATM and Plaintiffs paid Citi a fee for doing so. Each side of the transaction received consideration and, as a result, there was a contract. Am. Compl. ¶¶6-7. And these contracts were discriminatory in their terms—Plaintiffs alleged that Citi "charg[ed] [them] different prices based on race." Am. Compl. ¶50. Citi thus entered a contract that charged Plaintiffs "a higher price on account of … race." *Williams-Ellis*, 2007 WL 3232490, at *4.

Courts have recognized this kind of "point of sale" discrimination "directly implicate[s] plaintiffs' right to contract and to enjoy 'all benefits, privileges, terms, and conditions of the contractual relationship.'" *See Hill v. Shell Oil Co.*, 78 F. Supp. 2d 764, 777 (N.D. Ill. 1999). For example, in *Williams-Ellis*, the plaintiff alleged that a salon maintained "two base rates for haircuts" and charged Black customers "the higher charge on account of [] race." 2007 WL 3232490, at *4. The court held that this race-based price differential was sufficient to state a claim under Section 1981, reasoning that the statute requires "equality … in the terms and conditions of the contract." *Id.* Likewise, courts have held that policies requiring only Black customers to pre-pay for services at gas stations and restaurants "subject [those] customers to different terms of purchase" and thus violate Section 1981. *Hill*, 78 F. Supp. 2d at 777; *see also Bobbitt by Bobbitt v. Rage Inc.*, 19 F. Supp. 2d 512, 519 (W.D.N.C. 1998). Citi's Policy is no different than these examples, and it likewise violates §1981.

Yet again, Citi tries to reframe Plaintiffs' §1981 claims as resting on a different contract. *See supra* 11. Citi says the relevant contract isn't the one the parties actually entered—withdrawal

of cash in exchange for a fee—but the contract the parties *would have* entered if Plaintiffs were customers of a minority-owned bank. *See* Mot. 31-32. And because that contract would have no consideration on Plaintiffs' end—since there wouldn't be a fee—there is no contract that could violate §1981. *Id.* That is not how this works. Defendants engaging in expressly discriminatory contracting don't get to pick what contract a plaintiff challenges. Plaintiffs and Citi had a contract—their ATM withdrawals—and Citi's discrimination "impaired" that contract. *Domino's*, 546 U.S. at 476.

That is also now not how §1981 itself works. Citi charged Plaintiffs a fee because they weren't customers of a minority-owned bank. That fee is "a higher price on account of … race." *Williams-Ellis*, 2007 WL 3232490, at *4, and "racial discrimination [that] impairs an existing contractual relationship," *Domino's*, 546 U.S. at 476. Citi's contrary theory would lead to absurd consequences. Under Citi's view, it could charge all its minority customers a $5 ATM fee but waive that fee for its White customers. And a minority customer would be powerless to challenge that discriminatory $5 fee under §1981. That cannot be right.

Yet even if Citi were right—that the discriminatory contract at issue is not the one these parties entered but a future contract where Plaintiffs would not pay an ATM fee—that future exchange still would be a contract. Even for fee-waived ATM withdrawals, Citi still "collects [] personal information" from customers for those withdrawals. *See* Am. Compl. ¶12. This data has enormous value to organizations like Citi. *See, e.g.*, Gov't Accountability Off., *Consumer Privacy: Better Disclosures Needed on Information Sharing by Banks and Credit Unions*, GAO-21-36, gao.gov (October 22, 2020), https://perma.cc/3YUE-TVRL ("Banks and credit unions collect, use, and share consumers' personal information … to conduct everyday business and market products and services."). And courts have held that a customer's surrendering of that data in exchange for

a service is adequate consideration to create a contract. *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 412 (E.D. Va. 2020) ("Here, Plaintiffs have plausibly alleged that, in consideration for receiving credit services, Plaintiffs delivered to Capital One and Amazon their [personally identifying information]."); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 932 (N.D. Cal. 2023) ("Plaintiffs use Googl[e] … and plaintiffs in turn provide Google with vast amounts of information … [which is a] bargained-for exchange."); *see also Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1348 (S.D. Fla. 2011) ("consideration" is "a low threshold" that can be satisfied by "'any detriment to the promisee, no matter how small'"). So there is a viable contract no matter how Citi wants to frame Plaintiffs' claims.

## III.   The Amended Complaint states the subclass's claim under California's Unruh Civil Rights Act.

Citi's Policy harmed Becker and Guida in Florida, and they are asserting a nationwide class action against Citi under federal law—42 U.S.C. §1981. Am. Compl. ¶90. And like class actions often do, the complaint also seeks to certify a subclass under a state's laws, here California. There is nothing remarkable about a case that asserts a nationwide class and a subclass; it's commonplace. Citi's response (at 33-35) to that run-of-the-mill pleading interweaves distinct arguments that go to standing, a lead plaintiff's ability to represent a subclass under another state's law, and the merits of the California subclass's Unruh claim. Each of those are separate issues that must be dealt with separately.

