**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

Case No. 0:24-cv-60834-Singhal

WERNER JACK BECKER, DANA
GUIDA, individually and on behalf of
others similarly situated,

      Plaintiffs,

v.

CITIGROUP INC. d/b/a CITIBANK and
CITIBANK, N.A.,

      Defendants.

**REPLY IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS THE AMENDED COMPLAINT**
**PURSUANT TO RULE 12(B)(1) AND 12(B)(6)**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I. Plaintiffs Fail to Establish Article III Standing................................................... 2

II. Plaintiffs' Theory of Direct Discrimination Fails. ............................................... 6

III. Plaintiffs' Theory of Associational Discrimination Fails. ................................... 8

    A.     Under Section 1981, Like Title VII, Plaintiffs Need to Experience Racial Discrimination Themselves. ................................................................... 8

    B.     Plaintiffs' Theory of Association with Public Stockholders Fails. ...................... 12

IV. Plaintiffs Have Not Alleged a Contract They Claim Is Impacted By Discrimination............................................................................................. 12

V. No Unruh Claim Can Proceed Since Neither Named Plaintiff Can State That Claim................................................................................................... 14

CONCLUSION................................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page**

C<small>ASES</small>

*Albemarle Paper Co. v. Moody*,
 422 U.S. 405 (1975)............................................................................................5

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
 103 F.4th 765 (11th Cir. 2024) ............................................................. passim

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977)......................................................................................1, 6, 7

*Banaga v. Taylor Bean Mortg. Co.*,
 2011 WL 5056985 (N.D. Cal. Oct. 24, 2011)........................................................14

*Bolduc v. Amazon.com Inc.*,
 2024 WL 1808616 (E.D. Tex. Apr. 25, 2024)........................................................4

*Braunstein v. Arizona Dep't of Transp.*,
 683 F.3d 1177 (9th Cir. 2012) .............................................................................5

*Caulfield v. Hum. Res. Div.*,
 2015 WL 5190716 (D. Mass. Sept. 4, 2015) .......................................................5

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
 68 F.4th 864 (4th Cir. 2023) ...........................................................................2, 7

*Coleman v. Burger King Corp.*,
 2023 WL 5507730 (S.D. Fla. Aug. 25, 2023)........................................................15

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
 589 U.S. 327 (2020)..............................................................................................10

*Domino's Pizza, Inc. v. McDonald*,
 546 U.S. 470 (2006)..................................................................................11, 12, 13

*EEOC v. STME, LLC*,
 938 F.3d 1305 (11th Cir. 2019) ...........................................................................12

*Ensley Branch, N.A.A.C.P. v. Seibels*,
 31 F.3d 1548 (11th Cir. 1994) .............................................................................6

*Fiedler v. Marumsco Christian Sch.*,
    631 F.2d 1144 (4th Cir. 1980) ............................................................................9

*Floyd v. Amite Cnty. Sch. Dist.*,
    581 F.3d 244 (5th Cir. 2009) .........................................................................9, 10

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
    2022 WL 16729170 (11th Cir. Nov. 7, 2022) ...................................................15

*Jerue v. Drummond Co., Inc.*,
    2023 WL 6610603 (M.D. Fla. Aug. 25, 2023) ...................................................6

*Lowe v. STME, LLC*,
    354 F. Supp. 3d 1311 (M.D. Fla. 2019) ........................................................9, 12

*Marbury v. Madison*,
    1 Cranch 137 (1803) ..........................................................................................1

*McDonald v. Sante Fe Trail Transp. Co.*,
    427 U.S. 273 (1976)......................................................................................10, 11

*Nuzzo v. Baranco*,
    2018 WL 11488950 (N.D. Ga. Jan. 22, 2018) ...................................................9

*Parr v. Woodmen of the World Life Ins. Co.*,
    791 F.2d 888 (11th Cir. 1986) .......................................................................9, 10

*Senter v. JPMorgan Chase Bank, N.A.*,
    810 F. Supp. 2d 1339 (S.D. Fla. 2011) ............................................................14

*Tetro v. Elliot Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*,
    173 F.3d 988 (6th Cir. 1999) ...........................................................................11

*Tomczk v. Jocks & Jills Rests., LLC*,
    198 F. App'x 804 (11th Cir. 2006) ....................................................................9

*Transmax Prods., LLC v. Swartzberg*,
    2020 WL 5095370 (N.D. Ga. Aug. 28, 2020) .................................................11

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015) ...........................................................15

**STATUTES**

42 U.S.C. § 1981 ............................................................................................................... passim