To start with, Plaintiffs have standing. Citi previously suggested that lead class plaintiffs lack standing to bring claims on behalf of a subclass from another state. Doc. 29, at 27-28. But the Eleventh Circuit recently explained the question of whether a lead class plaintiff can assert such claims "is not a standing question at all." *In re Zantac (Ranitidine) Prod. Liab. Litigation*, 2022 WL 16729170, at *5 (11th Cir. Nov. 7, 2022). There, the district court dismissed "claims on behalf

of class members whose claims arise under the laws of the states in which no named … plaintiff resides." *Id.* at *4. The lead class plaintiffs appealed that decision and "argue[d] that [their] ability to raise these claims for putative class members is one of representative capacity under Federal Rule of Civil Procedure 23—not one of constitutional significance under Article III." *Id.* The Eleventh Circuit "agree[d]." *Id.* The Court "conclude[d] that [plaintiffs] had Article III standing to bring [their] claims against the defendants who allegedly sold [defective] products to its members." *Id.* at *6. And "[f]or class representation purposes, 'the claims that the plaintiffs made on behalf of class members [from other states] need not be stricken or disregarded,' as those claims 'may be considered' when determining the appropriateness of class certification under Rule 23." *Id.* "The district court erred in ruling otherwise." *Id.*

The same is true here. These lead Plaintiffs allege that Citi charged them unlawful fees in Florida pursuant to its Policy. Am. Compl. ¶¶6-7, 92, 99. And they allege that Citi charged members of a California subclass those same fees in California. *Id.* ¶¶66, 106, 112. Whether these Plaintiffs can assert those claims on behalf of the subclass is a question for the class certification stage under Rule 23.

To be sure, it is possible that a lead class plaintiff will assert out-of-state claims for a subclass that fail on the merits. For example, a Florida plaintiff's allegations may satisfy the elements of a Florida tort. But an analogous Georgia tort may have an additional element that the complaint fails to satisfy. The Georgia subclass's claim under Georgia law, as a result, could be dismissed under Rule 12(b)(6). Here, however, Citi's merits arguments under Rule 12(b)(6) against Unruh are identical to its merits arguments against §1981. *See* Mot. 35 ("[T]he Unruh Act claims should also be dismissed for the above reasons that Plaintiffs' Section 1981 claims fail."). The Court should deny Citi's 12(b)(6) motion for the Unruh claims for same reasons it should

deny the motion for the §1981 claims. And whether Becker and Guida can represent the California subclass's Unruh claims is a question for the Rule 23 stage where "the court may consider," for example, "commonality and typicality issues with respect to the named plaintiffs and other putative class members." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1230 (S.D. Fla. 2015).

Citi's contrary view largely distills to an empty formality. It says that the lead class Plaintiffs are Florida-based, Unruh applies only in California, and, as a result, the Unruh claims should be dismissed. Yet that is true in all nationwide classes where the lead plaintiffs represent out-of-state subclasses' interests too. And everyone agrees (or should agree) that lead plaintiffs in one state can represent subclasses in other states under those states' laws. That is why the Eleventh Circuit admonished in *Zantac* that "claims … made on behalf of class members [from other states] need not be stricken or disregarded,' as those claims 'may be considered' when determining the appropriateness of class certification under Rule 23." 2022 WL 16729170, at *5. It's simply not clear what "dismissing" the Unruh claims right now would accomplish.

One of Citi's primary authorities shows as much. *See Coleman v. Burger King Corp.*, 2023 WL 5507730, at *3 (S.D. Fla. Aug. 25, 2023). There, the court explained that "[o]ne day, we may allow [lead plaintiffs] to assert the claims of unnamed class members from other states." *Id.* As a result, the court explained, the plaintiffs "may (and probably should) assert in some of [the complaint's] counts that, at some future date and time, they will be seeking court approval (what we call 'certification') to assert materially identical consumer-protection claims on behalf of class members from other states." *Id.* "And they can even list in the named Plaintiffs' consumer-protection counts, the states whose … statutes (they believe) are similar enough to justify certification." *Id.* That's what the lead plaintiffs here have done. "Whether—and to what extent—these named Plaintiffs will be able to represent the claims of absent class members from other

states … is a question [the Court] will resolve … at the class-certification phase of this case." *Id.*

at *4. Dismissing the claims now would accomplish very little because, as even Citi must agree,

Plaintiffs will be able to re-raise them later when they seek class certification under Rule 23.

## <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: September 27, 2024

/s/  *Daniel Shapiro*
Daniel J. Shapiro (Fla. Bar No. 1011108)
Bryan Weir (*pro hac vice*)
Brandon M. Haase (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
daniel@consovoymccarthy.com
bryan@consovoymccarthy.com
brandon@consovoymccarthy.com

*Counsel for Plaintiffs*