42 U.S.C. § 1983 ...........................................................................................................10, 11

Cal. Civ. Code § 51(b) .........................................................................................................14

## INTRODUCTION

Plaintiffs' Opposition opens with a policy argument that reveals the fatal flaw in their suit and belies a fundamental Constitutional principle: "[i]t is emphatically the province and duty of the judicial department to say what the law is," not what it should be. *Marbury v. Madison*, 1 Cranch 137, 177 (1803). In furtherance of their policy goals, Plaintiffs seek to avoid the Constitution's case-and-controversy requirement and to thrust a square peg into Section 1981's round hole. This gambit fails because, under the laws of the United States, the Citibank ATM Community Network fee-waiver program neither injured Plaintiffs, nor discriminated against them (in contracting or otherwise).

*First*, Plaintiffs do not dispute any facts pertinent to Citibank's motion to dismiss for a lack of Article III standing: (i) the Network is a program that only admits *financial institutions*, not *individuals*; (ii) the Network is *not limited* to minority depository institutions (MDIs) but includes non-MDI community banks and credit unions; and (iii) the large national institutions where Plaintiffs bank (Chase and Bank of America) have expressed no interest in joining the Network and are thus not ready and able to participate. Dismissal follows straightforwardly from these facts because the Plaintiffs lack an injury caused by anything they challenge as unlawful. The mere fact that Plaintiffs paid an out-of-network fee to use a Citibank ATM cannot confer standing on them; indeed, were that the case, then *customers* of *minority institutions* outside the Network—who even Plaintiffs would concede could not have suffered discrimination—could claim standing.

*Second*, Plaintiffs' two theories of discrimination fail to state a claim. For their direct claim, Plaintiffs provide no case holding that a defendant can discriminate by operating a program open to institutions that are known to serve minority customers (while also serving all races). Plaintiffs' reliance on *Arlington Heights* fails, because they have not and cannot plead the "'invidious' discriminatory intent" that is a necessary element for challenging a "facially race-neutral policy,"

notwithstanding that the policy is intended to benefit minorities. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879 (4th Cir. 2023). For their associational claim, Plaintiffs admit that because neither one experienced racial discrimination themselves, they could not assert such a claim under Title VII. However, they incorrectly claim that the same constraint does not apply to Section 1981.

*Third*, the Court should dismiss Plaintiffs' Section 1981 claim on the independent ground that Plaintiffs have not been excluded from any contract. Plaintiffs, like all non-Citibank ATM users, have no contractual right to a fee-free ATM withdrawal from Citibank unless their bank has entered a contract with Citibank. There is no customer-specific contract that Citibank enters with non-Citibank customers to give those customers fee-free access to Citibank ATMs. Although Plaintiffs assert that entering one's PIN into an ATM constitutes valuable consideration establishing a contract, to state that argument is to refute it. Recognizing this problem, Plaintiffs try to relocate the contract-inquiry to the ATM transaction where Plaintiffs *paid* an out-of-network fee. But that "contract" to pay an ATM fee cannot be the challenged act supporting a Section 1981 discrimination claim since, as Plaintiffs concede, such fees are routinely charged by most banks regardless of the customer's race.

*Fourth*, Plaintiffs' Opposition does not dispute that neither Plaintiff can state a valid Unruh claim due to California's territorial limit. Their efforts to avoid that limit lack support.

## ARGUMENT

### I.   Plaintiffs Fail to Establish Article III Standing.

Plaintiffs lack standing because nothing about Citibank's program of waiving fees for certain participating financial institutions, *i.e.*, the ATM Community Network, impacts these Plaintiffs in the slightest. Or, in Article-III terms, the Network inflicts no injury-in-fact on the

Plaintiffs traceable to any alleged illegality.[1]

As an initial matter, Plaintiffs attempt to manufacture standing by obscuring how the Network operates. In particular, the Opposition repeatedly states that "Citi charged *Plaintiffs higher ATM fees* because they did not bank with financial institutions that were minority-owned" (Opp. 8) or that "defendants' policy likely caused them to *pay higher fees*" (Opp. 10) (emphases added). Not so. The Network is not some unilateral most-favored-non-customer list that dictates ATM-fee amounts. Rather, it is a program in which banks must agree to certain contractual obligations to join. If they do, they obtain a benefit for their customers: an ATM fee waiver. *See* Chavarin Decl. ¶¶ 3–8; Am. Compl. ¶¶ 12–13. No legally cognizable harm runs to Plaintiffs by virtue of paying out-of-network ATM fees, which Plaintiffs concede are commonly charged by most if not all banks. *See id.* Instead, Plaintiffs' asserted injury arises only if their banks would have sought to join the Network but were prevented from doing so, which Plaintiffs do not allege.

Plaintiffs' efforts to overcome Article III's limits fail. *First*, Plaintiffs argue that "*Fearless Fund*'s standing analysis has no application here." Opp. 11. But *Fearless Fund*'s able-and-ready standard "showed how the traditional injury-in-fact requirements apply to a Section 1981 claim." MTD 11. Under that standard, courts ask whether the plaintiff "has sufficiently demonstrated an intent to take the action that *she asserts is prohibited*." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 772 (11th Cir. 2024) (citing *Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003) (emphasis added)). Thus, because Plaintiffs do not allege that their banks would seek to join the Network in the future and do not allege that those banks intended to join the Network in the relevant past, Plaintiffs lack a traceable Article III injury.

---

[1] Given that Plaintiffs' Opposition does not dispute any facts presented in Citibank's 12(b)(1) standing challenge, those are the operative details about the Network. *See* MTD 9–10. Nor does any of the standing challenge (*contra* Opp. 8) intertwine with the merits. MTD 16–17.

*Second*, Plaintiffs say all they must allege is "that *they* are 'able and ready' to use Citi's ATMs again." Opp. 12. Under *Fearless Fund*, the injury-in-fact must be tied to "the action [the plaintiff] asserts is prohibited." 103 F.4th at 772. *See* Am. Compl. ¶ 13. Plaintiffs' concept of injury is completely divorced from the asserted *illegal* practice about which Plaintiffs complain: Citibank's granting of fee waivers through what Plaintiffs contend are objectionable criteria.[2] Plaintiffs' Opposition tries to ignore the role that the contracting banks play in whether customers receive a fee waiver. But even they concede that "if Plaintiffs banked at one of the minority-owned banks in th[e] Policy, they would not have paid the ATM fee." Opp. 11. Ultimately, only financial institutions are applicants to the Network. Because the Network program is unavailable to individuals, such as Plaintiffs—and the complaint does not allege their banks would seek to join it—Plaintiffs lack standing to challenge the Network's eligibility criteria. *See Bolduc v. Amazon.com Inc.*, 2024 WL 1808616, at *3, *5 (E.D. Tex. Apr. 25, 2024) (no Article III standing for Section 1981 claim challenging a grant to certain businesses that contract with Amazon, *i.e.*, Delivery Service Partners (DSP), since plaintiff was "not a DSP owner.").[3]

*Third*, Plaintiffs argue that retrospective damages for "pocketbook harm" (Opp. 11) allow them to avoid these rules. But Plaintiffs ignore *Brackeen*'s holding (MTD 16) that a "direct pocketbook injury" does not confer standing if you would "continue to incur the complained-of costs" *irrespective* of the challenged racial criteria. And, unless Plaintiffs' banks were able and

---

[2] The Amended Complaint alleges that the Network criteria for selecting eligible financial institutions (1) considers the race of the owner of a financial institution (associational theory) (Am. Comp. ¶¶ 55, 62) or (2) was motivated by a goal of supporting minority and other customers of those eligible financial institutions (direct theory) (Am. Comp. ¶¶ 56, 63). *See* Opp. 6–7.

[3] Plaintiffs cite cases (Opp. 8–10, 12–13) where businesspeople claimed injury when they were prevented from engaging in business activities or programs involving minorities. Unlike here, in each of those cases, it was the business-owner plaintiff whose transaction was subject to the act alleged as discriminatory (*e.g.*, "zoning decisions" or "cancel[ling]" an event). Opp. 9.

ready to join the Network, Plaintiffs' "pocketbook harm" in not being "provide[d]" a waiver "benefit" (Opp. 11) does not result from an allegedly unlawful criteria (MTD 13–14). To illustrate that Plaintiffs seek to manufacture standing from a financial cost unconnected to the Network's eligibility criteria challenged, consider that *customers of MDIs not in the Network* pay the *same* ATM fee that *Plaintiffs pay*. By Plaintiffs' logic, *those* MDI's customers would *also* have standing to bring this lawsuit—despite experiencing no discrimination (even under Plaintiffs' theories).[4]

Furthermore, as Citibank explained (MTD 16), claims for retrospective damages have to meet an even *higher* standing threshold. A plaintiff seeking such damages must "show *more* than that he is 'able and ready' to seek" an opportunity. *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012); *Caulfield v. Hum. Res. Div.*, 2015 WL 5190716, at *3 (D. Mass. Sept. 4, 2015) (motion to dismiss hiring-discrimination claim; no "standing to seek damages" without showing he "*would* have received" the role but had "standing to seek prospective relief" by the lower bar of "able and ready" to compete). Here, the Network's benefits can only be accessed by customers of a *bank* that has contracted with Citibank. So, standing for past damages requires alleging *both* that Plaintiffs' banks were ready and able to enter the Network, *and* that those banks would have been admitted but for any unlawful criteria. Plaintiffs allege neither.

Additionally, Plaintiffs' assertion that their injury is "redressable by an award of monetary damages" fails. Opp. 11. Plaintiffs never explain how damages for the out-of-network fee would "redress" any injury here. Plaintiffs would have paid that exact fee had Citibank never established the Network. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19 (1975) (redress for "economic" injury means placing an injured party "in the situation he would have occupied if the

---

[4] This is not hypothetical. *Such MDI customers are actually part of the putative class that these Plaintiffs seek to represent*. Am. Compl. ¶ 66.

wrong had not been committed"); *Jerue v. Drummond Co., Inc.*, 2023 WL 6610603, at *28 (M.D. Fla. Aug. 25, 2023) (persons not *financially* injured by alleged practice "have not suffered an injury that is redressable by an award of property damages" and lack standing).

## II.   Plaintiffs' Theory of Direct Discrimination Fails.

*No Discrimination.* Plaintiffs (Opp. 16–21) take the position that public statements by Citibank that it knew, or wanted, the Network to help expand banking and credit access among underbanked communities (including minorities) constitutes unlawful direct discrimination. But Plaintiffs offer no support, from *any* court, *ever*, holding that it is unlawful to benefit institutions open to *all* races—including credit unions and community banks—because they serve minority communities. Nor can Plaintiffs account for the many cases Citibank cited (MTD 19–21) that describe such policies as entirely lawful.[5] *See, e.g.*, *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1571 (11th Cir. 1994) (regarding as "race-neutral" efforts to cure discrimination such as "actively encourag[ing] blacks to apply for jobs, and . . . waiv[ing] or eliminat[ing] certain application fees"). Plaintiffs' only response is to imply that, even though the Supreme Court *currently* treats these policies as welcome alternatives to race-based decisions, it may *one day* change course. Opp. 19 & n.3. Whatever future doctrinal shifts Plaintiffs seek, current Supreme Court and Eleventh Circuit precedent must control here.

Plaintiffs rely on the framework of *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) (Opp. 18), but their argument is misguided. Under *Arlington Heights*, to allege "that an evenhanded, facially race-neutral policy" is discriminatory, the plaintiff must allege two

---

[5] Plaintiffs do not (and could not) argue that the alleged inclusion of MDIs as one of three types of financial institutions eligible for admission to the Network makes Citibank's policy facially non-neutral *for purposes of their direct-discrimination claim*. That is because that, at best, would pertain to whether the eligibility criteria is neutral as to bank *owners*, and that, necessarily, runs solely through Plaintiffs' associational discrimination claim, which fails for other reasons.

elements. *First*, "that the policy exacts a disproportionate impact on a certain racial group, and [*second*,] that such impact is traceable to an 'invidious' discriminatory intent." *Coal. for TJ*, 68 F.4th at 879. Most importantly, as to the second element of the test, Plaintiffs' allegations do not plausibly suggest any invidious intent, *e.g.*, an intent to harm any racial group. They simply suggest that one Network goal was to help minorities. As the Fourth Circuit held *en banc*—and the Supreme Court declined to review—a race-neutral geographic admission policy enacted with the "aim to expand access [to a high school] and to enhance the overall diversity of [its] student population" did not constitute "intentional racial discrimination" under *Arlington Heights*. *Id.* at 886–87. Plaintiffs fail to make any allegations about the customer composition of any particular financial institution in the Network or even general allegations of the "disparate impact" that *Arlington Heights* requires to trigger its analysis. *See* MTD 22–23 (noting, for example, the Network includes the University of Chicago credit union). Plaintiffs are wrong that Citibank conceded those facts (Opp. 21) by explaining Section 1981 does not allow disparate-impact claims.

Lastly, Plaintiffs misunderstand why Citibank noted that Plaintiffs' legal theories would doom many government and private programs designed to benefit minorities. MTD 20–21 & n.6. This observation is not "based in policy." Opp. 16. Instead, the point is to observe the dog that did not bark. Given the pervasiveness of such programs, one would expect Plaintiffs—were they right on the law—to be able to cite decisions invalidating such initiatives; *they cannot cite a single one*.

***No Basis for Plaintiffs' Perception Theory.*** The Court can alternatively dismiss the direct-discrimination claims without resolving the above issues on race neutrality. As explained, Plaintiffs' "perception-based [direct] discrimination claim[]" (Opp. 22 (discussing MTD 21–22)) independently falters because that doctrine has only been applied where the defendant has "mistak[en] particular people to be a particular race." MTD 22. Plaintiffs say there is nothing

"limit[ing] perception-based discrimination in that way." Opp. 23. But they fail to cite a *single* case not following that fact pattern. None of their cases (*Adewumi*, *Amos*, *Capek*, *Jones*) (Opp. 10, 22–23) remotely involves a plaintiff being imputed a race to support a discrimination claim on the ground that he is outside of a group perceived as including minorities. MTD 22. Plaintiffs bear the burden of justifying their unprecedented theory, not Citibank, especially given that all agree Citibank never knew Plaintiffs' race or that of any other ATM user.

### III.   Plaintiffs' Theory of Associational Discrimination Fails.

#### A.   Under Section 1981, Like Title VII, Plaintiffs Need to Experience Racial Discrimination Themselves.

Plaintiffs do not dispute (Opp. 23–25) that under their associational theory, neither of the Plaintiffs, nor any class member, experienced any discrimination based on their race. Rather, Plaintiffs agree—as Citibank explained (MTD 24–25, 27–28)—that customers of all races are treated identically as to whether they pay an out-of-network ATM fee: the only fact that matters is whether the customer's bank is part of the Network. In other words, a black customer of Chase pays the fee, just as a white customer of a participating MDI would not pay the fee.

Nevertheless, Plaintiffs' Opposition contends that a plaintiff may claim discrimination under Section 1981 without alleging that *he* has been racially discriminated against. According to Plaintiffs, "[a] § 1981 plaintiff needs to show only that he was harmed by discrimination *against someone else* because of *that* person's race." Opp. 25 (second emphasis in original). This fallacious argument should be rejected: it conflicts with Eleventh Circuit precedent, the text and history of Section 1981, and would expand associational-discrimination doctrine beyond its justifications.

*Precedent.* Plaintiffs admit (Opp. 26–27) that under Title VII an associational discrimination claim must be dismissed if, as here, the plaintiffs' race does not matter. They accept that where such claims were allowed, they were premised on an association between a plaintiff of

one race and an individual of another. *See* MTD 25–27. Because the Amended Complaint does not fit that pattern, Plaintiffs ask (Opp. 26) the Court to hold that Section 1981 lacks a comparable limit as Title VII. But that approach conflicts with the *Parr* decision and its progeny. *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986). *Parr* held that "section 1981 prohibits discrimination based upon an *interracial* marriage or *association.*" *Id.* at 890 (emphasis added). This Circuit followed others concluding that "taking adverse action against a white person because of his association with blacks—falls under § 1981." *Fiedler v. Marumsco Christian Sch.*, 631 F.2d 1144, 1150 (4th Cir. 1980); *see Parr*, 791 F.2d at 890. Then, in its Title VII discussion, *Parr* elaborated that "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race." 791 F.2d at 892.

A fair reading of *Parr* shows that the Eleventh Circuit treats Title VII and Section 1981 identically on this point. Courts applying *Parr*'s rule, including later Eleventh Circuit panels, have similarly recognized this limitation on Section 1981 claims. *E.g.*, *Tomczk v. Jocks & Jills Rests., LLC*, 198 F. App'x 804, 810 (11th Cir. 2006) (stating that "the same analytical framework appl[ies] to Title VII and § 1981 claims" and applying *Parr*'s holding that the plaintiff "was in a protected class because she was involved in an *interracial* relationship" (emphasis added)); *Nuzzo v. Baranco*, 2018 WL 11488950, at *14 (N.D. Ga. Jan. 22, 2018) ("cases applying the associational-discrimination theory in a . . . § 1981 context [are premised on] racial animus due to the employee of X-race being associated with a person of Y-race." (citing *Parr*)); *Lowe v. STME, LLC*, 354 F. Supp. 3d 1311, 1314 (M.D. Fla. 2019) (same); MTD 26–27. Courts have not only recognized *Parr*'s rule, they have used it to reject Section 1981 associational claims when (as here) the plaintiff does not allege his race matters. That is what happened in *Floyd* (as Plaintiffs admit (Opp.

- 9 -

27 n.5)). In *Floyd*, the Fifth Circuit cited *Parr* to reject Section 1981 claims because the Plaintiff had not asserted discrimination "on the basis of *his* race." *Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 250 & n.4 (5th Cir. 2009). Similarly, in *Baker v. Kelly Smith, LLC*, the plaintiff "fail[ed] to state a [Section 1981] claim for discrimination because Plaintiff [did] not allege that she endured discrimination directed against her because of her race[.]" 977 F. Supp. 2d 1231, 1237 (M.D. Fla. 2013). Nor can Plaintiffs' proposed rule be reconciled with the Supreme Court's explanation that Section 1981 asks "if the defendant would have responded differently but for *the plaintiff's* race." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020) (emphasis added). Plaintiffs simply ignore this key language that Citibank emphasized (MTD 24–25) and incorrectly claim *Comcast* permits a Section 1981 claim based on "*anyone's race.*" Opp. 24.

      ***Section 1981's Text and History.*** Accordingly, the precedent already has resolved whether a broader associational discrimination rule applies under Section 1981 than under Title VII—it does not. But even if the question were open, adopting Plaintiffs' approach would conflict with Section 1981's text and history. Section 1981 provides that "*[a]ll persons* … shall have the *same right* … to make and enforce contracts … *as is enjoyed by white citizens.*" 42 U.S.C. § 1981 (emphasis added). This text is limited to those "persons" deprived of *their* opportunity to contract on an equal footing. *See also McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 290 (1976) (Senate debates explaining Section 1981 "declares that *all persons* in the United States shall be entitled to the same civil rights, the right to the fruit of *their* own labor, the right to make contracts") (emphasis added)). Section 1981's text says nothing about giving a legal claim to a person who himself faces no racial obstacle to making or enforcing contracts, but who instead seeks to object to alleged discrimination solely against others. When the Supreme Court held that the "same right" as "white citizens" language in Section 1981 does not foreclose a lawsuit brought by a white

plaintiff, it did so confirming a white plaintiff would need to personally assert "racial discrimination against white persons." *McDonald*, 427 U.S. at 296. Indeed, *McDonald* involved white plaintiffs allegedly fired for the same conduct as a retained black employee. *Id.* at 277–78.

Plaintiffs argue (Opp. 26–27) it is "specific language [in Title VII]—that the discrimination be 'because of *such individual's* race,'" citing 42 U.S.C. § 2000e-2(a), which commands the associational limitation. But again, that language aligns with the same idea Section 1981 codifies: Congress enacted these laws to permit suit by those who themselves are the victims of discrimination. Indeed, in *Tetro* (discussed by Plaintiffs (Opp. 26)), it was the *defendant* who argued that the "such individual's" language *defeated* the associational discrimination claim, not the other way around. As this helps illustrate, the language and history of Section 1981 is, if anything, clearer than Title VII in that it confers a claim of *personal* racial discrimination—not one to redress third-parties' rights. *See Tetro v. Elliot Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994–95 (6th Cir. 1999) (claim proceeded because "the essence of the alleged discrimination [was] *the contrast in races* between [the plaintiff] and his daughter" such that the defendant "discriminated against [*the plaintiff*] *because of his race*." (emphasis added)).

***Doctrinal Justification for Associational Discrimination.*** As shown, the associational discrimination rubric under Section 1981 simply applies the rule that a plaintiff can sue when (but only when) his race leads to discrimination against him.[6] Much like Article III standing limits, this

---

[6] To the extent that *Transmax*, and other Section 1981 cases (Opp. 25–26) go beyond this, they conflict with this Circuit's precedent. And the invitation to follow Section *1983* cases to define a proper Section *1981* plaintiff (Opp. 25 & n.4) confuses two concepts. Yes, the statutes "effectively merge" against a government actor on a contract claim as to *relief*. But Section 1983 permits suit by any "party injured" by any unlawful act, 42 U.S.C. § 1983, while Section 1981 only permits suit over an "impaired 'contractual relationship' under which *the plaintiff* has rights." *Domino's*, 546 U.S. at 476 (emphasis added). Those Section 1983 cases also uniquely involve constitutional rights of the plaintiff to be free of the state's unequal enforcement of the laws.

rule is legally required, but also ensures the actual victims of discrimination have their day in court. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479 (2006) ("Injured parties usually will be the best proponents of their own rights[.]  And if [they] do not wish to assert them, third parties are not normally entitled to step into their shoes.").

### B.    Plaintiffs' Theory of Association with Public Stockholders Fails.

Citibank moved to dismiss the associational theory on an additional ground: permitting Plaintiffs' claim would require holding, without precedent, that every customer of a large, publicly traded corporation "associates" with its disparate stockholder owners. MTD 28–29. Plaintiffs cite no case for that sweeping principle. Instead, they recognize the Court would: (i) first need to take sides in a split among in-Circuit district courts and hold that "intimate" or personal association is not required and (ii) then *further* leap to the wholly novel situation here. Opp. 29.

The Court should decline Plaintiffs' expansion for two reasons. *First*, the Supreme Court has cautioned against interpreting Section 1981 so as to "produce satellite § 1981 litigation of immense scope." *Domino's*, 546 U.S. at 479. *Domino's* rejected the plaintiff's proposed theory, in part, because it would have "permit[ted] class actions by all the minority employees of the nonbreaching party to a broken contract[.]" *Id.* Here, Plaintiffs' association theory would improperly go farther afield, allowing *any customer* of *any race* of *any bank* not in the Network to bring a class action lawsuit. *Second*, the Eleventh Circuit has repeatedly policed the boundaries of associational claims. As discussed above, it has done so under Section 1981, as well as under other civil rights laws—as reflected in cases such as *EEOC v. STME, LLC* (MTD 29) where it rejected association with "unknown individuals." 938 F.3d 1305, 1319 (11th Cir. 2019). *See Lowe*, 354 F. Supp. 3d at 1315–16 (no Section 1981 claim for association "with an unidentified individual").

## IV.    Plaintiffs Have Not Alleged a Contract They Claim Is Impacted By Discrimination.

In *Fearless Fund*, the Eleventh Circuit assessed whether grant recipients chosen with

reference to race themselves had formed "a contract," when determining if the plaintiffs had a viable Section 1981 claim against the funding program. *Fearless Fund*, 103 F.4th at 775; MTD 29–30. While Section 1981 assures plaintiffs "the same right in every State and Territory to make and enforce contracts," 42 U.S.C. § 1981(a), it is "limited to situations involving contracts"—not for example, gifts or nonbinding agreements. *Domino's*, 546 U.S. at 479.

Plaintiffs' Opposition does not engage with *Fearless Fund*'s discussion of contract formation. Nor does it distinguish Citibank's other cases illustrating that a fee-free use of a Citibank ATM does not constitute a contract that can support a Section 1981 claim. MTD 30–31. Instead, Plaintiffs' three arguments for how they satisfy the contract requirement all miss the mark.

*First,* Plaintiffs continue to cite cases where someone received a lower price or more favorable terms than another person, but where *both people exchanged money* for a service or good. Opp. 29–30; MTD 32 n.10. They *still* cite no case allowing a Section 1981 claim based on exclusion from a *free* service or gift. And their rhetoric that it "cannot be right" to bar such a claim echoes the "policy arguments" rejected in *Domino's* (and contradicts counsel's statement to the Eleventh Circuit that Section 1981 does not prevent "giving away [ ] money for free" (MTD 31)).

*Second*, Plaintiffs claim Citibank is wrong to observe that the relevant transaction—for purposes of determining whether there is an enforceable contract under Section 1981—is the transaction "plaintiffs *would have* entered if Plaintiffs were customers of a minority-owned bank" inside the Network. Opp. 31. They argue that "Defendants engaging in expressly *discriminatory contracting* don't get to pick what contract a plaintiff challenges." *Id.* (emphasis added). But the only conceivable *discrimination* Plaintiffs allege is that Citibank is willing to grant fee-free ATM withdrawals to customers of Network institutions. No one claims it is unlawful to charge the out-of-network fee. The Plaintiffs' paying a fee to withdraw cash at a Citibank ATM (the only contract

- 13 -

under which these Plaintiffs have rights) is not impaired, and thus cannot support their 1981 claim.

*Third,* Plaintiffs fall back on the argument that "if Citi were right," the relevant exchange "where Plaintiffs would not pay an ATM fee," is somehow still supported by consideration because Citibank "collects [] personal information" at the ATM. Opp 31–32. This too fails. They analogize to cases where *specified* personal information is exchanged (and monetized or resold), such as internet searches, loan applications, and the like. Opp. 31–32. But Plaintiffs do not plausibly allege that any comparable personal information is shared at an ATM. Nor could they: ATMs do not ask for your race, your address, or your online shopping list. The *only* information ATM users provide is the information *necessary* to complete the transaction, and Plaintiffs do not (and cannot) allege that such information is of value to the ATM operator beyond processing the ATM transaction. *See* MTD 32. Merely taking a free service, by providing the information necessary for a machine to validate the service, is not consideration. *See Banaga v. Taylor Bean Mortg. Co*., 2011 WL 5056985, at *4 (N.D. Cal. Oct. 24, 2011) (rejecting as "unprecedented" that taking steps to seek "a privilege to which one is not entitled creates a binding contract"). Plaintiffs' authority recognizes as much. *See Senter v. JPMorgan Chase Bank, N.A*., 810 F. Supp. 2d 1339, 1348–49 (S.D. Fla. 2011) (providing "documentation of [] current income" and "personal circumstances" is not consideration, where simply "a part of the application process" to obtain a benefit sought).

## V.      No Unruh Claim Can Proceed Since Neither Named Plaintiff Can State That Claim.

California law prevents plaintiffs from other states not injured in California from stating an Unruh claim. MTD 34; Cal. Civ. Code § 51(b). These two Florida-based plaintiffs solely allege using an ATM in Florida, so they cannot state an Unruh claim. Plaintiffs do not dispute these legal rules or their application here but propose three reasons to ignore it. None succeeds.

*First*, Plaintiffs argue (Opp. 32) that this ground to dismiss is not an issue of standing. This attacks a straw man. Citibank's Unruh-specific argument arises solely under Rule 12(b)(6):

Plaintiffs do not meet the territorial *elements* of the cause of action.[7] Of course, if the Court agrees with Citibank's 12(b)(1) standing arguments (MTD 10–18), Plaintiffs' entire complaint should be dismissed. But if the Court reaches the 12(b)(6) arguments, it would then address the problems with direct and associational discrimination (MTD 18–33) and, if necessary, Unruh's territorial limit. *Second*, Plaintiffs have no authority for the argument that putative class claims allow them to bootstrap an Unruh claim based upon the alleged injuries of others. They nearly concede as much, agreeing that "it is possible that a lead class plaintiff will assert out-of-state claims for a subclass that fail on the merits" such as "an additional element that the complaint fails to satisfy" that "could be dismissed under Rule 12(b)(6)." Opp. 33. The Court should thus dismiss the Unruh claims. *See Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (dismissing Unruh claim in putative class action under 12(b)(6)); MTD 34.[8] *Third*, Plaintiffs incorrectly claim that dismissing the Unruh claim "would accomplish very little." Opp. 34–35. If the Court dismisses the Section 1981 claims, it makes the difference between the case ending or not. And if the Section 1981 claims survived, the Unruh claims may impact discovery or damages. But nonetheless, the court cannot retain a claim based on speculation about its impact. As elsewhere, Plaintiffs improperly seek to substitute their view of good policy with controlling law.

## CONCLUSION

The Court should dismiss the action with prejudice for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).

---

[7] As for *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 16729170 (11th Cir. Nov. 7, 2022) (Opp. 32–34), Plaintiffs do not address that the case "expressly permits dismissal if named plaintiffs have failed to *state a claim* under the elements of state law[.]" MTD 35.

[8] In invoking *Coleman* (Opp. 34), Plaintiffs ignore its approval of dismissal "under Rule 12(b)(6)" if "a named Florida plaintiff [asserted] a stand-alone count under, for instance, Georgia's consumer-protection statute—and on behalf of Georgia consumers" without alleging in-Georgia conduct. *Coleman v. Burger King Corp.*, 2023 WL 5507730, at *3 (S.D. Fla. Aug. 25, 2023).

Dated: October 7, 2024                    Respectfully submitted,

                                          /s/ Eliot Pedrosa
                                          Eliot Pedrosa
                                          Florida Bar No. 182443
                                          epedrosa@jonesday.com
                                          JONES DAY
                                          600 Brickell Avenue, Suite 3300
                                          Miami, FL 33131
                                          Telephone:  (305) 714-9700
                                          Facsimile:  (305) 714-9799

                                          Jayant W. Tambe (*admitted pro hac vice*)
                                          Alexander V. Maugeri (*admitted pro hac vice*)
                                          JONES DAY
                                          250 Vesey Street
                                          New York, NY 10281
                                          Telephone: (212) 326-3939
                                          Facsimile: (212) 755-7306
                                          amaugeri@jonesday.com
                                          jtambe@jonesday.com

                                          Christopher Pagliarella (*admitted pro hac vice*)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          Telephone: (202) 879-3939
                                          Facsimile: (202) 626-1700
                                          cpagliarella@jonesday.com

                                          ***Attorneys for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 7, 2024, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Eliot Pedrosa*
Eliot Pedrosa

***Attorney for Defendants***
